**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| **MAYOR AND CITY COUNCIL OF BALTIMORE**<br><br>    **Plaintiff,**<br><br>  **v.**<br><br>**BP P.L.C.; BP AMERICA, INC.; BP PRODUCTS NORTH AMERICA INC.; CROWN CENTRAL PETROLEUM CORPORATION; CROWN CENTRAL LLC; CROWN CENTRAL NEW HOLDINGS LLC; CHEVRON CORP.; CHEVRON U.S.A., INC., EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; CITGO PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; LOUISIANA LAND & EXPLORATION CO.; PHILLIPS 66; PHILLIPS 66 COMPANY; MARATHON OIL COMPANY; MARATHON OIL CORPORATION; MARATHON PETROLEUM CORPORATION; SPEEDWAY LLC; HESS CORP.; CNX RESOURCES CORPORATION; CONSOL ENERGY INC.; CONSOL MARINE TERMINALS LLC,**<br><br>    **Defendants.** | **CASE NO.:**<br><br>**NOTICE OF REMOVAL BY DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A., INC.**<br><br>**[Removal from the Circuit Court for Baltimore City]**<br><br>**Action Filed: July 20, 2018** |

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF THE MAYOR AND CITY COUNCIL OF BALTIMORE AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corp. and Chevron U.S.A., Inc. (collectively, "the Chevron Parties"), remove this action—with reservation of all defenses and rights—from the Circuit Court for Baltimore City, Case No. 24-C-18-004219, to the United States

District Court for the District of Maryland pursuant to 28 U.S.C. §§ 1331, 1334, 1441(a), 1442, 1452, and 1367(a), and 43 U.S.C. § 1349(b).

This Court has original federal question jurisdiction under 28 U.S.C. § 1331, because the Complaint arises under federal laws and treaties, and presents substantial federal questions as well as claims that are completely preempted by federal law.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims over which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction.  As set forth below, removal is proper pursuant to 28 U.S.C. §§ 1441, 1442, 1446, and 1452, and 43 U.S.C. § 1349(b).

In addition, the Complaint is legally without merit, and, at the appropriate time, Defendants will move to dismiss Plaintiff's claims pursuant to Rule 12 of the Federal Rules of Civil Procedure.

Through its Complaint, the Mayor and City Council of Baltimore calls into question longstanding decisions by the Federal Government regarding, among other things, national security, national energy policy, environmental protection, development of outer continental shelf lands, the maintenance of a national petroleum reserve, mineral extraction on federal lands (which has produced billions of dollars for the Federal Government), and the negotiation of international agreements bearing on the development and use of fossil fuels.  Many of the Defendants have contracts with the Federal Government to develop and extract minerals from federal lands and to sell fuel and associated products to the Federal Government for the Nation's defense.  The gravamen of the Complaint seeks either to undo all of those Federal Government policies or to extract "compensation" and force Defendants to relinquish the profits they obtained by having contracted with the Federal Government or relied upon national policies to develop fossil fuel resources.

In the Complaint's view, a state court, on petition by a city, may regulate the nationwide—and indeed, worldwide—economic activity of key sectors of the American economy, those that supply the fuels that power production and innovation, keep the lights on, and that form the basic materials from which innumerable consumer, technological, and medical devices are themselves fashioned.  Though nominally asserted under state law, the Complaint puts at issue long-established federal statutory, regulatory, and constitutional issues and frameworks, and it seeks to hold a small number of oil and gas companies—who themselves are responsible for a mere fraction of global greenhouse gas emissions—liable for the alleged effects of *global* warming, including sea level rise, droughts, and extreme precipitation caused by greenhouse gas emissions from countless nonparties.

This case is about *global* emissions.  Plaintiff alleges that the worldwide use of fossil fuels "plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution," which "is the main driver of the gravely dangerous changes occurring to the global climate."  Compl. ¶ 2.  Importantly, however, Plaintiff's claims are not limited to harms caused by fossil fuels extracted, sold, marketed, or used in Maryland.  Instead, their claims depend on Defendants' nationwide and global activities, as well as the activities of billions of fossil fuel consumers, including not only entities such as the U.S. government and military, but also hospitals, schools, manufacturing facilities, and individual households.

This lawsuit implicates bedrock federal-state divisions of responsibility, and appropriates to itself the direction of such federal spheres as nationwide economic development, international relations, and America's national security.  Reflecting the substantial and uniquely federal interests posed by greenhouse gas claims like these, the Supreme Court, the Ninth Circuit, and several

federal district courts have recognized that causes of action of the types asserted here are governed by federal common law, *not* state law.

The Complaint has no basis in law and is inconsistent with serious attempts to address important issues of national and international policy. Accordingly, Plaintiff's Complaint should be heard in this federal forum to protect the national interest by its prompt dismissal.

## I.     TIMELINESS OF REMOVAL

1.     Plaintiff, the Mayor and City Council of Baltimore, filed a Complaint against the Chevron Parties and other named Defendants in the Circuit Court for Baltimore County, Maryland, Case No. 24-C-18-004219, on July 20, 2018. A copy of all process, pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit A to the Declaration of Tonya Kelly Cronin, filed concurrently herewith.

2.     This notice of removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after receipt by the Chevron Parties of a copy of the initial pleading setting forth the claims for relief upon which this action is based. 28 U.S.C. § 1446(b). The Chevron Parties have not yet been served as of this date. *See* Kelly Decl. ¶ 2. The consent of the other defendants is not required because removal does not proceed "solely under 28 U.S.C. § 1441." 28 U.S.C. § 1446(b)(2)(A). The Chevron Parties have removed this action to federal court on several bases, including, for example, 28 U.S.C. § 1442(a)(1) and 28 U.S.C. § 1452. Further, consent is not required from any defendant that has not been served. *See* 28 U.S.C. § 1446(b)(2)(A); *HBCU Pro Football, LLC v. New Vision Sports Properties, LLC*, 2010 WL 2813459, at *2 (D. Md. July 14, 2010) ("Defendants . . . who are unserved when the removal petition is filed need not join

it." (quoting *Getty Oil Corp. v. Ins. Co. of N. America*, 841 F.2d 1254, 1262 n.9. (4th Cir. 1988) (alterations in original))).[1]

## II.   SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.      Plaintiff is the Mayor and City Council of Baltimore, Maryland.  Plaintiff brings claims against Defendants for alleged injuries relating to climate change, including damages and injunctive relief from injuries suffered from "global warming" and other "changes occurring to the global climate," including sea level rise, storms, heatwaves, drought, extreme precipitation, and other natural phenomena.  *See, e.g.*, Compl. ¶¶ 2, 8.  Plaintiff asserts the following claims on behalf of itself:  public nuisance; private nuisance; strict liability for failure to warn; strict liability for design defect; negligent design defect; negligent failure to warn; trespass; and violation of the Consumer Protection Act.  In addition to compensatory and punitive damages, Plaintiff seeks the "disgorgement of profits," as well as "[e]quitable relief, including abatement of the nuisances complained of" in the Complaint (Compl., Prayer for Relief).

4.      The Chevron Parties will deny that any Maryland court has personal jurisdiction and will deny any liability as to Plaintiff's claims.  The Chevron Parties expressly reserve all rights in this regard.  For purposes of meeting the jurisdictional requirements for removal only, however, the Chevron Parties submit that removal is proper on at least eight independent and alternative grounds.

---

[1] In filing this Notice of Removal, the Chevron Parties do not waive, and expressly preserve any right, defense, affirmative defense, or objection, including, without limitation, personal jurisdiction, insufficient process, and/or insufficient service of process.  A number of Defendants contend that personal jurisdiction in Maryland is lacking over them, and these Defendants will move to dismiss for lack of personal jurisdiction at the appropriate time.  *See, e.g.*, *Carter v. Bldg. Material & Const. Teamsters' Union Local 216*, 928 F. Supp. 997, 1000–01 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the action will be heard; it does not affect personal jurisdiction.") (citing *Morris & Co. v. Skandinavia Ins. Co.,* 279 U.S. 405, 409 (1929)).

5.      *First*, the action is removable under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims, to the extent that such claims exist, implicate uniquely federal interests and are governed by federal common law, and not state common law.  *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985).  Federal common law applies in those few areas of the law that so implicate "uniquely federal interests" that application of state law is affirmatively inappropriate.  *See, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988); *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 424 (2011) ("*AEP*") ("borrowing the law of a particular State would be inappropriate").  Plaintiff's claims, to the extent they exist at all, arise under federal common law, not state law, and are properly removed to this Court.

6.      *Second*, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because the action necessarily raises disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries.  *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).  In fact, the causes of action as alleged in the Complaint attack federal policy decisions and threaten to upset longstanding federal-state relations, second-guess policy decisions made by Congress and the Executive Branch, and skew divisions of responsibility set forth in federal statutes and the United States Constitution.  Additionally, the action necessarily raises disputed and substantial federal questions that implicate the federal regulatory scheme for protecting and preserving the "navigable waters of the United States."  *See* 33 U.S.C. § 403; 33 U.S.C. § 426i; *see also Grable*, 545 U.S. at 314.

7.      *Third*, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are completely preempted by the Clean Air Act and/or other federal statutes and the United States Constitution, which provide an exclusive federal remedy for

6

plaintiffs seeking stricter regulations regarding the nationwide and worldwide greenhouse gas emissions put at issue in the Complaint.

8.      **Fourth**, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), because this action "aris[es] out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

9.      **Fifth**, Defendants are authorized to remove this action under 28 U.S.C. § 1442(a)(1) because, assuming the truth of Plaintiff's allegations, they were "acting under" a federal officer; they can assert colorable federal defenses; and a causal nexus exists between their actions and federal authority.  *See Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209–10 (4th Cir. 2016)

10.     **Sixth**, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are based on alleged injuries to and/or conduct on federal enclaves.  As such, Plaintiff's claims arise under federal-question jurisdiction and are removable to this Court. *See* U.S. Const., art. I, § 8, cl. 17; *Jones v. John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012) ("A suit based on events occurring in a federal enclave ... must necessarily arise under federal law and implicates federal question jurisdiction under § 1331.").

11.     **Seventh**, removal is authorized under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b) because Plaintiff's state-law claims are related to cases under Title 11 of the United States Code. Plaintiff alleges that Defendants (improperly defined by Plaintiff to include the conduct of Defendants' respective subsidiaries and affiliates, *see, e.g.*, Compl ¶¶ 22(b)–(f), 150, 183(a), 252)

engaged in conduct constituting a public nuisance over many decades. Because Plaintiff's claims are predicated on historical activities of Defendants, including predecessor companies and companies that they may have acquired or with which they may have merged, and because there are hundreds, if not thousands, of non-joined necessary and indispensable parties, there are many other Title 11 cases that may be related. *See In re Celotex Corp.*, 124 F.3d 619 (4th Cir. 1997).

12.     ***Eighth, and finally***, Plaintiff's claims fall within the Court's original admiralty jurisdiction under 28 U.S.C. § 1333, and are removable under 28 U.S.C. § 1441(a), for that reason alone. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).

13.     For the convenience of the Court and all parties, Defendants will address each of these grounds in additional detail. Should Plaintiff challenge this Court's jurisdiction, Defendants will further elaborate on these grounds and will not be limited to the specific articulations in this Notice.

### III.   THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE PLAINTIFF'S CLAIMS ARISE, IF AT ALL, UNDER FEDERAL COMMON LAW

14.     This action is removable because Plaintiff's claims, to the extent that such claims exist, necessarily are governed by federal common law, and not state common law. 28 U.S.C. § 1331 grants federal courts original jurisdiction over "'claims founded upon federal common law as well as those of a statutory origin.'" *Nat'l Farmers Union*, 471 U.S. at 850 (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*")). As the Fourth Circuit has explained, it is "established that there is a body of federal common law by which a public nuisance in one state which infringes upon the environmental and ecological rights of another state may be abated." *Comm. for Consideration of Jones Falls Sewage Sys. v. Train*, 539 F.2d 1006, 1008 (4th Cir. 1976).

As Plaintiff's claims arise under federal common law, this Court has federal-question jurisdiction and removal is proper.

15. Though "[t]here is no federal *general* common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added), federal common law continues to exist, and to govern, in a few subject areas in which there are "uniquely federal interests," *Boyle*, 487 U.S. at 504. *See generally* Henry J. Friendly, *In Praise of* Erie—*and the New Federal Common Law*, 39 N.Y.U. L. Rev. 383 (1964). Such uniquely federal interests will require the application of federal common law where, for example, the issue is one that by its nature, is "'within national legislative power'" and there is "a demonstrated need for a federal rule of decision" with respect to that issue. *AEP*, 564 U.S. at 421 (citation omitted). Federal common law therefore applies, in the post-*Erie* era, in those discrete areas in which application of state law would be inappropriate and would contravene federal interests. *Boyle*, 487 U.S. at 504–07. The decision that federal common law applies to a particular issue thus inherently reflects a determination that state law does *not* apply. *See City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 n.7 (1981) ("*Milwaukee II*") ("[I]f federal common law exists, it is because state law cannot be used."); *Resolution Tr. Corp. v. Everhart*, 37 F.3d 151, 154 (4th Cir. 1994) ("Federal common law is appropriately made … where there is a significant conflict between some federal policy or interest and the use of state law."); *Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1204 (9th Cir. 1988).

16. Courts have applied federal common law to global warming-based tort claims because it applies to "'subjects within the national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands.'" *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) (quoting *AEP*, 564 U.S. at 421) (further citation and internal quotation marks omitted). Although Congress sometimes affirmatively

directs the application of federal common law, "[m]ore often, federal common law develops when courts must consider *federal* questions that are not answered by statutes." *Id*. (emphasis added). Given that claims asserting injuries from global warming have an intrinsic interstate and transnational character, such claims inherently raise federal questions and fall within the settled rule that federal common law governs "the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.* at 855; *see also id.* ("federal common law can apply to transboundary pollution suits" such as the plaintiff's); *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area within national legislative power, [and] one in which federal courts may fill in statutory interstices."); *Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) ("The sovereign prerogatives to force reductions in greenhouse gas emissions, to negotiate emissions treaties with developing countries, and (in some circumstances) to exercise the police power to reduce motor-vehicle emissions are now lodged in the Federal Government.").

17.     Moreover, two courts addressing nearly identical claims have recently held that these claims arise under federal common law. *California v. BP P.L.C.*, 2018 WL 1064293, at *2 (N.D. Cal. Feb. 27, 2018) ("*California*") (holding that "Plaintiffs' nuisance claims—which address the national or international geophysical phenomenon of global warming—are necessarily governed by federal common law"); *City of New York v. BP P.L.C.*, 2018 WL 3475470, at *4 ("*City of New York*") (S.D.N.Y. July 19, 2018) ("[T]he City's claims are ultimately based on the 'transboundary' emission of greenhouse gases, indicating that these claims arise under federal common law … .").

18.     The conclusion that federal common law governs an issue rests, not on a discretionary choice between federal law and state law, but on a determination that the issue is so distinctively federal in nature that application of state law to the issue would risk impairing

uniquely federal interests. *Boyle*, 487 U.S. at 506–07; *see also, e.g.*, *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159–60 (9th Cir. 2016) (liability of defense contractor to third party under government contract for weapons systems implicated "uniquely federal interests" in national security that would be impaired if disparate state-law rules were applied); *Everhart*, 37 F.3d at 154 ("Federal common law is appropriately made … where there is a significant conflict between some federal policy or interest and the use of state law."). In *California*, the court addressed nearly identical claims and held that "[i]f ever a problem cried out for a uniform and comprehensive solution, it is the geophysical problem described by the complaints, a problem centuries in the making (and studying) with causes ranging from volcanoes, to wildfires, to deforestation to stimulation of other greenhouse gases—and, most pertinent here, to the combustion of fossil fuels." 2018 WL 1064293, at *3; *see also City of New York*, 2018 WL 3475470, at *4 (S.D.N.Y. July 19, 2018) ("[C]laims … based on the 'transboundary' emission of greenhouse gases … require a uniform standard of decision.").

19. Although Plaintiff purports to style its nuisance and other common law claims as arising under state law, the question of whether a particular common law claim is controlled by federal common law rather than state law is itself a question of law that is governed by federal law as set forth in *Erie* and its progeny. While Plaintiff contends that its claims arise under Maryland law, the question of which state, if any, may apply its law to address global climate-change issues is a question that is itself a matter of federal law, given the paramount federal interest in avoiding conflicts of law in connection with ambient air and water. Moreover, the law is well settled that, in determining whether a case arises under federal law and is properly removable, the Plaintiff's proffered position on a question of law is not entitled to any deference but is instead subject to independent and *de novo* review by the court. *See, e.g.*, *Mayes v. Rapoport*, 198 F.3d 457, 460

(4th Cir. 1999) ("We review de novo questions of subject matter jurisdiction, including those relating to the propriety of removal.").

20.    Because global warming occurs only as the result of the undifferentiated accumulated emissions of all emitters in the world over an extended period of time, any judgment as to the reasonableness of particular emissions, or as to their causal contribution to the overall phenomenon of global warming, inherently requires an evaluation at an interstate and, indeed, transnational level.  Thus, even assuming that state tort law may properly address local source emissions within that specific state, the imposition of tort liability for Defendants' alleged unreasonable contributions to *global* warming would require an over-arching consideration of *all* of the emissions traceable to the extraction and sale of Defendants' products in each of the states, and, in fact, in the more than 180 nations of the world.  Given the Federal Government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, tort claims concerning global warming directly implicate uniquely federal interests, and a "patchwork of fifty different answers to the same fundamental global issue would be unworkable." *California*, 2018 WL 1064293, at *3; *see also City of New York*, 2018 WL 3475470, at *7 ("[T]he immense and complicated problem of global warming requires a comprehensive solution that weighs the global benefits of fossil fuel use with the gravity of the impending harms.").  Indeed, the Supreme Court expressly held in *AEP* that in cases like this, "borrowing the law of a particular State would be inappropriate."  564 U.S. at 422.  Such global warming-related tort claims, to the extent they exist, are therefore governed by federal common law.  *Kivalina*, 696 F.3d at 855–56; *California*, 2018 WL 1064293, at *3; *City of New York*, 2018 WL 3475470, at *3.

21.    Under the principles set forth above, Plaintiff's claims are governed by federal common law.  The gravamen of Plaintiff's claims is that "production and use of Defendants' fossil

fuel products plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution" which "is the main driver of the gravely dangerous changes occurring to the global climate."  Compl. ¶ 2; *see, e.g.*, *id.* ¶¶ 44–45, 49, 92, 96–100, 221, 239, 253, 276, 284.  Plaintiff's Complaint alleges that Defendants are responsible for "more than one in every six tons of carbon dioxide and methane emitted worldwide," *id.* ¶ 18, and that "greenhouse gas pollution is the dominant factor in each of the independent causes of [global] sea level rise," *id.* ¶ 49; *see also id.* ¶ 96–100, and other natural phenomena, such as drought, extreme precipitation, and heatwaves, *id.* ¶¶ 74, 170, 193–95, 213–17, 221(b), 224, 233, 253, 264(a), 272, 284.  As is evident from the term "global warming" itself, both the causes and the injuries Plaintiff identifies are not constrained to particular sources, cities, counties, or even states, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes.  *See id.* ¶ 3 n.4 (describing other sources of emissions); ¶ 7 (effectively acknowledging that 85% of $CO_2$ emissions allegedly caused by persons other than Defendants); ¶ 96 ($CO_2$ emissions cause "*global* sea level rise") (emphasis added); *see, e.g.*, *Massachusetts*, 549 U.S. at 509, 523–24 (describing Senate rejection of the Kyoto Protocol because emissions-reduction targets did not apply to "heavily polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427–29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *see also* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/01/statement-president-trump-paris-climate-accord   (announcing   United States' withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on Chinese emissions).

22.     Indeed, the Complaint itself demonstrates that the unbounded nature of greenhouse gas emissions, diversity of sources, and magnitude of the attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions.  *See, e.g.*, Compl. ¶ 143.  The paramount federal interest in addressing the worldwide effect of greenhouse gas emissions is manifested in the regulatory scheme set forth in the Clean Air Act as construed in *Massachusetts v. EPA.  See AEP*, 564 U.S. at 427–29.  Federal legislation regarding greenhouse gas emissions reflects the understanding that "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum:  as with other questions of national or international policy, informed assessment of competing interests is required.  Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *Id.* at 427.  As a "question[] of national or international policy," the question of how to address greenhouse gas emissions that underlies the requested relief at the heart of Plaintiff's claims implicates inherently federal concerns and is therefore governed by federal common law.  *See id.*; *see also Milwaukee II*, 451 U.S. at 312 n.7 ("[I]f federal common law exists, it is because state law cannot be used.").  Because common law claims that rest on injuries allegedly caused by global warming implicate uniquely federal interests, such claims (to the extent they exist at all) must necessarily be governed by federal common law.  This Court therefore has original jurisdiction over this action.

## IV.     THE ACTION IS REMOVABLE BECAUSE IT RAISES DISPUTED AND SUBSTANTIAL FEDERAL ISSUES

23.     "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed … to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  Federal district courts, in turn,

14

"have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  The Supreme Court has held that suits apparently alleging only state-law causes of action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.  Applying this test "calls for a common-sense accommodation of judgment to the kaleidoscopic situations that present a federal issue." *Id.* at 313.

24.    Plaintiff's Complaint attempts to undermine and supplant federal regulation of greenhouse gas emissions and hold a national industry responsible for the alleged consequences of rising ocean levels and hydrologic cycle disruptions such as drought, extreme precipitation, heatwaves, and wildfires that are allegedly caused by global climate change.  There is no question that Plaintiff's claims raise "federal issues, actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314.

25.    The issues of greenhouse gas emissions, global warming, hydrologic cycle disruption, and sea level rise are not unique to Baltimore City, the State of Maryland, or even the United States.  Yet the Complaint attempts to supplant decades of national energy, economic development, and federal environmental protection and regulatory policies by prompting a Maryland state court to take control over an entire industry and its interstate commercial activities, and impose massive damages contrary to the federal regulatory scheme.

26.    Collectively as well as individually, Plaintiff's causes of action depend on the resolution of disputed and substantial federal questions in light of complex national considerations.

15

For example, the Complaint's first and second causes of action both seek relief for an alleged nuisance. Indeed, "the scope and limitations of a complex federal regulatory framework are at stake in this case. And disposition of whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other." *Bd. of Comm'rs of Se. La. Flood Protection Auth. v. Tenn. Gas Pipeline Co*, 850 F.3d 714, 723 (5th Cir. 2017) (cert. petition pending) ("*Flood Protection Authority*").

27.    Under federal law, federal agencies must "assess both the costs and benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Executive Order 12866, 58 Fed. Reg. 190. Under Maryland law, were it to apply, nuisance claims require a plaintiff to prove that the defendant's conduct is "unreasonable," which depends upon whether "in view of the circumstances of the case," a nuisance amounts to a "derogation of the rights" of the plaintiff. *Wietzke v. Chesapeake Conference Ass'n*, 421 Md. 355, 376 (2011). Plaintiff alleges that Defendants, through their national and, indeed, global activities, "created, contributed to, and/or assisted, and/or were a substantial contributing factor in the creation of the public nuisance by, *inter alia*, … caus[ing] or exacerbate[ing] global warming and related consequences, including, but not limited to, sea level rise, drought, extreme precipitation events, and extreme heat events." Compl. ¶ 221. Plaintiff alleges that "[t]he seriousness of rising sea levels, more frequent and extreme drought, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes, is extremely grave, and outweighs the social utility of Defendants' conduct." *Id.* ¶¶ 224, 233.

28.     But Congress has directed a number of federal agencies to regulate Defendants'

conduct, and thus to engage in the same analysis of benefits and impacts that Plaintiff would have

the state court undertake.   Indeed, federal agencies have performed these cost-benefit analyses.

*See, e.g.*, Final Carbon Pollution Standards for New, Modified and Reconstructed Power Plants,

80 Fed. Reg. at 64683–84 (EPA considering the impacts of "wildfire" and "extreme precipitation

events," such as "droughts, floods, hurricanes, and major storms").   The benefits and harms of

Defendants' conduct are broadly distributed throughout the Nation, to all residents as well as all

state and government entities.   Given this diffuse and broad impact, Congress has acted through a

variety of federal statutes—primarily, but not exclusively, the Clean Air Act—to strike the balance

between energy extraction and production and environmental protections.   *See* Clean Air Act, 42

U.S.C. § 7401(c) (Congressional statement that the goal of the Clean Air Act is "to encourage or

otherwise promote reasonable Federal, State, and local governmental actions … for pollution

prevention"); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801 (Congressional

purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while

"restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act,

30 U.S.C. § 1201 (Congressional purpose to encourage "economic development of domestic

mineral resources" balanced with "environmental needs"); Surface Mining Control and

Reclamation Act, 30 U.S.C. § 1201 (Congressional findings that coal mining operations are

"essential to the national interest" but must be balanced by "cooperative effort[s] … to prevent or

mitigate adverse environmental effects").

29.     The question of whether the federal agencies charged by Congress to balance

energy and environmental needs for the entire Nation have struck that balance in an appropriate

way is "inherently federal in character" and gives rise to federal question jurisdiction.   *Buckman*

*Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001); *see also Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (federal removal under *Grable* appropriate where claims were "a collateral attack on the validity of" agency action under a highly reticulated regulatory scheme). Adjudicating these claims in federal court is appropriate because the relief sought by Plaintiff would necessarily alter the regulatory regime designed by Congress, impacting residents of the Nation far outside the state court's jurisdiction. *See, e.g.*, *Grable*, 545 U.S. at 312 (claims that turn on substantial federal questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme … requiring some degree of national uniformity in interpretation").

30.     The Complaint also calls into question Federal Government decisions to contract with Defendants for the extraction, development, and sale of fossil fuel resources on federal lands. Such national policy decisions have expanded fossil fuel production and use, and produced billions of dollars in revenue to the federal treasury. Available, affordable energy is fundamental to economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the Federal Government. Yet, Plaintiff's claims require a determination that the complained-of conduct—the lawful activity of placing fossil fuels into the stream of interstate and foreign commerce—is unreasonable, and that determination raises a policy question that, under the Constitution and the applicable statutes, treaties, and regulations, is a federal question. *See Nance v. Baltimore Am. Mortg. Corp.*, 2010 WL 4291579, at *1 (D. Md.

Oct. 29, 2010) (holding that removal jurisdiction existed over case that implicated the Home Ownership and Equity Protection Act, not because it created a federal cause of action but because "the interpretation of the relevant [federal] provision lies at the heart of Plaintiffs' claim. This is wholly sufficient to establish federal question jurisdiction and make removal of this action proper."). The cost-benefit analysis required by the claims asserted in the Complaint would thus necessarily entail a usurpation by the state court of the federal regulatory structure of an essential, national industry. "The validity of [Plaintiff's] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law." *Flood Control Authority*, 850 F.3d at 724; *see also Bader Farms, Inc. v. Monsanto Co.*, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds"); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action"). Indeed, the "inevitable result of such suits," if successful, is that Defendants "would have to change" their federally regulated "methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495.

31.     Plaintiff's claims also necessarily implicate substantial federal questions by seeking to hold Defendants liable for compensatory and punitive damages, as well as injunctive relief, based on allegations that Defendants have waged a "campaign to obscure the science of climate change" and "disseminat[ed] and fund[ed] the dissemination of information intended to mislead … regulators," which Plaintiff alleges defrauded and interfered with federal decision-making, thereby "delay[ing] efforts to curb those emissions." Compl. ¶ 179; *see also id.* ¶¶ 177–90, 221–28.

32.     To show causation, Plaintiff must establish that federal regulators were misled *and* would have adopted different energy and climate policies absent the alleged misrepresentations. Such a liability determination would require a court to construe federal regulatory decision-making standards, and determine how federal regulators would have applied those standards under counterfactual circumstances. *See id.* ¶ 161 (arguing that Global Climate Coalition "on behalf of Defendants" sought to "prevent[] U.S. adoption of the Kyoto Protocol"); *see also Flood Protection Authority*, 850 F.3d at 723 (finding necessary and disputed federal issue in plaintiffs' state-law tort claims because they could not "be resolved without a determination whether multiple federal statutes create a duty of care that does not otherwise exist under state law").

33.     Plaintiff's Complaint, which seeks to hold Defendants liable for "[p]unitive damages" and requests "[d]isgorgement of profits" through their businesses of manufacturing, producing, and/or promoting the sale of fossil fuel products, (*e.g.*, Compl., Prayer for Relief)— despite Defendants' uncontested compliance with state and federal law—necessarily implicates numerous other disputed and substantial federal issues.  Beyond the strictly jurisdictional character of the points addressed above and herein, it is notable that this litigation places at issue multiple significant federal issues, including but not limited to:  (1) whether Defendants can be held liable consistent with the First Amendment for, purportedly, "championing … anti-science campaigns" that Plaintiff alleges deceived federal agencies (*id*. ¶ 10); (2) whether a state court may hold Defendants liable for conduct that was global in scale (production of fossil fuels), that allegedly produced effects that are global in scale (increased $CO_2$ levels and rising sea levels), and on that basis, order Defendants to modify their conduct on a global scale (abating rising sea levels), consistent with the constitutional principles limiting the jurisdictional and geographic reach of state law and guaranteeing due process; (3) whether fossil fuel *producers* may be held liable,

consistent with the Due Process Clause, for climate change when it is the combustion of fossil fuels—including by Plaintiff and the People of Maryland themselves—that leads to the release of greenhouse gases into the atmosphere; (4) whether a state may impose liability under state common law when the Supreme Court has held that the very same *federal* common law claims are displaced by federal statute, and notwithstanding the commonsense principle that "[i]f a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived *in any form*," *Kivalina*, 696 F.3d at 857 (emphasis added); (5) whether a state court may regulate and burden on a global scale the sale and use of what federal policy has deemed an essential resource, consistent with the United States Constitution's Commerce Clause and foreign affairs doctrine, as well as other constitutional principles; (6) whether a state court may review and assess the validity of acts of foreign states in enacting and enforcing their own regulatory frameworks; and (7) whether a state court may determine the ability to sue based on alleged damages to land, such as coastal property and interstate highways (*see* Compl. ¶¶ 197, 199), which depends on the interpretation of federal laws relating to the ownership and control of property.

34.    Plaintiff's Complaint also raises substantial federal issues because the asserted claims intrude upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine.  Plaintiff seeks to govern extraterritorial conduct and encroach on the foreign policy prerogative of the Federal Government's Executive Branch as to climate change treaties.  "There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government

in the first place." *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 413 (2003).  Yet, this is the precise

nature of Plaintiff's action brought in state court.  *See United States v. Belmont*, 301 U.S. 324, 331

(1937) ("The external powers of the United States are to be exercised without regard to state laws

or policies… [I]n respect of our foreign relations generally, state lines disappear."); *Hines v.

Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government … requires that federal power in

the field affecting foreign relations be left entirely free from local interference.").   Indeed,

Plaintiff's Complaint takes issue with multiple federal decisions, threatening to upend the Federal

Government's longstanding energy and environmental policies and "compromis[ing] the very

capacity of the President to speak for the Nation with one voice in dealing with other governments"

on the issue of climate change.  *Garamendi*, 539 U.S. at 424.

35.     Through its action, Plaintiff seeks to regulate greenhouse gas emissions worldwide,

far beyond the borders of the United States.  This is premised, in part, according to Plaintiff, on

Defendants' purported campaign to undermine national and international efforts, like the Kyoto

Protocol, to rein in greenhouse gas emissions.  Compl. ¶¶ 158, 161.  Plaintiff alleges that its injuries

are caused by global weather phenomena, such as increases in the Earth's ambient temperatures,

ocean temperature, sea level, and extreme storm events, and that Defendants are a substantial

contributing factor to such climate change as a result of their collective operations on a worldwide

basis, which Plaintiff claims accounts for more than one-sixth of total global greenhouse gas

emissions.  *Id.* ¶¶ 18, 193–94.  But "[n]o State can rewrite our foreign policy to conform to its own

domestic policies.  Power over external affairs is not shared by the States; it is vested in the national

government exclusively.  It need not be so exercised as to conform to State laws or State policies,

whether they be expressed in constitutions, statutes, or judicial decrees."   *United States v.

Pink*, 315 U.S. 203, 233–34 (1942).  States have no authority to impose remedial schemes or

regulations to address what are matters of foreign affairs.  *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 231 (4th Cir. 2012) ("[T]he federal government has exclusive power over foreign affairs, and … states have very little authority in this area.").   Yet Plaintiff seeks to replace international negotiations and Congressional and Executive decisions with its own preferred foreign policy, using the ill-suited tools of Maryland common law and private litigation in a state court.  Even when *states* (as opposed to the *City* of Baltimore here) have made similar efforts, enacting laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state law can play no such role.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–81 (2000); *Garamendi*, 539 U.S. at 420–24.

      36.    Plaintiff's claims depend on the resolution of substantial, disputed federal questions relating to rising levels of navigable waters of the United States that Plaintiff alleges were caused by Defendants' extraction, processing, promotion, and consumption of global energy resources.  Among other assertions, Plaintiff claims the sea level rise will affect the port and waterfront of Baltimore—both navigable waters of the United States.  *See* Compl. ¶ 196–97.  These claims raise federal questions as Congress has given the Army Corps of Engineers ("the Corps"), which has a District office in Baltimore, jurisdiction to regulate navigable waters of the United States.  *See* 33 U.S.C. § 403; *see also, e.g.*, 33 U.S.C. § 426i.  Adjudication of Plaintiff's claims will require the Court to evaluate Plaintiff's claims of injury related to a rise in levels of the "navigable waters" and whether the remedy Plaintiff seeks is consistent with federal action.  This, in turn, will require interpretation of an extensive web of federal statutes and regulations.  *See, e.g.*, 33 C.F.R. § 320.4(a)(1)–(2); 33 U.S.C. § 408(a).  Accordingly, Plaintiff's claims provide a basis for federal jurisdiction because they present federal issues that are (1) "necessarily raise[d]," (2) "actually disputed," (3) "substantial," and (4) capable of resolution in federal court "without

disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.

37.     Plaintiff's claims also require the Court to evaluate the exercise of federal authority over many prior years.  For example, the Corps has considered potential impacts of sea-level change in its planning activities since 1986.  *See, e.g.*, U.S. Army Corps of Engineers, Eng'g Circular 1105-2-186: Planning Guidance on the Incorporation of Sea Level Rise Possibilities in Feasibility Studies (Apr. 21, 1989); U.S. Army Corps of Engineers, Technical Letter 1100-2-1, Procedures to Evaluate Sea Level Change: Impacts, Responses and Adaptation (June 30, 2014).  And the Corps is currently evaluating a "long-term restoration effort" of the Chesapeake Bay, including efforts to "pursue, design and construct restoration and protection projects to enhance the resiliency of the Chesapeake Bay and its aquatic ecosystems against the impacts of coastal storm erosion, coastal flooding, more intense and more frequent storms, and sea level rise." U.S. Army Corps of Engineers, Chesapeake Bay Comprehensive Water Resources and Restoration Plan: State of Maryland (June 2018).  But Plaintiff's nuisance claims are grounded on alleged past and future "[s]ea level rise," which Plaintiff alleges "endangers City property and infrastructure, causing coastal flooding of low-lying areas, erosion, and storm surges."  Compl. ¶ 199.  Because Plaintiff alleges that the comprehensive regulatory scheme Congress established to address these very issues failed to prevent its injuries, its Complaint challenges—and necessarily requires evaluation of—a federal regulatory scheme and the adequacy of past federal decision making under that scheme.  This gives rise to federal question jurisdiction.  *See Bd. Of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 724 (5th Cir. 2017) (in the context of comprehensive regulatory scheme, nuisance claims amount to "a collateral attack … premised on the notion that the scheme provides inadequate protection" (brackets omitted));

*Pet Quarters, Inc. v. Depository Trust and Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (complaint "presents a substantial federal question because it directly implicates actions taken by" a federal agency); *McKay v. City and Cty. of San Francisco*, 2016 WL 7425927, at *4 (N.D. Cal. Dec. 23, 2016) (denying remand and ruling that federal jurisdiction lies under *Grable* because state-law claims were "tantamount to asking the Court to second guess the validity of the FAA's decision"); *Bader Farms, Inc.*, 2017 WL 633815, at *3.

## V.    THE ACTION IS REMOVABLE BECAUSE IT IS COMPLETELY PREEMPTED BY FEDERAL LAW

38.    This Court also has original jurisdiction over this lawsuit because Plaintiff requests relief that would alter or amend the rules regarding nationwide—and even worldwide—regulation of greenhouse gas emissions.  This action is completely preempted by federal law.

39.    The Supreme Court has held that a federal court will have jurisdiction over an action alleging only state-law claims where "the extraordinary pre-emptive power [of federal law] converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).

40.    For the reasons set forth above, litigating in state court the inherently transnational activity challenged by these complaints would inevitably intrude on the foreign affairs power of the federal government and is completely preempted.  *See Garamendi*, 539 U.S. at 418 ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict."); *see also California v. Gen. Motors Corp.*, 2007 WL 2726871, at *14 (N.D. Cal. Sept. 17, 2007) (dismissing claims against automakers because the federal government "ha[s] made foreign policy determinations regarding the United States' role in the international concern about

global warming," and a "global warming nuisance tort would have an inextricable effect on …

foreign policy").

41.     In addition, Plaintiff's claims are preempted by the Clean Air Act.  A state cause of

action is preempted under this "complete preemption" doctrine where a federal statutory scheme

"provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures

and remedies governing that cause of action."  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8

(2003).  It also requires a determination that the state-law cause of action falls within the scope of

the federal cause of action, including where it "duplicates, supplements, or supplants" that cause

of action.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).  A federal court addressing

nearly identical claims recently found that the Clean Air Act displaced these claims.  *City of New

York*, 2018 WL 3475470, at *6 (S.D.N.Y. July 19, 2018) ("[T]he Clean Air Act displaces claims

arising from damages caused by domestic greenhouse gas emissions because Congress has

expressly delegated these issues to the EPA.").

42.     Both requirements for complete preemption are present here.  Among other things,

Plaintiff's Complaint seeks an "abatement" of a nuisance it alleges Defendants have caused—

namely, a rise in sea levels, an increase in the frequency and intensity of flooding, and an increase

in the intensity and frequency of storms and storm-related damages.  As such, it seeks regulation

of greenhouse gas emissions far beyond the borders of Maryland and even the borders of the United

States.  This can be accomplished only by a nationwide and global reduction in the emission of

greenhouse gases.  Even assuming that such relief can be ordered against Defendants for their

production and sale of fossil fuels, which are then combusted by others at a rate Plaintiff claims

causes the alleged injuries, this claim must be decided in federal court because Congress has

created a cause of action by which a party can seek the creation or modification of nationwide

emission standards by petitioning the Environmental Protection Agency ("EPA"). That federal cause of action was designed to provide the exclusive means by which a party can seek nationwide emission regulations. Because Plaintiff's state causes of action would "duplicate[], supplement[], or supplant[]" that exclusive federal cause of action, they are completely preempted.

### A.      The Clean Air Act Provides the Exclusive Cause of Action for Challenging EPA Rulemakings.

43.      The Clean Air Act permits private parties, as well as state and municipal governments, to challenge EPA rulemakings (or the absence of such) and to petition the EPA to undertake new rulemakings. *See, e.g.*, 5 U.S.C. § 553(e); 42 U.S.C. §§ 7604, 7607. The Fourth Circuit has observed that the Clean Air Act preempts such state common law nuisance cases because "[i]f courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult for anyone to determine what standards govern. Energy policy cannot be set, and the environment cannot prosper, in this way." *N.C. ex rel. Cooper v. Tenn Valley Auth.*, 615 F.3d 291, 298 (4th Cir. 2010).

44.      The Clean Air Act provides the exclusive cause of action for regulation of nationwide emissions. The Act establishes a system by which federal and state resources are deployed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). At the heart of this system are the emission standards set by the EPA. Specific Clean Air Act provisions authorize or require emission standards to be set if certain findings are made, and such standards must comport with the statutory criteria set by Congress, consistent with the dual goals of the Act. Under the Clean Air Act, "emissions have been extensively regulated nationwide." *N.C. ex rel. Cooper v. Tenn Valley Auth.*, 615 F.3d at 298. Regulation of greenhouse

gas emissions, including carbon dioxide, is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528-29, and EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and motor vehicles).

45.     Congress manifested a clear intent that judicial review of Clean Air Act matters must take place in federal court.  42 U.S.C. § 7607(b).

46.     This congressionally mandated statutory and regulatory scheme is thus the "exclusive" means for seeking the nationwide regulation of greenhouse gas emissions and "set[s] forth procedures and remedies" for that relief, *Beneficial Nat'l Bank*, 539 U.S. at 8, irrespective of the savings clauses applicable to some other types of claims.

**B.      Plaintiff's Asserted State-Law Causes of Action Duplicate, Supplement, and/or Supplant the Federal Cause of Action.**

47.     Plaintiff asks the Court to order Defendants to "abate nuisances" alleged to have caused "the increase in global mean temperature and consequent increase in global mean sea surface height and disruptions to the hydrologic cycle, including, but not limited to, more frequent and extreme droughts, more frequent and extreme precipitation events, increased frequency and severity of heat waves and extreme temperatures, and the associated consequences of those physical and environmental changes, since 1965."  Compl. ¶ 13, 193; *see also id.*, Prayer for Relief (requesting "[e]quitable relief, including abatement of the nuisances complained of herein").

48.     According to Plaintiff's own allegations, the alleged nuisances can be abated only by a global—or at the very least national—reduction in greenhouse gas emissions. *See* Compl. ¶ 235 ("[I]t is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gases quickly diffuse and comingle in the atmosphere."); *id.* ¶ 94 (describing "global" greenhouse gas emissions relating to fossil fuel products). Indeed, Plaintiff's allegations purport to show that Defendants "undertook a momentous effort to evade *international* and *national* regulation of greenhouse gas emissions"—*not* state or local regulations. *Id.* ¶ 169 (emphases added); *see also id.* ¶ 145 ("Defendants embarked on a decades-long campaign designed to … undermine national and international efforts like the Kyoto Protocol to rein in greenhouse gas emissions."); *id.* ¶ 143 (acknowledging, *inter alia*, federal legislative efforts to regulate $CO_2$ and other greenhouse gases that allegedly "prompted Defendants to change their tactics … to a public campaign aimed at evading regulation"); *id.* ¶¶ 158, 159(a), 161, (describing alleged efforts to encourage the United States to reject the international Kyoto Protocol).

49.     Plaintiff's state-law tort claims are effectively an end-run around a petition for a rulemaking regarding greenhouse gas emissions because they seek to regulate nationwide emissions that Plaintiff concedes conform to the EPA's emission standards. *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 539 (1992). The claims would require precisely the cost-benefit analysis of emissions that the EPA is charged with undertaking and would directly interfere with the EPA's determinations. *See supra* ¶¶ 27–28. Because Congress has established a clear and detailed

process by which a party can petition the EPA to establish stricter nationwide emissions standards, Plaintiff's claims are completely preempted by the Clean Air Act.

50.     Congress has provided an exclusive statutory remedy for the regulation of greenhouse gas emissions which provides federal procedures and remedies for that cause of action. Because Plaintiff's claims fall within the scope of the federal cause of action, Plaintiff's claims are completely preempted by federal law and this Court has federal-question jurisdiction.

## VI.    THE   ACTION   IS   REMOVABLE   UNDER   THE   OUTER CONTINENTAL SHELF LANDS ACT

51.     This Court also has original jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA").  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155.  This action "aris[es] out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("th[e] language [of § 1349(b)(1)] [i]s straightforward and broad").  The outer continental shelf ("OCS") includes all submerged lands that belong to the United States but are not part of any State.  43 U.S.C. §§ 1301, 1331.

52.     The breadth of federal jurisdiction granted by OCSLA reflects the Act's "expansive substantive reach."  *See EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).  "OCSLA was passed … to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *Id*. at 566.  "[T]he efficient exploitation of the minerals of the OCS … was … a primary purpose for OCSLA."  *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it "to be the policy of the United States that … the outer Continental Shelf … should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).  It further provides

that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States … such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." *Id.* § 1332(4) (emphasis added).

53.     When enacting Section 1349(b)(1), "Congress intended for the judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development on the [OCS]." *Laredo Offshore Constructors, Inc. v. Hunt Oil. Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). Consistent with Congress' intent, courts repeatedly have found OCSLA jurisdiction where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS.[2] *See, e.g., EP Operating*, 26 F.3d at 569–70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

54.     OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims. *See, e.g., In re Deepwater Horizon*, 745 F.3d at 163. The Court, moreover, may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists. *See, e.g., Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011

---

[2] As stated in 43 U.S.C. § 1333(a)(1): "The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed … for the purpose of exploring for, developing, or producing resources therefrom … to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State … ."

A.M.C. 2624, 2640 (D. Del. 2011) (citing *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir. 1998)).

55.     Under OCSLA, the Department of Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal Continental Shelf. 43 U.S.C. § 1334 *et seq.*  Pursuant to this authority, the Department of Interior "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion in leasing revenue … [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production."  Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), *available at* https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.  Certain Defendants here, of course, participate very substantially in the federal OCS leasing program.  For example, from 1947 to 1995, Chevron U.S.A., Inc. produced 1.9 billion barrels of crude oil and 11 billion barrels of natural gas from the federal outer continental shelf in the Gulf of Mexico alone.  U.S. Dep't of Int., Minerals Mgmt. Serv., Gulf of Mex.  Region,  Prod.  by  Operator  Ranked  by  Vol.  (1947–1995),  *available  at* https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%201947%20-%201995.pdf. In 2016, Chevron U.S.A. produced more than 49 million barrels of crude oil and 50 million barrels of natural gas from the outer continental shelf on the Gulf of Mexico.  U.S. Dep't of Int., Bureau of Safety & Envtl. Enf't, Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (2016), *available at* https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202016.pdf.   Numerous other Defendants conduct, and have for decades conducted, similar oil and gas operations on the federal OCS; indeed, Defendants and their affiliated companies presently hold approximately

32.95% of all outer continental shelf leases.  *See* Bureau of Ocean Energy Management, Lease

Owner Information, *available at* https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx.

For example, certain BP companies and Exxon Mobil currently own lease interests in, and the BP

companies operate, "one of the largest deepwater producing fields in the Gulf of Mexico," which

is capable of producing up to 250,000 barrels of oil per day.  *See* Thunder Horse Field Fact Sheet,

*available at* http://www.bp.com/content/dam/bp-country/en_us/PDF/Thunder_Horse_Fact_Sheet

_6_14_2013.pdf.  And as noted on the BP website, production from this and other OCS activities

will continue into the future.  *Id.* ("BP intends to sustain its leading position as an active participant

in all facets of the Deepwater US Gulf of Mexico—as an explorer, developer, and operator.").  A

substantial portion of the national consumption of fossil fuel products stems from production on

federal lands, as approved by Congress and Executive Branch decision-makers.

56.    The Complaint itself makes clear that a substantial part of Plaintiff's claims

"'arise[] out of, or in connection with,'" Defendants' "operation[s] 'conducted on the outer

Continental Shelf'" that involve "the exploration and production of minerals."  *In re Deepwater

Horizon*, 745 F.3d at 163.  Plaintiff, in fact, challenges *all of* Defendants' "extraction … of coal,

oil, and natural gas" activities, *e.g.*, Compl. ¶¶ 3, 18, a substantial quantum of which arise from

outer continental shelf operations, *see* Ranking Operator by Oil, Bureau of Ocean Energy Mgmt.,

*available    at*    https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil   (documenting

Chevron's oil and natural gas production on the federal outer continental shelf from 1947 to 2017).

Plaintiff alleges that emissions have risen due to increased outer continental shelf extraction

technologies.  *See, e.g.*, Compl. ¶¶ 172–73 (discussing arctic offshore drilling equipment and

patents which may be relevant to conduct near Alaskan outer continental shelf).  And Plaintiff

challenges energy projects that occurred in Canadian waters.  Compl. ¶¶ 135, 138.  Defendants

conduct similar activity in American waters and many of the emissions Plaintiff challenges necessarily arise from the use of fossil fuels extracted from the OCS.

57.     The relief sought also arises out of and impacts OCS extraction and development. *See, e.g.*, Compl., Prayer for Relief (seeking damages designed to cripple the energy industry and equitable relief that would no doubt rein in extraction, including that on the OCS). And "any dispute that alters the progress of production activities on the OCS threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS. Congress intended such a dispute to be within the grant of federal jurisdiction contained in § 1349." *Amoco Prod. Co.*, 844 F.2d at 1211.

## VII.     THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

58.     The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof … for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). A party seeking removal under section 1442 must establish "(1) it is a federal officer or a person acting under that officer, (2) a colorable federal defense; and (3) the suit is for an act under color of office, which requires a causal nexus between the charged conduct and asserted official authority." *Ripley*, 841 F.3d at 209–10 (internal citations, quotation marks, and alterations omitted). All three elements are satisfied here for the Chevron Parties and many other Defendants, which have engaged in activities pursuant to the directions of federal officers that, assuming the truth of Plaintiff's allegations, have a causal nexus to Plaintiff's claims, and which have colorable federal defenses to Plaintiff's claims. Among other things, Defendants have acted pursuant to government mandates and contracts, performed functions for the U.S. military, and engaged in activities on federal lands pursuant to federal leases.

59.     First, Defendants "acted under" a federal officer because "the government exert[ed] some 'subjection, guidance, or control,'" over Defendants' actions and because Defendants "engage[d] in an effort 'to assist, or to help carry out, the duties or tasks of the federal superior.'" *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151–52 (2007)).

60.     Second, assuming the truth of Plaintiff's allegations, there is a causal nexus between Defendants' alleged actions, taken pursuant to a federal officer's direction, and Plaintiff's claims.  In *Sawyer*, the Fourth Circuit held removal proper where a military contractor, sued for failing to warn about asbestos in military equipment, showed extensive evidence of federal control over its activities.  This included "highly detailed ship specifications and military specifications provided by the Navy," where the Navy exercised "intense direction and control … over all written documentation to be delivered with" the equipment, deviations from which "were not acceptable." *Id.* at 253.  Here, Plaintiff's causation and damages allegations depend on the activities of Defendants over the past decades—many of which were undertaken at the direction of, and under close supervision and control by, federal officials.

61.     To take only one example, the Chevron Parties and other Defendants have long explored for and produced minerals, oil and gas on federal lands pursuant to leases governed by the OCSLA as described above.  *E.g.*, Kelly Decl., Exs. B, C.  In doing so, those Defendants were "'acting under' a federal 'official'" within the meaning of Section 1442(a)(1).  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007).  Under OCSLA, the Department of Interior is charged with "manag[ing] access to, and … receiv[ing] a fair return for, the energy and mineral resources of the Outer Continental Shelf."  Statement of Walter Cruickshank, Deputy Director, Bureau of Ocean Energy Management, Before The Committee On Natural Resources, July, 6, 2016,

*available at* https://www.boem.gov/Congressional-Testimony-Cruickshank-07062016/.  To fulfill this statutory obligation, the Interior officials maintain and administer the OCS leasing program, under which parties such as Defendants are required to conduct exploration, development and production activities that, "in the absence of a contract with a private firm, the Government itself would have had to perform."  *Watson*, 551 U.S. at 154.

62.     OCS leases obligate lessees like Defendants to "develop[] … the leased area" diligently, including carrying out exploration, development and production activities approved by Department of Interior officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."  Ex. C § 10.  Indeed, for decades Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions, and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."  Ex. B § 10 (emphasis added).  All drilling takes place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which further had to conform to "diligence" and "sound conservation practices."  Ex. C §§ 9, 10.  Federal officers further have reserved the rights to control the rates of mining (Ex. B § 10) and to obtain "prompt access" to facilities and records (Ex. B § 11, Ex. C § 12).  The government also maintains certain controls over how the leased oil/gas/minerals are disposed of once they are removed from the ground, as by preconditioning the lease on a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States

36

shall so prescribe" (Ex. B § 14, Ex. C § 15(d)), and mandating that 20% of all crude and natural gas produced pursuant to drilling leases be offered "to small or independent refiners" (Ex. C § 15(c)).  The Federal Treasury has reaped enormous financial benefits from those policy decisions in the form of statutory and regulatory royalty regimes that have resulted in billions of dollars of revenue to the Federal Government.

63.     Certain Defendants have also engaged in the exploration and production of fossil fuels pursuant to agreements with federal agencies.  For example, in June 1944, the Standard Oil Company (a Chevron predecessor) and the U.S. Navy entered into a contract "to govern the joint operation and production of the oil and gas deposits … of the Elk Hills Reserve," a strategic petroleum reserve maintained by the Navy.  *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014).   "The Elk Hills Naval Petroleum Reserve (NPR-1) … was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."  GAO Fact Sheet, Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December 1986 (Jan. 1987) ("GAO Fact Sheet"), *available at* http://www.gao.gov/assets/90/87497.pdf.  In response to the OPEC oil embargo in 1973–74, the Naval Petroleum Reserves Production Act of 1976 (Public Law 94-258, April 5, 1976) was enacted, which "authorized and directed that NPR-1 be produced at the maximum efficient rate for 6 years." *Id.*  In 1977, Congress "transferred the Navy's interests and management obligations to [the Department of Energy]," and Chevron continued its interest in the joint operation until 1997. *Id.*  That contract governing Standard's rights shows the Federal Government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the reserve:

- The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*." Ex. D, Recitals § 6(d)(i) (emphases added).

- "[The] Navy shall, subject to the provisions hereof, have the exclusive control over the exploration, prospecting development and operation of the Reserve[.]" Ex. D § 3(a).

- "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires." Ex. D § 4(a) (emphasis added).

- "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve." Ex. D § 3(b). In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard." Ex. D § 9(a).

- The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard was entitled to receive, or increase the rate of production. Ex. D §§ 4(b), 5(d)(1).

The contract demonstrates that Defendants' activities under federal officers went far beyond simple compliance with the law or participation in a regulated industry.

64.     Defendants also have supplied motor vehicle fuels under agreements with the Federal Government, including the Armed Forces. For instance, CITGO Petroleum Corporation

("CITGO") was a party to fuel supply agreements with the Navy Exchange Service Command ("NEXCOM"), which is a department of the Naval Supply Systems Command of the U.S. Navy. Among other things, NEXCOM sells goods and services at a savings to active duty military, retirees, reservists, and their families.  Starting in approximately 1988 through approximately 2012, pursuant to its agreements with NEXCOM, CITGO supplied CITGO branded gasoline and diesel fuel to NEXCOM for service stations operated by NEXCOM on Navy bases located in a number of states across the country.  The NEXCOM agreements contained detailed fuel specifications, and CITGO complied with these government specifications in supplying the fuel to NEXCOM.  CITGO also contracted with NEXCOM to provide demolition, site preparation, design, construction, and related financing services to build new gasoline service stations on Navy bases in the 1990s.

65.     As discussed above, these and other federal activities are encompassed in Plaintiff's Complaint.  *See supra* ¶¶ 51–64.  Plaintiff alleges that the drilling and mining operations Defendants performed led to the sale of fossil fuels—including to the Federal Government—which led to the release of greenhouse gases by end-users—including to the Federal Government. Furthermore, the oil and gas Defendants extracted—which the Federal Government (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed and (ii) has purchased from Defendants to fuel its military operations—is the very same oil and gas that Plaintiff alleges is a "defective" product giving rise to strict liability.  Accordingly, Plaintiff seeks to hold Defendants liable for the very activities Defendants performed under the control of a federal official, and thus the nexus element has been satisfied.

66.     Third, Defendants intend to raise numerous meritorious federal defenses, including preemption, *see Prince v. Sears Holdings Corp.*, 848 F.3d 173, 179 (4th Cir. 2017), the government

contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Sawyer*, 860 F.3d at

255–56, and others.  In addition, Plaintiff's claims are barred by the United States Constitution,

including the Commerce and Due Process clauses, as well as the First Amendment and the foreign

affairs doctrine.  These and other federal defenses are more than colorable.  *See Willingham v.*

*Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his

case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

## VIII.   THE ACTION IS REMOVABLE BECAUSE THIS CASE ARISES FROM ACTS ARISING FROM MULTIPLE FEDERAL ENCLAVES

67.   This Court also has original jurisdiction under the federal enclave doctrine.  The

Constitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over

all places purchased with the consent of a state "for the erection of forts, magazines, arsenals,

dock-yards, and other needful buildings."  U.S. Const., art. I, § 8, cl. 17.  "A suit based on events

occurring in a federal enclave … must necessarily arise under federal law and implicates federal

question jurisdiction under § 1331."  *Jones*, 2012 WL 1197391, at *1. This Court has denied a

motion to remand where plaintiff's claims "ar[o]se out of work performed by [defendant] at [a]

Government enclave."  *Norair Eng'g Corp. v. URS Fed. Servs., Inc.*, 2016 WL 7228861, at *3 (D.

Md. Dec. 14, 2016).  The "key factor" in determining whether a federal court has federal enclave

jurisdiction "is the location of the plaintiff's injury or where the specific cause of action arose."

*Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014); *see also Fung v. Abex*

*Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) ("Failure to indicate the federal enclave status and

location of the exposure will not shield plaintiffs from the consequences of this federal enclave

status."); *Bd. of Comm'rs of Se. La. Flood Protection Auth.-E. v. Tenn. Gas Pipeline Co., LLC*, 29

F. Supp. 3d 808, 831 (E.D. La. 2014) (noting that defendants' "conduct" or "the damage

complained of" must occur on a federal enclave).  Federal jurisdiction is available if some of the

events or damages alleged in the complaint occurred on a federal enclave. *See Stokes v. Adair*, 265 F.2d 662, 665–66 (4th Cir. 1959) (district court had jurisdiction where "exclusive jurisdiction over [the location of the alleged injury had been] ceded by [the] state to the United States").

68.     Three requirements exist for land to be a federal enclave:  (1) the United States must have acquired the land from a state; (2) the state legislature must have consented to the jurisdiction of the Federal Government; and (3) the United States must have accepted jurisdiction. *Wood v. Am. Crescent Elevator Corp.*, No. 11-397, 2011 WL 1870218, at *2 (E.D. La. May 16, 2011).

69.     Upon information and belief, the Federal Government owns federal enclaves in the area at issue where Plaintiff's "damage complained of" allegedly occurs. *Tenn. Gas Pipeline*, 29 F. Supp. 3d at 831.  Indeed, Plaintiff broadly alleges injuries to huge swaths of the City, *see* Compl. ¶¶ 196–205, and "[f]ailure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status," *Fung*, 816 F. Supp. at 571.

70.     On information and belief, Defendants maintain or maintained oil and gas operations on military bases or other federal enclaves such that the Complaint, which bases the claims on the "extracting, refining, processing, producing, promoting and[/or] marketing of fossil fuel products" (Compl. ¶ 18), arises under federal law.  *See, e.g.*, *Humble Pipe Line Co. v. Waggoner*, 376 U.S. 369, 372 (1964) (noting that the United States exercises exclusive jurisdiction over oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Mississippi River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale AFB, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000, approximately 14% of the National Wildlife Refuge

System "had oil or gas activities on their land," and these activities were spread across 22 different states.  *See* GAO, *U.S. Fish and Wildlife Service: Information on Oil and Gas Activities in the National Wildlife Refuge* (Oct. 30, 2001), *available at* http://www.gao.gov/new.items/d0264r.pdf. Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department— pursuant to a joint operating agreement with the Navy.  *See Chevron U.S.A.*, 116 Fed. Cl. at 205. Pursuant to that agreement, Standard Oil "operat[ed] the lands of Navy and Standard in the Reserve."  Ex. D at 4.

71.     In addition, the Complaint relies upon conduct occurring in the District of Columbia—itself a federal enclave, *see, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6 (D.D.C. 2014); *Hobson v. Hansen*, 265 F. Supp. 902, 930 (D.D.C. 1967)—as a basis for Plaintiff's claims.  Indeed, Plaintiff complains that Defendants' supposedly wrongful conduct included their memberships in various "trade association[s]," and providing funding to "think tanks," which allegedly had the effect of "evad[ing] regulation" of fossil fuel products by "deceiv[ing]" policymakers about the role of fossil fuel products in causing global warming.  Compl. ¶¶ 166– 167, 170.  The Complaint also points to Defendants' purported funding of "lobbyist[s]" to influence legislation and legislative priorities.  Here, too, "some of the[] locations" giving rise to Plaintiff's claims "are federal enclaves," further underscoring the presence of federal jurisdiction. *Bell*, 2012 WL 1110001, at *2.  As the Ninth Circuit contemplated in *Jacobson v. U.S. Postal Serv.*, 993 F.2d 649, 657 (9th Cir. 1992), free speech placed at issue in a federal enclave falls under the jurisdiction of the federal courts.  *Id.* (observing that newspaper vendors were required to obtain permits pursuant to a federal statute to sell newspapers in front of U.S. post office locations, which the Court deemed to be "within the federal enclave").  Because Plaintiff claims that Defendants'

speech within the federal enclave of the District of Columbia was, among other alleged causes, the basis of its injury, and because Plaintiff complains of damages allegedly occurring on federal enclaves, this Court is the only forum suited to adjudicate the merits of this dispute.

## IX.   THE ACTION IS REMOVABLE UNDER THE BANKRUPTCY REMOVAL STATUTE

72.     The Bankruptcy Removal Statute allows removal of "any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."[3]   28 U.S.C. § 1452(a).   Section 1334, in turn, provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings, arising under Title 11, or arising in or related to cases under title 11" of the United States Code.   28 U.S.C. § 1334(b).   The Fourth Circuit has emphasized that "'related to' jurisdiction is to be 'broadly interpreted.'"   *In re A.H. Robins Co., Inc.*, 86 F.3d 364, 372 (4th Cir. 1996).   An action is thus "related to" a bankruptcy case if it "could conceivably have any effect on the estate being administered in bankruptcy."   *In re Celotex Corp.*, 124 F.3d at 625. Where a Chapter 11 plan has been confirmed, there must be a "close nexus" between the post-

---

[3] Removal is also sought under the numerous other statutes and theories set forth herein that make removal to this Court appropriate.  Indeed, this Court has "original but not exclusive jurisdiction of all civil proceedings, arising under Title 11, or arising in or related to cases under title 11" of the United States Code.  28 U.S.C. § 1334(b).  Nonetheless, the Chevron Parties recognize that Local Rule 103.5(d) states that "[r]emovals under 28 U.S.C. § 1452 or § 1441 in cases related to bankruptcy cases should be filed with the Bankruptcy Clerk" and that, pursuant to Local Rule 402 (incorporating 28 U.S.C. § 157(a)), "all cases . . . related to cases under Title 11 shall be deemed to be referred to the bankruptcy judges of this District."  However, in light of the numerous other grounds for removal to this Court, as noted above, removal is properly sought in this Court, and it is appropriate for the Court to withdraw any applicable reference to the bankruptcy court and require this matter to proceed solely in this Court.  *See, e.g., Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 481 (4th Cir. 2015); *Kelly v. Schlossberg*, 2018 WL 3142021, at *5 (D. Md. June 27, 2018).

confirmation case and the bankruptcy plan for related-to jurisdiction to exist. *Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 836 (4th Cir. 2007). "Practically speaking, under this inquiry matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* at 836–37 (brackets and citation omitted).

73.     Plaintiff's claims are purportedly predicated on historical activities of Defendants, including predecessor companies, subsidiaries, and companies that Defendants may have acquired or with which they may have merged, as well as numerous unnamed but now bankrupt entities. Indeed, Plaintiff explicitly premises its theories of liability on the actions of Defendants' subsidiaries. *See, e.g.*, Compl ¶ 252.[4]  Because there are hundreds of non-joined necessary and indispensable parties, there are many other Title 11 cases that may be related.  Indeed, the related climate-change cases that Plaintiff's counsel recently filed on behalf of other cities and counties already generated bankruptcy court proceedings. *See, e.g.*, *In re Peabody Energy Corp.*, 2017 WL 4843724, Case No. 16-42529 (Bankr. E.D. Mo. Oct.24, 2017) (holding that the plaintiffs' state-law claims were discharged when Peabody emerged from bankruptcy in March 2017); *In re Arch Coal, Inc.*, Case No. 16-40120, Dkt. 1615 (Bankr. E.D. Mo. Nov. 21 2017) (stipulation providing that any action in the Peabody bankruptcy proceedings that results in dismissal of any of the plaintiffs' claims against Peabody will require dismissal of claims against Arch).  Accordingly, Plaintiff's broad claim has the required close nexus with Chapter 11 plans to support federal

---

[4] To the extent Plaintiff seeks to hold Defendants liable for the conduct of their subsidiaries, affiliates or other related entities, such attempts are improper.  *See, e.g.*, *Todd v. Xoom Energy Maryland, LLC*, 2016 WL 727108, at *11 n.10 (D. Md. Feb. 22, 2016) ("[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent.").

jurisdiction. *Celotex*, 124 F.3d at 625; *see also In re Dow Corning Corp.*, 86 F.3d 482, 493–94 (6th Cir. 1996).

74.     As just one example of how Plaintiff's historical allegations have created a "close nexus" with a Chapter 11 plan, one of Chevron's current subsidiaries, Texaco Inc., filed for bankruptcy in 1987. *In re Texaco Inc.*, 87 B 20142 (Bankr. S.D.N.Y. 1987). The Chapter 11 plan, which was confirmed in 1988, bars certain claims against Texaco arising prior to March 15, 1988. *Id.* Dkt. 1743.   Plaintiff's Complaint alleges that Texaco, as well as unnamed Chevron "predecessors" and "subsidiaries," engaged in culpable conduct prior to March 15, 1988, and it attributes this conduct to defendant "Chevron." *See* Compl. ¶¶ 18–19, 111, 115, 120, 174. Plaintiff's claims against Chevron thus are at least partially barred by Texaco's confirmed Chapter 11 plan to the extent that the claims relate to Texaco's conduct prior to 1988. Accordingly, even though Texaco's Chapter 11 plan has been confirmed and consummated, Plaintiff's claim has a "close nexus" to the plan to support federal jurisdiction. *See In re Wilshire Courtyard*, 729 F.3d 1279, 1292–93 (9th Cir. 2013) (federal court had "'related to' subject matter jurisdiction … despite the fact that the Plan transactions have been long since consummated").

75.     Finally, Plaintiff's action is primarily one to protect its "pecuniary interest." *See City & Cnty. of San Francisco v. PG&E Corp.*, 433 F.3d 1115, 1124 (9th Cir. 2006).   As demonstrated by Plaintiff's request for billions of dollars in compensatory damages, "punitive damages," and "disgorgement of profits" (*see, e.g.*, Compl. ¶¶ 227, 247, 259, 268, 280, 289, Prayer for Relief), this action is primarily pecuniary in nature. *See also id.* ¶¶ 16 ("The City must spend substantial funds to plan for and respond to these [climate change-related] phenomena, and to mitigate their secondary and tertiary impacts.""), 210 (alleging that "[t]he City has incurred and will incur expenses in planning and preparing for, treating and responding to, and educating

residents about the public health impacts associated with anthropogenic global warming"), 212 (alleging that "[t]he City has and is planning, at significant expense, adaptation strategies to address climate change related impacts," and that "the City has incurred and will incur significant expense in educating and engaging the public on climate change issues, and to promote and implement policies to mitigate and adapt to climate change impacts, including promoting energy and water efficiency and renewable energy"), 213 (alleging that the City "has incurred and will incur significant expenses related to planning for and predicting future sea level rise-related and hydrologic cycle change-related injuries to its real property, improvements thereon, municipal infrastructure, and citizens, and other community assets in order to preemptively mitigate and/or prevent injuries to itself and its citizens").  These allegations make clear that Plaintiff's action is primarily brought to fill the City's coffers by reaping a financial windfall.  *See PG&E Corp.*, 433 F.3d at 1125 n.11.

## X.    THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS FALL WITHIN THE COURT'S ADMIRALTY JURISDICTION

76.    Finally, Plaintiff's claims are removable because they fall within the Court's original admiralty jurisdiction.  The Constitution extends the federal judicial power "to all Cases of admiralty and maritime Jurisdiction."  U.S. Const. Art. III, § 2.  "Congress has embodied that power in a statute giving federal district courts 'original jurisdiction [over] … [a]ny civil case of admiralty or maritime jurisdiction[.]"  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995) (alterations in original).  "The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, *even though the injury or damage is done or consummated on land*."  46 U.S.C. § 30101(a) (emphasis added).

46

77.     The alleged injuries have occurred on the navigable waters.  Plaintiff alleges that several Defendants' production and sale of fossil fuels occur on and/or over the navigable waters of the United States.  *See, e.g.*, Compl. ¶ 22(b) ("Chevron Corporation's and its subsidiaries' operations consist of … transporting crude oil and refined products by … marine vessel … .").  Beyond that, Plaintiff alleges that the tort arises from production of fossil fuels, including worldwide extraction, a significant portion of which takes place on "mobile offshore drilling unit[s]" that operate in navigable waters.  *See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 949 (E.D. La. 2011).  "Under clearly established law," a floating drilling platform is "a vessel, not a fixed platform," *id*., and "[o]il and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce," *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir. 1986).  Moreover, Defendants' fossil fuel extraction is connected to maritime activity because, according to Plaintiff's Complaint, it has the "potential to disrupt maritime commerce" by damaging ports.  *Grubart*, 513 U.S. at 538; *see* Compl. ¶ 197 (alleging that rising seas will inundate Baltimore's port).  Because Plaintiff's claims fall within the Court's admiralty jurisdiction, they are removable under 28 U.S.C. §§ 1441 and 1333.

## XI.     THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

78.     Based on the foregoing allegations from the Complaint, and others not specifically described herein, this Court has original jurisdiction over this action under 28 U.S.C. § 1331.  Accordingly, removal of this action is proper under 28 U.S.C. §§ 1334, 1441, 1442, 1452, and 1446, as well as 43 U.S.C. § 1349(b).

79.     The United States District Court for the District of Maryland is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff

originally filed this case, in the Circuit Court for Baltimore City, Maryland.  *See* 28 U.S.C. § 84(a);

28 U.S.C. § 1441(a).  Pursuant to Local Rule 501.2, the action should be assigned to the Northern

Division of this Court.

80.     All defendants that have been properly joined and served (or purported to be served)

have consented to the removal of the action, *see* Kelly Decl., ¶ 4, and there is no requirement that

any party not properly joined and served consent.  *See HBCU Pro Football, LLC v. New Vision*

*Sports Properties, LLC*, 2010 WL 2813459, at *2 (D. Md. July 14, 2010); 28 U.S.C. §

1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and

served").[5]  Copies of all process, pleadings, and orders from the state-court action being removed

to this Court that Chevron has been able to obtain from the Circuit Court and other defendants and

which are in the possession of Chevron are attached hereto as Exhibit A to the Kelly Declaration.

Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders"

received by the Chevron Parties in the action.

81.     Upon filing this Notice of Removal, Defendants will furnish written notice to

Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Circuit Court

for Baltimore City, pursuant to 28 U.S.C. § 1446(d).

---

[5] In addition, the consent of all defendants is not required for bankruptcy removal under 28 U.S.C. § 1452 and federal officer removal.  *See Creasy v. Coleman Furniture Corp.*, 763 F.2d 656, 660 (4th Cir. 1985) ("Under the bankruptcy removal statute, … any one party has the right to remove the state court action without the consent of the other parties."); *Joyner v. A.C. & R. Insulation Co.*, 2013 WL 877125, at *2 n.4 (D. Md. Mar. 7, 2013) ("Although, as a general matter, all defendants must join in or consent to the removal of an action to federal court, that requirement does not apply when the case is removed under the federal officer removal statute … ." (citation omitted)).

Accordingly, Defendants remove to this Court the above action pending against them in the Circuit Court for Baltimore City, Maryland.

Respectfully submitted,

Dated:  July 31, 2018

_____/s/ Tonya Kelly Cronin_____
Tonya Kelly Cronin, Bar Number 27166
Jonathan Biran, Bar Number 28098
Aron U. Raskas, Bar Number 04393
RIFKIN WEINER LIVINGSTON LLC
2002 Clipper Park Road, Unit 108
Baltimore, MD 21211
Tel: 410-769-8080
Fax: 410-769-8811
tkelly@rwllaw.com
jbiran@rwllaw.com
araskas@rwllaw.com

*Attorneys for Defendants Chevron Corporation and Chevron U.S.A., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed through the ECF system on the 31st day of July 2018.  Additionally, I certify that on the 31st day of July 2018, a copy of the foregoing document was sent via e-mail and first-class mail to the following counsel of record for Plaintiff Mayor and City Council of Baltimore:

Andre M. Davis
Suzanne Sangree
Elizabeth Ryan Martinez
**Baltimore City Law Department**
100 N. Holliday Street, Suite 109
Baltimore, MD 21202
Andre.Davis@baltimorecity.gov
Suzanne.Sangree2@baltimorecity.gov
Liz.Martinez@baltimorecity.gov

Victor M. Sher
Matthew K. Edling
Timothy R. Sloane
Martin D. Quiñones
Meredith S. Wilensky
Katie H. Jones
**Sher Edling LLP**
100 Montgomery Street, Suite 1410
San Francisco, CA 94104
vic@sheredling.com
matt@sheredling.com
tim@sheredling.com
marty@sheredling.com
meredith@sheredling.com
katie@sheredling.com

_____/s/ Tonya Kelly Cronin_____