**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE | |
| Plaintiff, | Case Number: 1:18-cv-02357 ELH |
| vs. | |
| BP P.L.C.; *et al.*, | |
| Defendants. | [Removal from the Circuit Court for Baltimore City] |

**MEMORANDUM OF LAW IN SUPPORT OF MAYOR AND CITY COUNCIL OF
BALTIMORE'S MOTION TO REMAND TO STATE COURT**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION.......................................................................................... 1

II.     FACTS ........................................................................................................ 3

III.    APPLICABLE LEGAL STANDARDS .................................................... 6

        A.    Defendants Bear the Burden to Defeat the Strong Presumption Against
              Removal Jurisdiction. ........................................................................ 6

        B.    Federal Defenses, Including Ordinary Preemption, Cannot Confer
              Subject-Matter Jurisdiction.............................................................. 7

IV.     REMAND TO STATE COURT IS REQUIRED BECAUSE THERE IS NO
        SUBJECT-MATTER JURISDICTION. .................................................. 7

        A.    Federal Common Law Does Not Confer Subject-Matter Jurisdiction Over the
              City's Claims. ..................................................................................... 7

              1.    Defendants' Assertion that Federal Common Law "Governs" the City's
                    Claims Raises an Ordinary Preemption Defense, and Nothing More............. 9

              2.    No Appellate Authority Holds That Tort Claims Related to Climate
                    Change Must Be Exclusively Pleaded Under Federal Common Law. ......... 12

              3.    Defendants' Cases Address Ordinary Preemption Defenses and Choice
                    of Law, Not Removal Jurisdiction. .............................................. 15

              4.    The City's Claims Fall Outside the Scope of Any Operative Federal
                    Common Law in Any Event................................................................ 16

        B.    The City's Complaint Does Not Necessarily Raise Any Substantial, Disputed
              Federal Questions and Therefore Does Not "Arise Under" Federal Law. .............. 20

              1.    The City's Complaint Does Not "Necessarily Raise" Any "Actually
                    Disputed" Issues of Federal Law. ................................................. 21

              2.    Defendants Have Not Shown That the Complaint Raises Questions of
                    Federal Law That Are "Substantial" to the Federal System as a Whole....... 27

              3.    Congress Has Struck the Balance of Judicial Responsibility in Favor of
                    State Courts Hearing State Law Claims...................................... 29

              4.    Defendants' Laundry List of Federal Defenses Does Not Provide Federal
                    Jurisdiction. ................................................................................. 30

              5.    Defendants' Invocation of Foreign Relations Is a Red Herring and Not a
                    Basis for Federal Jurisdiction........................................................ 31

              6.    Federal Laws Authorizing Regulation of Federal Navigable Waters
                    Do Not Confer *Grable* Jurisdiction............................................. 33

        C.    The Clean Air Act Does Not Completely Preempt the City's Claims.................... 35

              1.    Far from Indicating Congressional Intent to Completely Preempt State Law,
                    the Clean Air Act Repeatedly Emphasizes the Primary Role of the States. . 37

i

2.     The Clean Air Act Does Not Create a Right of Action that Encompasses the City's Tort Claims. ................................................................. 41

D.    The City's Complaint Does Not Fall Within the Jurisdictional Grant of the Outer Continental Shelf Lands Act. ......................................................... 42

E.    There Is No Enclave Jurisdiction Because the City's Claims Do Not "Arise" Within the Federal Enclave. ................................................................. 46

    1.     The City's Injuries Occurred and Will Occur Exclusively on Non-Federal Lands. ..................................................................... 46

    2.     Each of the City's Claims Arose Only Once a Complete Tort Existed, Which Occurred When and Where the City Suffered Injury— on Non-Federal Lands. ............................................................... 48

F.    The City's Claims Are Not Removable Under 28 U.S.C. § 1442(a)(1) Because Defendants Are Not "Acting Under Federal Officers." ......................... 50

    1.     Defendants Have Not Shown They "Acted Under" Federal Officers. .......... 50

    2.     No Nexus Exists Between Defendants' Actions Challenged in This Case and the Directions of Any Federal Officer. ................................. 55

G.    The Case Is Not Removable Under the Bankruptcy Removal Provisions, 28 U.S.C §§ 1452(a) and 1334. ............................................................ 56

    1.     The City Brings This Action Pursuant to Its Police and Regulatory Powers. ........................................................................ 56

    2.     The City's Suit Is Not "Relate[d] to" Any Bankruptcy Case. ..................... 59

    3.     Equity Demands That This Case Be Remanded to State Court. ................. 60

H.    There Is No Admiralty Jurisdiction, and Admiralty Jurisdiction Cannot Serve as a Ground for Removal. ............................................................ 61

    1.     Admiralty Jurisdiction Is Not a Basis for Removal. .................................... 62

    2.     No Tort Has Caused Injury on Navigable Water, and No Vessel on Navigable Water Has Caused an Injury on Land. ........................................ 63

    3.     The Claims Have No Substantial Relationship to Traditional Maritime Activity. .................................................................... 64

V.    **CONCLUSION** ................................................................. **65**

## **TABLE OF AUTHORITIES**

### Cases

*A.E.A. ex rel. Angelopoulos v. Volvo Penta of the Americas, LLC*,
   77 F. Supp. 3d 481 (E.D. Va. 2015) ........................................................... 63

*Adams v. Comm'rs of Town of Trappe*,
   102 A.2d 830 (Md. 1954) ........................................................................ 49

*Al Shimari v. CACI Int'l, Inc.*,
   679 F.3d 205 (4th Cir. 2012) .................................................................... 33

*Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*,
   __ F.3d __, 2018 WL 4263250 (9th Cir. Sept. 7, 2018) ...................................... 18

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) ...................................................................... 32, 33, 35

*Am. Laundry Mach. Indus. v. Horan*,
   412 A.2d 407 (Md. Ct. Spec. App. 1980) ...................................................... 24

*Am. Elec. Power Co. v. Connecticut*,
   564 U.S. 410 (2011) ................................................................ 8, 12, 13, 14

*Amoco Prod. Co. v. Sea Robin Pipeline Co.*,
   844 F.2d 1202 (5th Cir. 1988) .................................................................. 45

*Atl. Coast Marine Grp., Inc. v. Willis*,
   210 F. Supp. 3d 807 (E.D.N.C. 2016) ......................................................... 63

*Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*,
   390 U.S. 557 (1968) .......................................................................... 36, 41

*Bader Farms, Inc. v. Monsanto Co.*,
   No. 1:16-CV-299 SNLJ, 2017 WL 633815 (E.D. Mo. Feb. 16, 2017) ..................... 27

*Barker v. Hercules Offshore, Inc.*,
   713 F.3d 208 (5th Cir. 2013) .................................................................... 65

*Bd. of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E v. Tennessee Gas Pipeline Co.*,
   850 F.3d 714 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 420 (2017) .............. 26, 27, 34

*Bd. of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co.*,
   29 F. Supp. 3d 808, 831 (E.D. La. 2014) ................................................ 46, 47, 48

*Bearse v. Port of Seattle*,
   No. C09-0957RSL, 2009 WL 3066675 (W.D. Wash. Sept. 22, 2009) ..................... 37

*Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation*,
   770 F.3d 944 (10th Cir. 2014) .................................................................. 23

*Bell v. Cheswick Generating Station*,
   734 F.3d 188 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) ................... 37, 39

*Bender v. Jordan*,
   623 F.3d 1128 (D.C. Cir. 2010) ................................................................ 28

*Beneficial Nat'l Bank v. Anderson*,
539 U.S. 1 (2003)............................................................................................... 35, 36, 40, 41

*Bennett v. Sw. Airlines Co.*,
484 F.3d 907 (7th Cir. 2007) ......................................................................................... 23

*Bordetsky v. Akima Logistics Servs., LLC*,
No. CV 14-1786 (NLH/JS), 2016 WL 614408 (D.N.J. Feb. 16, 2016).................................. 48

*Boyle v. United Technologies Corp.*,
487 U.S. 500 (1988)........................................................................................................ 15, 17

*Brooklyn Union Expl. Co. v. Tejas Power Corp.*,
930 F. Supp. 289 (S.D. Tex. 1996) ................................................................................. 45

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)........................................................................................................ 27

*California ex rel. Brown v. Villalobos*,
453 B.R. 404 (D. Nev. 2011) .......................................................................................... 58

*California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. Hardesty Sand & Gravel*,
No. 2:11-CV-02278 JAM, 2012 WL 639344 (E.D. Cal. Feb. 24, 2012) ........................... 36

*California v. Gen. Motors Corp.*,
No. C06-05755 MJJ, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007).............................. 35

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
824 F.3d 1156 (9th Cir. 2016) ....................................................................................... 15, 16

*Cassidy v. Murray*,
34 F. Supp. 3d 579 (D. Md. 2014).................................................................................. 62

*Caterpillar Inc. v. Williams*,
482 U.S. 386 (1987)................................................................................................... 6, 9, 35, 40

*Cerny v. Marathon Oil Corp.*,
No. CIV.A. SA-13-CA-562, 2013 WL 5560483 (W.D. Tex. Oct. 7, 2013)........................ 36

*City & Cty. of San Francisco v. PG & E Corp.*,
433 F.3d 1115 (9th Cir. 2006), *cert. denied*, 549 U.S. 882 (2006)................................ 57

*City of Milwaukee v. Illinois & Michigan*,
451 U.S. 304 (1981)........................................................................................................ 14, 16

*City of New York v. BP P.L.C.*,
No. 18 CIV. 182 (JFK), 2018 WL 3475470 (S.D.N.Y. July 19, 2018) ............................. 12, 40

*City of Oakland v. BP P.L.C*,
*No. C* 17-06011 WHA, 2018 WL 3109726 (N.D. Cal. June 25, 2018)............................ 35

*City of Oakland v. BP p.l.c.*,
No. C 17-06011 WHA, 2018 WL 1064293 (N.D. Cal. Feb. 27, 2018)......................... 9, 10, 63

*Collier v. District of Columbia*,
46 F. Supp. 3d 6 (D.D.C. 2014) ..................................................................................... 47

*Colon v. United States*,
No. GJH-17-775, 2018 WL 1352962 (D. Md. Mar. 14, 2018)......................................... 49

*Committee for the Consideration of the Jones Falls Sewage System v. Train*,
    539 F.2d 1006 (4th Cir. 1976) ........................................................................ 15

*Coronel v. AK Victory*,
    1 F. Supp. 3d 1175 (W.D. Wash. 2014).......................................................... 62

*Counts v. Gen. Motors, LLC*,
    237 F. Supp. 3d 572 (E.D. Mich. 2017).......................................................... 19

*CTS Corp. v. Waldburger*,
    134 S. Ct. 2175 (2014)..................................................................................... 37

*Cty. of San Mateo v. Chevron Corp.*,
    294 F. Supp. 3d 934 (N.D. Cal. 2018) ..................................................... passim

*Dixon v. Coburg Dairy, Inc.*,
    369 F.3d 811 (4th Cir. 2004) (en banc) ...................................................... 6, 22

*E.P.A. v. EME Homer City Generation, L.P.*,
    134 S. Ct. 1584 (2014)............................................................................... 37, 38

*Empire Healthchoice Assur., Inc. v. McVeigh*,
    547 U.S. 677 (2006)......................................................................... 20, 28, 34

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
    541 U.S. 246 (2004).......................................................................................... 38

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
    26 F.3d 563 (5th Cir. 1994) ............................................................................. 43

*Exxon Mobil Corp. v. Albright*,
    71 A.3d 30 (Md. 2013) ..................................................................................... 49

*Exxon Mobil Corp. v. Allapattah Servs.*,
    545 U.S. 546 (2005).......................................................................................... 6

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008).......................................................................................... 58

*Fairfield Indus., Inc. v. EP Energy E&P Co.*,
    No. CV H-12-2665, 2013 WL 12145968 (S.D. Tex. May 2, 2013) ................ 44

*Faulk v. Owens-Corning Fiberglass Corp.*,
    48 F. Supp. 2d 653 (E.D. Tex. 1999)............................................................... 52

*Fed. Home Loan Bank of Boston v. Ally Fin., Inc.*,
    No. CIV.A. 11-10952-GAO, 2012 WL 769731 (D. Mass. Mar. 9, 2012)........ 61

*Flying Pigs, LLC v. RRAJ Franchising, LLC*,
    757 F.3d 177 (4th Cir. 2014) ........................................................................ 7, 22

*Ford v. Murphy Oil U.S.A., Inc.*,
    750 F. Supp. 766 (E.D. La. 1990).................................................................... 37

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
    463 U.S. 1 (1983)......................................................................................... passim

*Freeman v. Grain Processing Corp.*,
    848 N.W.2d 58 (Iowa 2014), *cert. denied*, 135 S. Ct. 712 (2014)......... 14, 25, 37, 42

*Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*,
    245 F. Supp. 2d 1144 (D. Colo. 2002) ................................................................. 50

*Fung v. Abex Corp.*,
    816 F. Supp. 569 (N.D. Cal. 1992) ....................................................................... 48

*Gingery v. City of Glendale*,
    831 F.3d 1222 (9th Cir. 2016) .............................................................................. 31

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,
    545 U.S. 308 (2005) ..................................................................................... passim

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
    508 F. Supp. 2d 295 (D. Vt. 2007) ....................................................................... 18

*Gully v. First Nat'l Bank*,
    299 U.S. 109 (1936) ............................................................................................... 7

*Gunn v. Minton*,
    568 U.S. 251 (2013) .............................................................................. 7, 10, 20, 21

*Gutierrez v. Mobil Oil Corp.*,
    798 F. Supp. 1280 (W.D. Tex. 1992) .................................................................... 36

*Healy v. Ratta*,
    292 U.S. 263 (1934) ............................................................................................... 6

*Her Majesty The Queen In Right of the Province of Ontario v. City of Detroit*,
    874 F.2d 332 (6th Cir. 1989) ........................................................................... 36, 41

*Herb's Welding, Inc. v. Gray*,
    470 U.S. 414 (1985) ............................................................................................. 64

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ............................................................................................... 32

*Hobson v. Hansen*,
    265 F. Supp. 902 (D.D.C. 1967) .......................................................................... 47

*Hollingsworth & Vose Co. v. Connor*,
    764 A.2d 318 (Md. Ct. Spec. App. 2000) ............................................................. 49

*Humble Pipe Line Co. v. Waggonner*,
    376 U.S. 369 (1964) ............................................................................................. 47

*Illinois v. City of Milwaukee, Wis.*,
    406 U.S. 91 (1972) ............................................................................................... 10

*In re Agent Orange Prod. Liab. Litig.*,
    635 F.2d 987 (2d Cir. 1980) ........................................................................... 18, 19

*In re Deepwater Horizon*,
    745 F.3d 157 (5th Cir. 2014) ..................................................................... 43, 44, 45

*In re Masterbuilt Cos., Inc.*,
    458 B.R. 725 (D. Md. 2011) ................................................................................. 61

*In re McCarthy*,
    230 B.R. 414 (B.A.P. 9th Cir. 1999) .................................................................... 60

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
488 F.3d 112 (2d Cir. 2007) ........................................................... 30, 52, 53, 58

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) .......................................................................... 19, 38

*In re Ray*,
624 F.3d 1124 (9th Cir. 2010) .................................................................... 59, 60

*In re Universal Life Church, Inc.*,
128 F.3d 1294 (9th Cir. 1997), *cert. denied*, 524 U.S. 952 (1998)........................ 58

*In re Vioxx Prods. Liab. Litig.*,
843 F. Supp. 2d 654 (E.D. La. 2012)................................................................... 23

*In re Volkswagen "Clean Diesel" Litig.*,
CL-2016-9917, 2016 WL 10880209 (Va. Cir. Ct. 2016) ................................. 19, 20

*In re Wireless Telephone Radio Frequency Emissions Prods. Liab. Litig.*,
327 F. Supp. 2d 554 (D. Md. 2004)..................................................................... 56

*International Paper Co. v. Ouellette*,
479 U.S. 481 (1987)................................................................................... 16, 39

*Jackson v. Johns-Manville Sales Corp.*,
750 F.2d 1314 (5th Cir. 1985) .................................................................... 18, 19

*Jacobsen v. U.S. Postal Service*,
993 F.2d 649 (9th Cir. 1992) ........................................................................... 47

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995)............................................................................ 61, 63, 64

*Jet Aviation, Inc. v. City of Cleveland, Ohio*,
409 U.S. 249 (1972)......................................................................................... 64

*K2 Am. Corp. v. Roland Oil & Gas, LLC*,
653 F.3d 1024 (9th Cir. 2011) .......................................................................... 23

*Keltner v. SunCoke Energy, Inc.*,
No. 3:14-CV-01374-DRHPMF, 2015 WL 3400234 (S.D. Ill. May 26, 2015)........................ 37

*Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*,
No. 04 CIV. 708 (GEL), 2004 WL 1048239 (S.D.N.Y. May 7, 2004) ................................... 61

*King v. Marriott Int'l, Inc.*,
337 F.3d 421 (4th Cir. 2003) ...................................................................... 35, 41

*Kirk v. Palmer*,
19 F. Supp. 3d 707 (S.D. Tex. 2014)................................................................... 23

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
754 F.2d 1223 (5th Cir. 1985) .......................................................................... 45

*LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*,
No. CIVA 06-11248, 2007 WL 854307 (E.D. La. Mar. 16, 2007) .......................... 45

*Lontz v. Tharp*,
413 F.3d 435 (4th Cir. 2005) ............................................................. 6, 9, 35, 40

*Louisville & Nashville R.R. Co. v. Mottley*,
　211 U.S. 149 (1908)...........................................................................7

*Madruga v. Superior Court of State of Cal.*,
　346 U.S. 556 (1954) ........................................................................ 62

*May v. Air & Liquid Sys. Corp.*,
　129 A.3d 984 (Md. 2015) ................................................................ 24

*Merrell Dow Pharm. Inc. v. Thompson*,
　478 U.S. 804 (1986).........................................................................29

*Merrick v. Diageo Americas Supply, Inc.*,
　805 F.3d 685 (6th Cir. 2015) .............................................. 14, 19, 37

*Metro. Life Ins. Co. v. Taylor*,
　481 U.S. 58 (1987)................................................................... passim

*Meyers v. Chesterton*,
　No. CIV.A. 15-292, 2015 WL 2452346 (E.D. La. May 20, 2015)........................................... 56

*Mississippi River Fuel Corp. v. Cocrehan*,
　390 F.2d 34 (5th Cir. 1968) ............................................................ 47

*Mobley v. Cerro Flow Prod., Inc.*,
　No. CIV 09-697-GPM, 2010 WL 55906 (S.D. Ill. Jan. 5, 2010) ............................................ 50

*Morrison v. Drummond Co.*,
　No. 2:14-cv-0406-SLB, 2015 WL 1345721 (N.D. Ala. Mar. 23, 2015) ................................. 36

*N.C. ex rel. Cooper v. Tennessee Valley Authority*,
　615 F.3d 291 (4th Cir. 2010), *cert. denied*, 132 S. Ct. 46 (2011)........................................... 40

*Nance v. Baltimore Am. Mortg. Corp.*,
　No. CIV. JFM-10-2083, 2010 WL 4291579 (D. Md. Oct. 29, 2010)....................................... 27

*Nat'l Audubon Soc'y v. Dep't of Water*,
　869 F.2d 1196 (9th Cir. 1988) ........................................................ 19

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*,
　471 U.S. 845 (1985)......................................................................... 11

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
　663 F. Supp. 2d 863 (N.D. Cal. 2009) ............................................ 13

*Native Village of Kivalina v. ExxonMobil Corp.*,
　696 F.3d 849 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2390 (2013)................................... 8, 13

*Norair Eng'g Corp. v. URS Fed. Servs., Inc.*,
　RDB-16-1440, 2016 WL 7228861 (D. Md. Dec. 14, 2016)................................................... 49

*OCS, Par. of Plaquemines v. Total Petrochem. & Ref. USA, Inc.*,
　64 F. Supp. 3d 872 (E.D. La. 2014)............................................ 43, 44

*Ohio ex rel. Skaggs v. Brunner*,
　549 F.3d 468 (6th Cir. 2008) .......................................................... 31

*Oman v. Johns-Manville Corp.*,
　764 F.2d 224 (4th Cir. 1985), *cert. denied*, 474 U.S. 970 (1985)........................................... 65

*Oregon ex rel. Kroger v. Johnson & Johnson*,
   832 F. Supp. 2d 1250 (D. Or. 2011) ................................................................. 24

*Owens-III, Inc. v. Rapid Am. Corp*,
   124 F.3d 619 (4th Cir. 1997) ............................................................................. 59

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
   559 F.3d 772 (8th Cir. 2009) ............................................................................. 27

*Philip Morris Inc. v. Angeletti*,
   752 A.2d 200 (Md. 2000) ................................................................................... 49

*Phipps v. Gen. Motors Corp.*,
   363 A.2d 955 (Md. 1976) ................................................................................... 24

*Pinney v. Nokia*,
   402 F.3d 430 (4th Cir. 2005) ...................................................................... passim

*Plains Gas Sols., LLC v. Tennessee Gas Pipeline Co.*,
   46 F. Supp. 3d 701 (S.D. Tex. 2014) ................................................... 42, 43, 44

*Pressl v. Appalachian Power Co.*,
   842 F.3d 299 (4th Cir. 2016) ............................................................................... 6

*Provincial Gov't of Marinduque v. Placer Dome, Inc.*,
   582 F.3d 1083 (9th Cir. 2009) .......................................................................... 31

*Recar v. CNG Producing Co.*,
   853 F.2d 367 (5th Cir. 1988) ............................................................................ 43

*Resolution Trust Corp. v. Everhart*,
   37 F.3d 151 (4th Cir. 1994) .............................................................................. 15

*Rocky Mountain Farmers Union v. Corey*,
   730 F.3d 1070 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 2875 (2014) ..................... 18

*Romero v. Int'l Terminal Operating Co.*,
   358 U.S. 354 (1959) ..................................................................................... 62, 63

*Rosenblatt v. Exxon Co., U.S.A.*,
   642 A.2d 180 (Md. 1994) ................................................................................... 24

*Rubber Co. v. Buckeye Egg Farm, L.P.*,
   No. 2:99-CV-1413, 2000 WL 782131 (S.D. Ohio June 16, 2000) ..................... 37

*Rush Prudential HMO, Inc. v. Moran*,
   536 U.S. 355 (2002) .......................................................................................... 38

*Safety-Kleen, Inc. (Pinewood) v. Wyche*,
   274 F.3d 846 (4th Cir. 2001) ....................................................................... 57, 58

*Sawyer v. Foster Wheeler LLC*,
   860 F.3d 249 (4th Cir. 2017) ........................................................... 52, 53, 55, 56

*Shulthis v. McDougal*,
   225 U.S. 561 (1912) .......................................................................................... 20

*Sonoco Prods. v. Physicians Health Plan, Inc.*,
   338 F.3d 366 (4th Cir. 2003) ............................................................................ 40

*Sparling v. Doyle*,
  No. EP-13-CV-00323-DCG, 2014 WL 2448926 (W.D. Tex. May 30, 2014) ....................... 48

*St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*,
  774 F. Supp. 2d 596 (D. Del. 2011) ....................................................................................... 45

*Stokes v. Adair*,
  265 F.2d 662 (4th Cir. 1959) ........................................................................................... 46, 49

*Tadjer v. Montgomery Cty.*,
  479 A.2d 1321 (Md. 1984) ............................................................................................... 24, 28

*Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prod. Co.*,
  448 F.3d 760 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 670 (2006) .......................................... 65

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) .............................................................................................................. 17

*Totah v. Bies*,
  No. C 10-05956 CW, 2011 WL 1324471 (N.D. Cal. Apr. 6, 2011) ........................................ 48

*U.S. EEOC v. CTI Glob. Sols., Inc.*,
  422 B.R. 49 (D. Md. 2010) ..................................................................................................... 58

*United Offshore Co. v. S. Deepwater Pipeline Co.*,
  899 F.2d 405 (5th Cir. 1990) ................................................................................................. 45

*United States v. Belmont*,
  301 U.S. 324 (1937) .............................................................................................................. 32

*United States v. Hooker Chems. & Plastics Corp.*,
  722 F. Supp. 960 (W.D.N.Y. 1989) ....................................................................................... 30

*United States v. Pink*,
  315 U.S. 203 (1942) .............................................................................................................. 32

*United States v. Standard Oil Co. of California*,
  545 F.2d 624 (9th Cir. 1976) ................................................................................................. 54

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009) .................................................................................................................. 7

*Valley Hist. Ltd. P'ship v. Bank of N.Y.*,
  486 F.3d 831 (4th Cir. 2007) ............................................................................................ 59, 60

*W. Virginia ex rel. McGraw v. Eli Lilly & Co.*,
  476 F. Supp. 2d 230 (E.D.N.Y. 2007) .................................................................................... 27

*W. Virginia ex rel. McGraw v. JPMorgan Chase & Co.*,
  842 F. Supp. 2d 984 (S.D.W. Va. 2012) ............................................................................ 26, 28

*Washington Suburban Sanitary Comm'n v. CAE-Link Corp.*,
  622 A.2d 745 (Md. 1993) ....................................................................................................... 24

*Washington v. Monsanto Co.*,
  274 F. Supp. 3d 1125 (W.D. Wash. 2017) .............................................................................. 46

*Watson v. Philip Morris Cos., Inc.*,
  551 U.S. 142 (2007) ................................................................................................ 51, 52, 54, 55

*Winters v. Diamond Shamrock Chem. Co.*,
   149 F.3d 387 (5th Cir. 1998) ................................................................. 53

**Statutes**

28 U.S.C. § 1331 .......................................................................................... 8, 11

28 U.S.C. § 1333 ............................................................................... 61, 62, 63

28 U.S.C. § 1334 ...................................................................................... 57, 59

28 U.S.C. § 1441 ............................................................................... 61, 62, 63

28 U.S.C. § 1442 ............................................................................ 50, 51, 52, 55

28 U.S.C. § 1447 ................................................................................................ 3

28 U.S.C. § 1452 ...................................................................................... 60, 61

28 U.S.C. § 1452(a) .................................................................................. 57, 59

28 U.S.C. § 1452(b) .................................................................................. 60, 61

28 U.S.C. § 362(b)(4) ....................................................................................... 57

30 U.S.C. § 1255 ............................................................................................... 29

30 U.S.C. § 1270(e) .......................................................................................... 29

30 U.S.C. §§ 21a, 29–32, 54 ............................................................................ 29

42 U.S.C. § 5801 *et seq.* ................................................................................. 29

42 U.S.C. § 7401 ............................................................................................... 38

42 U.S.C. § 7401(a)(3) ................................................................................ 29, 38

42 U.S.C. § 7416 ................................................................................... 19, 29, 38

42 U.S.C. § 7604 ............................................................................................... 42

43 U.S.C. § 1349 ............................................................................................... 43

43 U.S.C. § 1349(b)(1) ..................................................................................... 42

46 U.S.C. § 30101(a) .................................................................................. 63, 64

Md. Comm. L. § 13-301(1) ............................................................................... 24

Md. HB 514 § 2-1304 ....................................................................................... 17

Pub. L. No. 112-63, 125 Stat. 758 ................................................................... 63

Pub. L. No. 112-63, 125 Stat. 758 (Dec. 7, 2011) .......................................... 63

**Other Authorities**

Md. Exec. Order 01.01.2007.07, Commission on Climate Change (Apr. 20, 2007) .................... 17

U.S. Const. art. III, § 2, cl. 1 ........................................................................... 61

1 *Collier on Bankruptcy* (15th ed.) § 3.07[3] ............................................... 57

## I.  INTRODUCTION

Defendants' Notice of Removal entirely mispresents the substance of the state law causes of action brought in Maryland state court by Plaintiff Mayor and City Council of Baltimore (the "City"). The City's claims seek money damages and abatement under Maryland law to mitigate harm caused by climate change, which have resulted directly from the Defendants' tortious over-promotion, over-marketing, and resulting sales of massive quantities of fossil fuels despite knowing for more than fifty years that their actions would cause serious harm to places like Baltimore. The City seeks to vindicate these harms under Maryland law; its well-pleaded complaint creates no basis for federal jurisdiction, and this action should be remanded to the Maryland court where it originally arose.

The menagerie of bases for removal that Defendants assert all rely, at bottom, on the premise that climate change poses such a large, complex, national problem that no state court may adjudicate tort claims to remedy the local harms it causes. But a federal court's jurisdiction does not turn on whether a plaintiff's alleged injuries are part of a large, complex, nationwide problem. To the contrary, the district court's jurisdiction is limited to the specific cases and controversies expressly defined (and jealously guarded) by the Constitution and acts of Congress. As the Northern District of California recently recognized in remanding cases brought by California municipalities alleging state law causes of action for climate change-related injuries:

> [T]o justify removal from state court to federal court, a defendant must be able to show that the case being removed fits within one of a small handful of small boxes. Because these cases do not fit within any of those boxes, they were properly filed in state court and improperly removed to federal court.

*Cty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 939 (N.D. Cal. 2018), *appeal docketed*, No. 18-15499 (9th Cir. Mar. 27, 2018) ("*San Mateo*").

Defendants' Notice of Removal, presenting the same arguments raised in *San Mateo*, wrongly portrays the substance of the City's claims as seeking to halt, or at least to usurp control over, all greenhouse gas emissions and fossil fuel use worldwide. Defendants' theories of removal have nothing to do with the allegations and claims in the Complaint, and everything to do with preventing the City from protecting itself from the real, local damages inflicted by Defendants. The Supreme Court has long recognized the fundamental principle that:

> [Under] the century-old jurisdictional framework governing removal of federal question cases from state into federal courts, . . . a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law. The 'well-pleaded complaint rule' is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts.

*Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) (citations omitted). There is no federal question presented in the Complaint's state law causes of action. And none of the state law claims presents an "embedded" federal question under the narrow test for removal articulated in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005) ("*Grable*").

Defendants' attempt to shoehorn a federal common law cause of action into the Complaint also fails. Even assuming federal common law "controls" (which it does not), it could only arise as a federal law defense and therefore cannot provide a jurisdictional basis to support removal. Defendants' further efforts to invoke "complete preemption" under the federal Clean Air Act (the "Act") conflicts with the text, context, structure, and purpose of the Act—which explicitly emphasizes the primary role of states in addressing air pollution—and likewise provides no basis for removal jurisdiction.

Additionally, Defendants' arguments premised on fossil fuel extraction on the Outer Continental Shelf, in a federal enclave, or at the direction of a federal officer have no foundation

in the Complaint or the law. The City's allegations focus on injuries from the defective nature of Defendants' fossil fuel products, from Defendants' injection of those products into the marketplace without sufficient warnings of their known dangers, and from Defendants' over-promotion, over-marketing, and deliberate campaigns of misinformation that undermined public understanding of those dangers. The location of the extraction of these fuels is irrelevant to the success or failure of the Complaint, and any contractual relationship with an actual federal officer is unconnected to Defendants' tortious conduct or the ability to obtain relief through state court. Because the City's claims arise out of the exercise of its police power to protect the public interest, there is no basis for removal based on bankruptcy, and Defendants' assertion that this case is "related to" a non-party subsidiary bankruptcy plan confirmed over 30 years ago borders on frivolous. Finally, even if the City's claims arose out of admiralty, which they do not, state law admiralty claims brought in state court are not removable.

Defendants fail to establish the constitutionally irreducible requirement of subject-matter jurisdiction to support removal. The City respectfully requests that this Honorable Court grant its motion to remand, pursuant to 28 U.S.C. § 1447, and properly return this case to state court.

## II.   FACTS

The City sued Defendants—26 companies that produce, market, promote, and sell fossil fuels—in the Circuit Court of Maryland for Baltimore City, seeking damages and equitable relief associated with injuries the City has sustained and will sustain from climate change. Doc. No. 1 (July 31, 2018) ("Not. of Rem."), Ex. A & Doc. No. 42 ("Compl.") ¶¶ 218–98.[1] Defendants filed a notice of removal asserting eight separate grounds for federal court jurisdiction (*see generally*,

---

[1] Unless otherwise noted, all paragraph symbols (¶) in this Section refer to paragraphs so numbered in the City's Complaint ("Compl.").

Not. of Rem. ¶¶ 5–12).

Defendants have known for nearly 50 years that their oil, gas, and coal products create greenhouse gas pollution that warms the oceans, changes our climate, and causes sea levels to rise. ¶¶ 1, 5, 103–40. They were so certain of this conclusion that some took steps to protect their own assets from rising seas and more extreme storms, and they developed new technologies to profit from a warming world. ¶¶ 5, 171–90. Despite this knowledge, Defendants engaged for decades in a coordinated, multi-front effort to conceal and contradict their own knowledge, discredit the growing body of publicly available science, and persistently create doubt in the minds of customers, consumers, regulators, and the media. ¶¶ 141–70. Their own scientists warned in the 1970s that a narrowing window of time remained before "hard decisions regarding changes in energy strategy might become critical." ¶ 112. Defendants launched multi-million-dollar public relations campaigns to prevent regulation by denying the truth and deceiving the public and policymakers, while continuing to market and promote their products aggressively to increase production and profits. ¶ 147.

Defendants are responsible by themselves for a substantial share of all industrial carbon dioxide emissions between 1965 and 2015, a critical period known to scientists as the "Great Acceleration," during which the vast majority of all such emissions in human history have occurred. ¶¶ 4, 7, 44–46. Industrial carbon dioxide emissions—that is, emissions from the use of coal, oil, and gas—are the dominant factor in the expansion of the oceans, melting of land-based glaciers, and loss of the polar ice caps, all of which are the dominant factors contributing to sea level rise. ¶¶ 36–60. The frequency of extreme sea-level events has correspondingly increased with the acceleration of industrial emissions. ¶ 52. Industrial carbon dioxide has increased mean air temperatures, resulting in extreme high temperatures and heat waves; disrupted the hydrologic

cycle resulting in increased extreme precipitation events, including cyclones, floods, and drought; and contributed to ocean acidification. ¶¶ 61–90. As a result of these climate change impacts, the City and its residents have been injured. ¶¶ 8, 191–217. The impacts on the City, already serious, will substantially worsen. Even if all emissions from fossil fuel use ceased today, sea levels would continue to rise and other impacts of climate change would continue to accelerate due to greenhouse gases already emitted. ¶ 179.

The primary source of industrial carbon dioxide emissions is the extraction, production, and consumption of fossil fuel products—coal, oil, and natural gas. *See, e.g.*, ¶ 3. The City's injuries arise from the defective nature of those fossil fuel products manufactured, marketed, and sold by Defendants; Defendants' knowledge of the dangerous effects of their products; Defendants' injection of those products into the stream of commerce without sufficiently warning of those known dangers; and Defendants' campaign of misinformation that undermined public understanding of those dangers. ¶¶ 218–98.

The City asserts claims exclusively under Maryland law. Specifically, the City pleads public nuisance, private nuisance, product liability (failure to warn and defective design), negligence, trespass, and violations of the Maryland Consumer Protection Act, arising out of injuries to the City, its resources and infrastructure, and its residents, all sustained within the City's borders. ¶¶ 218–98. The City does not seek to nullify or modify any permit issued under state or federal law; nor to affect any greenhouse gas regulation, law, or treaty, foreign or domestic; it certainly does not, contrary to Defendants' arguments, "seek to regulate nationwide emissions that . . . conform to EPA's emission standards" (Not. of Rem. ¶ 49); nor does it "seek[] to regulate greenhouse gas emissions worldwide, far beyond the borders of the United States" (*id.* ¶ 35). Rather, the City seeks damages and costs of abatement—i.e., the costs of adaptation and mitigation

measures within its geographic boundaries, even expressly excluding measures that may be required on federal lands in the City—for harms caused by Defendants' conduct. ¶¶ 1 n.2, 218–98, Prayer.

## III.   APPLICABLE LEGAL STANDARDS

### A.   Defendants Bear the Burden to Defeat the Strong Presumption Against Removal Jurisdiction.

The U.S. Supreme Court has always recognized that, axiomatically, federal courts are "courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005) (internal quotation omitted). This rule embodies the "[d]ue regard for the rightful independence of state governments, which should actuate federal courts, [by requiring] that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Healy v. Ratta*, 292 U.S. 263, 270 (1934). Courts must "construe removal jurisdiction strictly" because it implicates "significant federalism concerns." *Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005). Accordingly, the burden is on the party seeking removal. *Id.* at 439. "[I]f federal jurisdiction is doubtful, a remand to state court is necessary. *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc).

The well-pleaded complaint rule prohibits the exercise of federal question jurisdiction if no federal claim appears within the four corners of the complaint. *See Pressl v. Appalachian Power Co.*, 842 F.3d 299, 302 (4th Cir. 2016). This rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). It is a "powerful doctrine" that "severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9–10 (1983) ("*Franchise Tax Bd.*"). For a case to arise under federal law, a

complaint must establish either (1) that federal law creates the cause of action, or (2) "the second, more narrow basis applicable only to a state-law cause of action implicating a 'significant' federal issue." *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 181 (4th Cir. 2014). A state law cause of action only falls within the latter "slim category" when it "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

### B. Federal Defenses, Including Ordinary Preemption, Cannot Confer Subject-Matter Jurisdiction.

The well-pleaded complaint rule's close corollary is that "[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense" based in federal law, whether anticipated by the plaintiff in the complaint, or asserted by the defendants in the notice of removal. *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) (quoting *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)). It is "settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax Bd.*, 463 U.S. at 14; *see also Gully v. First Nat'l Bank*, 299 U.S. 109, 116 (1936) ("By unimpeachable authority, a suit brought upon a state statute does not arise under an act of Congress or the Constitution of the United States because prohibited thereby.").

## IV. REMAND TO STATE COURT IS REQUIRED BECAUSE THERE IS NO SUBJECT-MATTER JURISDICTION.

### A. Federal Common Law Does Not Confer Subject-Matter Jurisdiction Over the City's Claims.

Defendants' assertion that the City's tort claims are "governed by" federal common law (Not. of Rem. ¶ 14) could not provide a basis for removal even if it were correct. Defendants' position is, at most, an ordinary preemption defense for the Circuit Court of Baltimore City to

consider on remand. *See, e.g.*, *Franchise Tax Bd.*, 463 U.S. at 14. No appellate authority supports the proposition that state law claims that are "governed by" federal law—whether statutory or common law—for that reason "arise under" federal law within the meaning of 28 U.S.C. § 1331 and are therefore removable. To the contrary, the Supreme Court in *Grable* and its progeny articulated the exclusive test that courts must apply to determine whether a well-pleaded state law claim arises under federal law. *See Grable*, 545 U.S. at 314; *infra* § IV.B. Defendants' theory would obviate the distinction between complete and ordinary preemption, turn the well-pleaded complaint rule on its head, and render any garden variety preemption defense grounds for removal. That result is irreconcilable with *Grable*.

Moreover, Defendants are wrong that the City's claims are "governed by" federal common law at all. The body of common law the Defendants seek to apply was displaced by the Clean Air Act and never resurrected. Additionally, Defendants' assertion that federal common law applies exclusively to any cause of action touching on climate change, such that state law claims under any theory have been obliterated, contradicts the Supreme Court's holding in *American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011) ("*AEP*"), and the Ninth Circuit's subsequent decision in *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012) ("*Kivalina*"), *cert. denied*, 133 S. Ct. 2390 (2013). As the district court correctly found in *San Mateo*, the Supreme Court held "that the question of whether such state law claims survived would depend on whether they are preempted by the federal [Clean Air Act] that had displaced federal common law (a question the Court did not resolve)." *San Mateo*, 294 F. Supp. 3d at 937 (citing *AEP*, 564 U.S. at 429). "Simply put, th[is] cas[e] should not have been removed to federal court on the basis of federal common law that no longer exists." *Id*.

1.   **Defendants' Assertion that Federal Common Law "Governs" the City's Claims Raises an Ordinary Preemption Defense, and Nothing More.**

The crux of Defendants' federal common law argument is that this "action is removable because Plaintiff's claims, to the extent that such claims exist, necessarily are governed by federal common law, and not state common law." Not. of Rem. ¶ 14. Defendants conspicuously avoid using the term "preemption," but their argument unavoidably reduces to an ordinary preemption defense, which does not and cannot confer removal jurisdiction on this Court.

Defendants insist *ad nauseum* that the City's claims are "governed by" federal common law. Not. of Rem. ¶¶ 14, 21. The City strongly disagrees. As explained in Section IV.A.2, *infra*, a district court expressly held in *San Mateo* that similar claims pled under California law are not "governed" by any body of federal common law. 294 F. Supp. 3d at 937. But even if Defendants were correct that federal common law "governs" any state law cause of action here (Not. of Rem. ¶ 18), Defendants would at best have a preemption defense to City's claims *in state court on remand*—and not a basis for removal jurisdiction. It is settled law that ordinary preemption is a federal defense and so cannot warrant removal. *Caterpillar*, 482 U.S. at 392. "Even if preemption forms the very core of the litigation, it is insufficient for removal." *Lontz*, 413 F.3d at 441.

Departing from established precedent, the district court in the San Francisco and Oakland climate change public nuisance cases determined that federal subject-matter jurisdiction existed and removal was proper because "a uniform standard of decision is necessary to deal with the issues raised in plaintiffs' complaints." *City of Oakland v. BP p.l.c.*, No. C 17-06011 WHA, 2018 WL 1064293, at *3 (N.D. Cal. Feb. 27, 2018) ("*Oakland*"). Respectfully, that decision and order is wrong, as the district court found in *San Mateo*, 294 F. Supp. 3d at 937, and either misapplies or ignores express Supreme Court authority. The *Oakland* court acknowledged that the city plaintiffs' public nuisance claims were "pled as state-law claims" and facially raised no

questions of federal law, but nonetheless found that the well-pleaded complaint rule did not apply. *Id.* at *5.[2] The court neither applied nor even cited *Grable*; instead the court simply concluded *ipse dixit* that removal was proper because "judicial relief should be uniform across the nation," and the cities' nuisance claims were therefore "governed by" and arose under federal common law, notwithstanding the contents of the well-pleaded complaint. *Oakland*, 2018 WL 106429, at *3, *5. But there is no exception to *Grable* for questions that "should be uniform across the nation," and no court of appeals has held that a district court may ignore *Grable* where a plaintiff could have alleged federal common law claims but elected to rely entirely on state law.

The Fourth Circuit has expressly rejected similar attempts to circumvent *Grable* by advancing federal "uniformity" or "governing" federal law as bases for federal jurisdiction. In *Pinney v. Nokia*, 402 F.3d 430 (4th Cir. 2005), four plaintiffs brought separate product liability, consumer protection, fraud, conspiracy, and negligence claims under four states' laws, alleging that (1) Nokia's cellular telephones "emit an unsafe level of [radio frequency or "RF"] radiation" and (2) Nokia "negligently and fraudulently endangered the consuming public by marketing wireless telephones without headsets" that reduce users' RF exposure. *Id.* at 440. Nokia removed the cases from state court, and all four were consolidated before the District of Maryland. *Id.* at 441. Nokia argued for a novel so-called "sufficient connection" test, such that "where a plaintiff's

---

[2] Citing dicta from *Illinois v. City of Milwaukee, Wis.*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*"), the court found that a state law cause of action "'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law." *Oakland*, 2018 WL 1064293, at *5. In *Milwaukee I*, however, the State of Illinois expressly brought "claims founded upon federal common law" in the original jurisdiction of the Supreme Court, and neither alleged state law causes of action nor ever proceeded in state court. 406 U.S. at 100. No question of removal jurisdiction was before the Court or addressed. More than thirty years after *Milwaukee I*, by contrast, the Supreme Court articulated in *Grable* and *Gunn v. Minton*, 568 U.S. 251, 259 (2013), the specific four-part test district courts must apply to determine whether well-pleaded state law claims filed in state court arise under federal law and are removable. *See infra* § IV.B.

state law complaint is sufficiently connected to a federal regulatory regime as to which Congress has expressed a need for uniform implementation and interpretation, that connection can provide a basis for federal question jurisdiction even if no explicitly federal claim is pled." *Id.* at 448. In overturning the district court's denial of remand, the Fourth Circuit held:

> Nokia's sufficient connection theory, as applied to these claims, is similar to, if not indistinguishable from, the argument that the Pinney plaintiffs' claims are removable under the substantial federal question doctrine because they are preempted by the FCA and the federal RF radiation standards. Nokia, of course, avoids couching its argument in preemption terms because it knows that the affirmative defense of preemption cannot serve as a basis for removal under the substantial federal question doctrine. Regardless of whether Nokia's sufficient connection theory is at bottom a preemption argument, we reject it because it is not supported by our [precedent], and it is inconsistent with Supreme Court precedent.

*Id.* at 448–49. In short, even if a state law cause of action is "governed by" federal law—as Defendants contend incorrectly here—the Fourth Circuit has squarely held that such a cause of action does not *per se* "arise under" federal law for removal purposes to the exclusion of a proper *Grable* analysis, which the court's precedent and Supreme Court authority require.[3] Again, to argue federal law or federal regulations "control" is to argue that the City's claims *arising under*

---

[3] *National Farmers Union Insurance Companies v. Crow Tribe of Indians*, 471 U.S. 845 (1985), which Defendants cite (Not. of Rem. ¶¶ 5, 14), does not alter the calculus. The plaintiffs there sued the Crow Tribe in federal district court, seeking to enjoin enforcement of a default judgment entered by the tribal court. *Id.* at 847–48. The Court held that jurisdiction existed over the plaintiff's claims under 28 U.S.C. § 1331 because the plaintiffs themselves "contend[ed] that federal law has divested the Tribe" of the "power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court," and thus facially presented a federal question. *Id.* at 852–53. *Crow Tribe*, like *Kivalina* and *AEP*, was filed in federal court on explicitly federal law theories, and involved neither removal jurisdiction, nor the relationship between state laws and federal common law, nor the complete preemption doctrine.

*state law* are preempted, a question this Court lacks jurisdiction to adjudicate. For that reason, the court in *Oakland* erred in denying remand, and remand is required here.[4]

### 2. No Appellate Authority Holds That Tort Claims Related to Climate Change Must Be Exclusively Pleaded Under Federal Common Law.

Even if it were a proper basis for removal jurisdiction, Defendants' assertion that any tort claim touching on climate change is necessarily "controlled" by federal common law to the exclusion of all state law is not supported by the cases they cite, nor any other appellate authority.

In *AEP* and *Kivalina*, the Supreme Court and Ninth Circuit, respectively, found that the plaintiffs' claims, both filed in federal district court and expressly pled under federal common law, were displaced by the federal Clean Air Act. Significantly, neither case considered the relationship between federal common law and state law, and neither case considered any issue of subject matter jurisdiction. In *AEP*, eight states, New York City, and three land trusts sued five electric power companies in federal court, alleging that the companies' greenhouse-gas emissions violated the federal common law of interstate nuisance or, in the alternative, state tort law. 564 U.S. at 418. Justice Ginsburg, writing for a unanimous Court, specifically reserved the question of whether state nuisance law may address emissions by stationary sources regulated by the Clean Air Act:

> In light of our holding that the Clean Air Act displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act. None of the parties have briefed preemption or otherwise

---

[4] The court in *City of New York v. BP P.L.C.*, No. 18 CIV. 182 (JFK), 2018 WL 3475470 (S.D.N.Y. July 19, 2018), made a similar error in the context of a motion to dismiss, converting the City of New York's well-pleaded state law nuisance and trespass claims into federal common law ones and finding those "federal" claims were displaced by the Clean Air Act. *Id.* at *4. As in *Oakland,* the only cases the court cited for the proposition that state law claims could be treated as federal common law claims were ones where the plaintiff expressly pled claims under federal common law. And as in *Oakland,* the court simply declared that the City's causes of actions *were* federal because they supposedly involved "exactly the type of 'transboundary pollution suit[]' to which federal common law should apply." *Id.* As explained in Section IV.A.2, *infra*, the court's conclusion misinterprets *AEP, Kivalina*, and a host of other cases.

addressed the availability of a claim under state nuisance law. We therefore leave the matter open for consideration on remand.

*Id.* at 429 (citations omitted).[5]

In *Kivalina*, the plaintiff municipality brought both federal and state nuisance claims in federal court against fossil fuel and utility companies. 696 F.3d at 853. The district court had granted the defendants' motion to dismiss the federal claims, separately stating that it "decline[d] to assert supplemental jurisdiction over the remaining state law claims which are dismissed *without prejudice to their presentation in a state court action*." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 882–83 (N.D. Cal. 2009) (emphasis added), *aff'd on other grounds*, 696 F.3d 849. Because the plaintiff did not appeal the dismissal of the supplemental state law claims, the Ninth Circuit had no occasion to address federal jurisdiction over them, much less their removability had they been filed originally in state court. Rather, the Court of Appeals applied *AEP*'s holding that the Clean Air Act addresses "domestic greenhouse gas emissions from stationary sources and has therefore displaced *federal* common law." *Kivalina*, 696 F.3d at 856 (emphasis added). As Judge Pro explained:

> Displacement of the federal common law does not leave those injured by air pollution without a remedy. *Once federal common law is displaced, state nuisance law becomes an available option to the extent it is not preempted by federal law. . . .* The district court below dismissed Kivalina's state law nuisance claim without prejudice to refiling it in state court, and *Kivalina may pursue whatever remedies it may have under state law to the extent their claims are not preempted*.

*Id.* at 866 (Pro, J., concurring) (emphases added).

---

[5] Defendants' reliance on the Court's dictum that "borrowing the law of a particular State would be inappropriate" (Not of Rem. ¶¶ 5, 20) is also misplaced. The Court's statement, made without discussion, was not an endorsement of federal common law over state law, but instead an acknowledgement that the case involved eight States and New York City as plaintiffs all suing emitters holding permits in other states. *See AEP*, 564 U.S. at 418, 423. For that reason, selecting the law of one state to control the claims of all plaintiffs and defendants could well have been inappropriate.

Defendants conflate the relationship between federal statutes and federal common law, on the one hand, with the relationship between federal law and state law, on the other. *AEP* and *Kivalina* addressed only the relationship between federal common law and federal statutory law; neither case considered the preemptive relationship between federal and state law that invokes a very different calculus. "Legislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law." *AEP*, 564 U.S. at 423 (citing *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 317 (1981)).[6] *AEP* and *Kivalina* both explicitly left open the viability of state law claims addressing harms related to climate change, and appropriately left questions of ordinary preemption for consideration in state court.

Interpreting *AEP* and *Kivalina* together in the context of removal jurisdiction, the district court in *San Mateo* correctly granted the plaintiffs' motion to remand:

> Far from holding (as the defendants bravely assert) that state law claims relating to global warming are superseded by federal common law, the Supreme Court [in *AEP*] noted that the question of whether such state law claims survived would depend on whether they are preempted by the federal statute that had displaced federal common law (a question the Court did not resolve). [564 U.S. at 429]. This seems to reflect the Court's view that once federal common law is displaced by a federal statute, there is no longer a possibility that state law claims could be superseded by the previously-operative federal common law. . . . Because federal

---

[6] *Accord, e.g.*, *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015) *reh'g en banc denied*, 805 F.3d 685 (2015) ("There are fundamental differences between displacement of federal common law by the [Clean Air] Act and preemption of state common law by the Act. For one thing, the Clean Air Act expressly reserves for the states—including state courts—the right to prescribe requirements more stringent than those set under the Clean Air Act."); *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 83 (Iowa 2014), *cert. denied*, 135 S. Ct. 712 (2014) ("(1) [T]he question of displacement of federal common law is different than the question of preemption of state law actions, and (2) the standard for displacement of federal common law is different than the standard for preemption of state law. Further, in considering the issues of displacement of federal common law under the [Clean Water Act] and the [Clean Air Act], the Supreme Court has not had to consider the statutory language in the [Clean Air Act] suggesting a congressional intent to not preempt state law.").

common law does not govern the plaintiffs' claims, it also does not preclude them
from asserting the state law claims in these lawsuits.

*San Mateo*, 294 F. Supp. 3d at 937. Likewise here, Defendants' federal common law argument is

no more than an ordinary preemption defense. It does not provide an independent basis for subject

matter jurisdiction, and it is not a valid ground for removal.

### 3. Defendants' Cases Address Ordinary Preemption Defenses and Choice of Law, Not Removal Jurisdiction.

Nor do any of the other cases Defendants cite for their erroneous substantive position that

federal law "governs" this case support removal jurisdiction. Indeed, none even considered that

issue. Rather, all but one of Defendants' cases were filed in federal district court in the first

instance, and all considered ordinary preemption or choice of law issues.

In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988), the Court held generally

that in "a few areas, involving 'uniquely federal interests,' . . . state law is pre-empted and

replaced" by federal common law. But *Boyle* was a diversity case commenced in district court and

did not consider any jurisdictional issue. *See id.* at 502. Similarly, *Committee for the Consideration

of the Jones Falls Sewage System v. Train*, 539 F.2d 1006, 1008 (4th Cir. 1976), also was brought

in federal court, and the plaintiffs expressly sought relief under the federal common law of

nuisance. The Fourth Circuit held that federal common law could not be invoked for an entirely

intrastate water pollution issue. *Id.* at 1010.

*Resolution Trust Corp. v. Everhart*, 37 F.3d 151, 153 (4th Cir. 1994), only addressed

whether the viability of state law claims arising out of short-term commercial construction loans

should be determined based on state or federal common law for *choice of law* purposes. The court

found that state law should be applied where the claims "were authorized and enabled by state

law." *Id.* Likewise, the Ninth Circuit in *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d

1156 (9th Cir. 2016), did not consider any jurisdictional question. The court held only that breach

of contract claims against military contractors are "governed by federal common law" for choice of law purposes, and affirmed dismissal for failure to state a claim. *Id.* at 1159–61.

*City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 310 (1981) ("*Milwaukee II*"), began when the State of Illinois filed a complaint in federal court seeking to abate an alleged nuisance "under federal common law." The Court held that the Clean Water Act had displaced certain federal common law nuisance claims related to water pollution, but did not present any jurisdiction or removability issue. *Id.* at 317. Finally, in *International Paper Co. v. Ouellette*, 479 U.S. 481, 500 (1987), the state common law action was removed from Vermont state court on diversity grounds, and the Court considered only whether the Clean Water Act preempted the state claims as alleged—not whether any basis for jurisdiction existed beside diversity. In short, Defendants' cases have nothing to do with the removability of state law claims and do not stand for Defendants' position that well-pled state law claims may be converted *ipse dixit* by a court into federal common law claims.[7]

### 4. The City's Claims Fall Outside the Scope of Any Operative Federal Common Law in Any Event.

Even if the federal common law Defendants champion had not been displaced (it has), Defendants' argument would still fail. Federal common law does not "control" all cases against greenhouse gas emitters. Further, there is no federal common law applicable to claims against

---

[7] Defendants also raise a puzzling argument, citing no authority, that removal is proper because "the question of whether a particular common law claim is controlled by federal common law rather than state law is itself a question of law that is governed by federal law as set forth in *Erie* and its progeny." Not. of Rem. ¶ 19. That argument simply repackages the ordinary preemption defense asserted elsewhere in the Notice. To say a "particular claim is controlled by federal common law rather than state law" is simply to say that federal common law preempts state law. "Federal pre-emption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to federal court." *Metro. Life Ins. Co.*, 481 U.S. at 63; *supra* § III.B.

manufacturers and sellers for tortious promotion and marketing of products known to be dangerous. Nor does any "uniquely federal interest" warrant application of federal common law.

The City's claims here focus on Defendants' wrongful production, promotion, and marketing of their fossil fuel products. *See, e.g.*, Compl. ¶¶ 218–98. The City does not seek injunctive relief that would compel any regulatory agency to reconsider its regulations, nor does it seek to interfere with permits held by any party under the Clean Air Act or any other law. Rather, the City seeks damages and abatement—the costs for adaptation and mitigation measures within its geographic boundaries—against the manufacturers and promoters of products they knew would cause harm.

No authority supports applying federal common law to the City's claims. The instances where it is appropriate to develop federal common law are "few and restricted." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (citations omitted). There must be a "uniquely federal interest," *id.*, and a "significant conflict" between federal policy or interests and state law, *Boyle*, 487 U.S. at 507. Climate change is far from a "uniquely federal interest." Indeed, the havoc wreaked at the state and local level directly implicates fundamental state interests, and many state laws address climate change and global warming, including those of Maryland. *See, e.g.*, Md. Exec. Order 01.01.2007.07, Commission on Climate Change (Apr. 20, 2007) (establishing commission to develop climate action plan because "Maryland's people, property, natural resources, and public investments are extremely vulnerable to the ensuing impacts of climate change, including sea level rise, increased storm intensity, extreme droughts and heat waves, and increased wind and rainfall events"); Md. HB 514 § 2-1304 (codifying Maryland Commission on Climate Change).

Courts have frequently and expressly recognized states' interests in combatting climate

change. In *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 2875 (2014), the Ninth Circuit rejected challenges to California's regulation of certain fuels even though the regulations might affect out-of-state producers:

> Because [greenhouse gases] mix in the atmosphere, all emissions related to transportation fuels used in California pose the same local risk to California citizens. That these climate change risks are widely-shared does not minimize California's interest in reducing them. . . . One ton of carbon dioxide emitted when fuel is produced in Iowa or Brazil harms Californians as much as one emitted when fuel is consumed in Sacramento.

*Id.* at 1080–81 (citation and quotation omitted). As the court noted, "[i]f [greenhouse gas] emissions continue to increase, California may see its coastline crumble under rising seas, its labor force imperiled by rising temperatures, and its farms devastated by severe droughts." *Id.* at 1097. *Accord, e.g.*, *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 339–40 (D. Vt. 2007) (rejecting preemption of regulations addressing greenhouse gas emissions standards for new automobiles; emphasizing that the states' "regulation of greenhouse gases emitted from motor vehicles has a place in the broader struggle to address global warming").[8]

Second, it is well established that suits against sellers and manufacturers of products do not present "uniquely federal interests" warranting application of federal common law, even where nationwide conduct or impacts are at stake. *See, e.g.*, *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1324 (5th Cir. 1985) (en banc) (state law, not federal common law, governed in cases against asbestos manufacturers); *In re Agent Orange Prod. Liab. Litig.*, 635 F.2d 987, 995 (2d Cir. 1980) (state law, not federal common law, governed class action tort case on behalf of millions of

---

[8] *Accord Am. Fuel & Petrochem. Mfrs. v. O'Keeffe*, __ F.3d __, 2018 WL 4263250, at *6, *9 (9th Cir. Sept. 7, 2018) (noting that that "[i]t is well settled that the states have a legitimate interest in combatting the adverse effects of climate change on their residents," and affirming the district court's holding that the Act does not preempt Oregon regulations of lifecycle greenhouse gas emissions from transportation fuels).

U.S. soldiers who had served in Vietnam against producers of Agent Orange, despite federal interest in the health of veterans). The fact that a product is sold in many states, or causes injury throughout the country, does not create a "uniquely federal interest." As the Fifth Circuit explained in *Jackson*: "A dispute . . . cannot become 'interstate,' in the sense of requiring the application of federal common law, merely because the conflict is not confined within the boundaries of a single state." 750 F.2d 1324. Contrary to the district court's reasoning in *Oakland*, the Second Circuit has expressly held that "there is no federal interest in uniformity for its own sake. . . . The fact that application of state law may produce a variety of results is of no moment" and is "the nature of a federal system." *In re Agent Orange Prod. Liab. Litig.*, 635 F.2d at 994.

Third, there is no "uniquely federal interest" merely because the injury results from emissions of a pollutant regulated by the Clean Air Act. *See Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1203 (9th Cir. 1988) ("[T]here is not 'a uniquely federal interest' in protecting the quality of the nation's air. Rather, the primary responsibility for maintaining the air quality rests on the states."); *Merrick*, 805 F.3d at 687 ("The Clean Air Act states that air pollution prevention and control is the primary responsibility of individual states and local governments." (citing 42 U.S.C. § 7416)). Courts have allowed state law claims against manufacturers whose were regulated under the Act. *See, e.g.*, *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) ("*MTBE*") (rejecting preemption of state tort claims against gasoline producers for contamination of groundwater with MTBE, a gasoline additive regulated under the Clean Air Act); *In re Volkswagen "Clean Diesel" Litig.*, CL-2016-9917, 2016 WL 10880209, at *5–6 (Va. Cir. Ct. 2016) ("*Volkswagen*") (permitting state law claims against defendant vehicle manufacturer based on tortious behavior beyond alleged noncompliance with Clean Air Act emissions standards); *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 591–92 (E.D. Mich.

2017) (claims against automaker not preempted where "the gravamen of Plaintiffs' claims, like in *Volkswagen*, focus on 'the deceit about compliance, rather than the need to enforce compliance'").

B.    **The City's Complaint Does Not Necessarily Raise Any Substantial, Disputed Federal Questions and Therefore Does Not "Arise Under" Federal Law.**

Defendants' second argument, invoking *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), dramatically overreads the scope of jurisdiction federal courts may assert over state law claims, and misconstrues the relief the City seeks. Only two types of actions invoke federal question jurisdiction: (1) those asserting causes of action created by federal law and, much less commonly, (2) those asserting state law causes of action that "arise under" federal law. *Grable*, 545 U.S. at 312. The City's claims do not fall into the first category because, on their face, they are not federal causes of action. They also do not come within the second category, because the causes of action arise under Maryland law. *Grable* and its progeny instruct that a well-pleaded state law cause of action "arises under" federal law for removal purposes only when the plaintiff's affirmative case "will necessarily require application" of federal law, such that it cannot meet its *prima facie* burden without relying on a federal standard. *Gunn*, 568 U.S. at 259. *Grable* did not alter the bedrock rule that federal *defenses* cannot create removal jurisdiction (*see supra* § III.B), no matter how important those defenses may ultimately prove to the litigation.

The Supreme Court has repeatedly and unambiguously held that state law causes of action only fall into the "'special and small' category of cases in which arising under jurisdiction still lies," *Gunn*, 568 U.S. at 258, if they "really and substantially involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law." *Grable*, 545 U.S. at 313 (quoting *Shulthis v. McDougal*, 225 U.S. 561, 569 (1912)); *Gunn*, 568 U.S. at 258 (same) (quoting *Empire*

20

*Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)). Federal jurisdiction exists over a wholly state-law complaint only in the limited circumstance where a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

Here, as in *San Mateo*, "the defendants have not pointed to a specific issue of federal law that must necessarily be resolved to adjudicate the state law claims. Instead, the defendants mostly gesture to federal law and federal concerns in a generalized way." *San Mateo*, 294 F. Supp. 3d at 938. Defendants do not and cannot argue that the City's *prima facie* case "requir[es] resolution of a substantial question of federal law, or even interpreting federal law." *Franchise Tax Bd.*, 463 U.S. at 13. Defendants instead contend that the Complaint's wholly state law claims are *unavailable* based on a flotilla of purported federal defenses ranging from the actions of federal regulators to the First Amendment. But even if true (and it is not), Defendants' argument could not create removal jurisdiction. The standard Defendants advocate would mutate the clear, four-part *Grable* test into a free-floating inquiry into how much interpretation of federal law the trial court may encounter in the course of the litigation—whether or not those issues appear on the face of the well-pleaded complaint. Defendants fail to show that the Complaint necessarily invokes disputed and substantial questions of federal law, and therefore removal under *Grable* is improper.

### 1.   The City's Complaint Does Not "Necessarily Raise" Any "Actually Disputed" Issues of Federal Law.

The City's Complaint does not "necessarily raise" any "disputed" issue of federal law, substantial or otherwise. Defendants do not argue that the City's claims depend on the interpretation of federal law but insist instead that some elements of some of the City's causes of action *resemble* or *parallel* federal regulatory considerations, and therefore "arise under" federal

law. Not. of Rem. ¶¶ 27–28. The Fourth Circuit has directly considered and rejected that reasoning, holding that it is inconsistent with *Grable* and other binding Supreme Court and Fourth Circuit authority. *See Pinney*, 402 F.3d at 442 ("If a plaintiff can establish, without the resolution of an issue of federal law, all of the essential elements of his state law claim, then the claim does not necessarily depend on a question of federal law.").

A complaint satisfies this element only where a "question of federal law is a *necessary element* of one of the well-pleaded state claims." *Franchise Tax Bd.*, 463 U.S. at 13 (emphasis added). The Fourth Circuit has repeatedly held, in turn, that "a plaintiff's right to relief for a given claim necessarily depends on a question of federal law only when *every* legal theory supporting the claim requires the resolution of a federal issue." *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 182 (4th Cir. 2014) (quoting *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (en banc)). "In other words, if the plaintiff can support his claim with *even one* theory that does not call for an interpretation of federal law, his claim does not 'arise under' federal law for purposes of § 1331." *Dixon*, 369 F.3d at 817 (4th Cir. 2004) (emphasis added).

The Fourth Circuit in *Pinney* squarely rejected Defendants' central argument that *Grable* creates jurisdiction in any case where "Congress has directed a number of federal agencies to regulate [a] Defendant['s] conduct" in ways tangentially related to the plaintiff's state law allegations. Not. of Rem. ¶ 28. The district court there denied the plaintiffs' motion to remand, finding that their allegations Nokia fraudulently withheld information that its cell phones emitted dangerous levels of radiation "necessarily depend on the resolution of a substantial federal question" because cell phone radiation is regulated by the FCC. 402 F.3d at 441. The district court held the claims were "a disguised attack on FCC's RF radiation standards, and resolution of the claims would require the court to rule on the validity of those standards." *Id.* In reversing the

district court, the Fourth Circuit observed that the well-pleaded complaint rule controls the court's

consideration of a motion to remand and found, after "thoroughly examin[ing]" the plaintiffs' state

law causes of action, that "the elements of each of the claims depend only on the resolution of

questions of state law," and thus were not removable. *Id.* at 445. The court's reasoning applies

directly here:

> According to Nokia, there is a comprehensive federal scheme to regulate
> wireless telecommunications, and Congress has delegated to federal
> regulators the exclusive authority over all technical aspects of wireless
> telecommunications. A sufficient connection exists between the
> telecommunications regulatory regime and the Pinney plaintiffs' claims,
> Nokia says, because the claims are premised on the amount of RF radiation
> that emits from wireless telephones, a technical aspect of wireless telephones
> that is regulated by the FCC. . . .
>
> By Nokia's reasoning, even if the Pinney plaintiffs can establish the
> necessary elements of their claims without resolving a question of federal
> law, the cases are still removable under the substantial federal question
> doctrine because of a connection between the federal scheme regulating
> wireless telecommunications and the Pinney plaintiffs' state claims. That is
> not enough. The Supreme Court has been quite clear that for removal to be
> proper under the substantial federal question doctrine, a plaintiff's ability to
> establish the necessary elements of his state law claims must rise or fall on
> the resolution of a question of federal law.

*Id.* at 448–49.[9] *Accord San Mateo*, 294 F. Supp. 3d at 938 ("Nor does the mere existence of a

---

[9] Numerous other courts routinely remand where, as in *Pinney*, the case takes place against a
factual backdrop of federal regulation but no claim relies on a federal right to relief or turns on
interpreting federal law. *See, e.g.*, *Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation*,
770 F.3d 944, 947–48 (10th Cir. 2014) (no federal question jurisdiction over a breach of contract
claim against Indian Tribe even though contract required approval from U.S. Secretary of the
Interior); *K2 Am. Corp. v. Roland Oil & Gas, LLC*, 653 F.3d 1024, 1032 (9th Cir. 2011) ( "[t]he
mere fact that the Secretary of the Interior must approve oil and gas leases does not raise a federal
question"); *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 912 (7th Cir. 2007) (reversing denial of
remand in personal injury case stemming from airline crash: despite extensive federal regulation
of air travel, the fact "that some standards of care used in tort litigation come from federal law
does not make the tort claim one 'arising under' federal law"); *Kirk v. Palmer*, 19 F. Supp. 3d 707,
708–12 (S.D. Tex. 2014) (no federal jurisdiction over state law breach of contract claim arising
from federal patent, because state contract law and fiduciary principles controlled right of

federal regulatory regime mean that these cases fall under *Grable*."). Here, Defendants argue that, "decades of national energy, economic development, and federal environmental protection and regulatory policies," and the general interest in "uniformity" of their enforcement, are sufficient to create jurisdiction. *See* Not. of Rem. ¶¶ 25, 29. That position is identical to Nokia's arguments in *Pinney*, and fails as a matter of law.

Applying the appropriate test, it is clear that the rights and duties the City seeks to vindicate, and its entitlement to relief, all stem entirely from Maryland law and do not incorporate or depend on any federal standards. None of the City's claims depends on federal law to create the right to relief, none incorporates a federal tort duty that Defendants allegedly violated, and none turns on the application or interpretation of federal law in any way.[10] In short, there is no necessary,

---

recovery); *In re Vioxx Prods. Liab. Litig.*, 843 F. Supp. 2d 654, 669 (E.D. La. 2012) (granting remand of State's state law consumer protection claim where, to the extent it concerned a violation of FDA reporting requirements "that federal question would be resolved in the context of whether that conduct constituted a violation of *Kentucky* law"); *Oregon ex rel. Kroger v. Johnson & Johnson*, 832 F. Supp. 2d 1250, 1255–56, 1260 (D. Or. 2011) (remanding claims against drug manufacturers where state could prove its claims arising from manufacturers' "secret recall" of defective drugs without calling into question validity of FDA's decision not to order public recall).

[10] The City's first and second causes of action allege Defendants' creation of and contribution to a public and private nuisance, as defined under Maryland law. Compl. ¶¶ 218–36; *Tadjer v. Montgomery Cty.*, 479 A.2d 1321, 1327 (Md. 1984) (defining elements of public nuisance); *Washington Suburban Sanitary Comm'n v. CAE-Link Corp.*, 622 A.2d 745, 749–50 (Md. 1993) (defining elements of private nuisance). The third and fourth causes of action rely on Defendants' manufacturing, marketing, and selling defective products, and failing to warn of known defects, all as defined under Maryland law and in violation of duties imposed by Maryland law. Compl. ¶¶ 237–60; *May v. Air & Liquid Sys. Corp.*, 129 A.3d 984, 988–89 (Md. 2015) and *Phipps v. Gen. Motors Corp.*, 363 A.2d 955, 957–58 (Md. 1976) (defining strict product liability for design defect and failure to warn). The fifth and sixth causes of action allege that Defendants negligently designed, manufactured, marketed, and sold defective and dangerous products, and negligently failed to warn of known defects, all in violation of duties imposed by Maryland law. Compl. ¶¶ 261–81; *Am. Laundry Mach. Indus. v. Horan*, 412 A.2d 407, 411–15 (Md. Ct. Spec. App. 1980) (elements of negligent products liability). The seventh cause of action alleges Defendants' conduct caused an unlawful, unconsented intrusion onto the City's real property, violating Maryland law. Compl. ¶¶ 282–90; *Rosenblatt v. Exxon Co., U.S.A.*, 642 A.2d 180, 189–90 (Md. 1994) (defining

disputed federal law issue. Though *factual* issues may arise touching on Defendants' interactions with the federal government, the causes of action in the well-pleaded Complaint neither allege nor depend on any violation of federal *law*.

Defendants are also simply incorrect that adjudicating the City's state law claims will require "the same analysis of benefits and impacts" from fossil fuels that federal agencies conduct. *Id.* ¶ 28. A regulatory agency's prospective, generalized, policy-oriented "balancing" pursuant to regulatory authority, differs fundamentally in kind from the backward-looking, case-specific factor weighing a court conducts in a common law tort suit. The critical distinction was highlighted by the Iowa Supreme Court in *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58 (Iowa 2014). Holding that the Clean Air Act did not preempt residents' state law claims over pollution from a corn milling facility, the court emphasized that unlike the civil penalties imposed under the Act to protect the public at large, "the common law focuses on special harms to property owners caused by pollution at a specific location" allowing owners of real property to "obtain compensatory damages, punitive damages, and injunctive relief . . . in particular locations for actual harms." *Id.* at 69. So too here. The City's Maryland common law claims have no overlap with the various regulatory laws and agency decisions Defendants gesture toward.

Even if Defendants' position were correct, moreover, it would at most present a conflict preemption defense, which is outside *Grable*'s scope and does not make any federal law issue "actually disputed." *Cf. Pinney*, 402 F.3d at 448 ("Nokia's sufficient connection theory, as applied to these claims, is similar to, if not indistinguishable from, the argument that the Pinney plaintiffs' claims are removable under the substantial federal question doctrine because they are preempted

---

trespass). The eighth cause of action alleges violations of Maryland's Consumer Protection Act, Md. Comm. L. § 13-301(1). *Id.* ¶¶ 291–98.

. . . [which] cannot serve as a basis for removal under the substantial federal question doctrine."). As the district court correctly held in *San Mateo*, "[o]n the defendants' theory, many (if not all) state tort claims that involve the balancing of interests and are brought against federally regulated entities would be removable. *Grable* does not sweep so broadly." *San Mateo*, 294 F. Supp. 3d at 938.[11]

The few cases Defendants cite only highlight the fatal flaw in their argument. In every case cited, the plaintiff's claims did not merely touch on a defendant's federally regulated conduct; rather, *the right to relief itself* grew directly out of federal regulation. In *Board of Commissioners of Southeast Louisiana Flood Protection Authority v. Tennessee Gas Pipeline Co.*, 850 F.3d 714, 720–21 (5th Cir. 2017) ("*Tennessee Gas Pipeline*"), *cert. denied*, 138 S. Ct. 420 (2017), for example, the plaintiff alleged that various defendant companies had increased regional flood risk by dredging a network of canals to facilitate fuel transport from oil and gas wells. Even though the plaintiff's claims were framed under state law, the court found removal proper because the complaint itself "dr[ew] on federal law as the *exclusive basis* for holding Defendants liable for some of their actions," which were not subject, under Louisiana law, to the duties the plaintiffs

---

[11] This Court's sister districts have applied the same reasoning to reject identical arguments:

> If the Court accepts Defendants' argument that *Grable* jurisdiction can be found simply because the Complaint will require some application of a federal law, in an area where there is substantial federal regulation, the category of eligible cases will be no longer special nor small. . . . If the fact that an area of federal law may preempt state law through field, conflict, or express preemption is sufficient to raise a substantial federal question under *Grable*, the rule that only *complete* preemption is a basis for removal would collapse into *Grable*. Such a result would undermine the well-pleaded complaint rule in many areas of law where there is extensive federal involvement.

*W. Virginia ex rel. McGraw v. JPMorgan Chase & Co.*, 842 F. Supp. 2d 984, 1001–02 (S.D.W. Va. 2012).

sought to enforce—namely backfilling the canals and performing other regional flood mitigation. *Id.* at 722–23 (emphasis added). Therefore, "[t]he absence of any state law grounding for the duty . . . for the Defendants to be liable means that that duty would have to be drawn from federal law." *Id.* at 723. Removal was therefore proper because the nuisance and negligence claims "[could not] be resolved without a determination whether multiple federal statutes create a duty of care that does not otherwise exist under state law." *Id.* Here, by contrast, the relief the City seeks, and the duties it seeks to enforce, are drawn from traditional precepts of Maryland law.[12]

### 2. Defendants Have Not Shown That the Complaint Raises Questions of Federal Law That Are "Substantial" to the Federal System as a Whole.

Even if a question of federal law were necessarily raised and actually disputed, Defendants

---

[12] All of Defendants' other citations present the same issue: a nominally state law cause of action that depended entirely on federal law to create the right to relief. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (2001) (finding that "fraud on the FDA" claims "exist[ed] solely by virtue of the [federal] disclosure requirements," unlike "certain state-law causes of actions that parallel federal safety requirements" but do not depend on a substantial federal question); *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming removal of state securities violation claim challenging federally approved "Stock Borrow Program," where plaintiff alleged program "by its mere existence, hinders competition," and therefore "directly implicate[d] actions taken by the [SEC] in approving the creation of the Stock Borrow Program and the rules governing it"); *Bader Farms, Inc. v. Monsanto Co.*, No. 1:16-CV-299 SNLJ, 2017 WL 633815, at *2–3 (E.D. Mo. Feb. 16, 2017) (fraudulent concealment claims rested on defendant's alleged withholding of material information from the Department of Agriculture, and therefore necessarily raised a federal question because the information defendants were required to disclose was defined by federal regulations that "in large part, . . . identif[y] the duty to provide information and the materiality of that information"); *Nance v. Baltimore Am. Mortg. Corp.*, No. CIV. JFM-10-2083, 2010 WL 4291579, at *1 (D. Md. Oct. 29, 2010) (mortgage obligor sued mortgage assignee under federal and Maryland law, but "under Maryland law, an assignee has no affirmative liability . . . to an obligor for an assignor's misconduct" and thus "if any such liability exists, it exists only under [federal law], and the interpretation of the relevant [federal] provision lies at the heart of Plaintiffs' claim"); *W. Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 233 (E.D.N.Y. 2007) (removal jurisdiction existed over case challenging Medicaid reimbursement rates because "[r]esolution of the question of the state's obligation to reimburse its insureds for Zyprexa, using funds largely provided by the federal government, is essential to the state's theory of damages and presents a substantial and disputed federal issue under *Grable*").

have not met their burden to prove such a question is "substantial" within *Grable*'s meaning. A federal issue is "substantial" if it presents "a nearly pure issue of law" that "could turn on a new interpretation of a federal statute or regulation which will govern a large number of cases. . . . Conversely, federal jurisdiction is disfavored for cases that are 'fact-bound and situation-specific' or which involve substantial questions of state as well as federal law." *Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) (quoting *Empire Healthchoice*, 547 U.S. at 701); *see also W. Virginia ex rel. McGraw*, 842 F. Supp. 2d at 1001 (same).

Defendants do not bother to address any of the substantiality factors the Supreme Court has provided. Instead they present a jumble of federal standards that might become relevant (*see generally* Not. of Rem. ¶¶ 27–37), but do not identify any determinative "pure issue of law." *See Empire Healthchoice*, 547 U.S. at 701. The only causes of action Defendants specifically discuss— public and private nuisance—by Defendants' own reasoning, require detailed, fact-bound balancing of the "utility" of the Defendants' tortious conduct against the harm it has caused the City. Not. of Rem. ¶¶ 27–30, 49; *see, e.g.*, *Tadjer*, 479 A.2d at 1327 (nuisance requires determination that defendant's conduct was unreasonable) (citation omitted).

Defendants also do not point to any aspect of this case that will control many other cases raising the same purported federal issues. The most Defendants assert—wrongly—is that the nuisance and product liability claims will require "the same analysis of benefits and impacts" that some federal agencies conduct pursuant to federal regulations. Not. of Rem. ¶¶ 28, 49. But the City does not ask that those federal regulatory decisions be amended or supplanted in any regard. And Defendants do not explain how the jury's determinations on those questions would control any federal law issue in future cases. They would not. Ultimately, Defendants have not met their burden to show that any federal issue that may arise in this case is "substantial" under *Grable*.

3.      **Congress Has Struck the Balance of Judicial Responsibility in Favor of State Courts Hearing State Law Claims.**

Even if the other *Grable* factors were satisfied, removal would still be improper because Congress has struck the jurisdictional balance in favor of the City's claims being heard in state court. The Supreme Court has provided clear guidance for the limited circumstances in which state law claims may be removed: "[T]he combination of no federal cause of action and no preemption of state remedies" is "an important clue to Congress's conception of the scope of jurisdiction to be exercised under § 1331," and indicates that federal jurisdiction is not specially favored. *Grable*, 545 U.S. 318. To find jurisdiction where there is no private federal cause of action "flout[s], or at least undermine[s], congressional intent." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 812 (1986).

Defendants ignore this factor. The Clean Air Act *affirmatively declares* the "primary" role of the states in protecting air quality (42 U.S.C. § 7401(a)(3)), and twice expressly *preserves* rights of action existing under state law. *See infra* § IV.C.2; 42 U.S.C. §§ 7416, 7604(e). The Clean Air Act also does not provide a private right of action akin to the City's claims that provides the remedies the City seeks, providing additional proof that Congress did not intend the district courts to serve as the primary—much less exclusive—forum to resolve such claims.[13]

---

[13] Defendants point to a number of other statutes for the proposition that energy regulation is a national concern, but none of them shows Congress intended a federal forum for every injury related in any way to energy production. The Surface Mining Control and Reclamation Act's savings clauses preserve both "any State law or regulation . . . which provides for more stringent land use and environmental controls and regulations of surface coal mining and reclamation operation than do the provisions of this chapter," and "any right which any person (or class of persons) may have under any statute or common law." 30 U.S.C. §§ 1255, 1270(e). It creates a private right of action for any person "injured in his person or property through violation by any operator of any rule, regulation, order, or permit issued pursuant to this chapter," but no such injury is alleged here. *Id.* § 1270(f). The Energy Reorganization Act established the Energy Research and Development Administration and Nuclear Regulatory Commission, and the only substantive rights

Under *Grable*'s plain terms, the "congressionally approved balance of federal and state judicial responsibilities" here favors state court jurisdiction. *Grable*, 545 U.S. 314. Indeed, redressing the kinds of deceptive marketing and promotion campaigns Defendants undertook here falls directly within the traditional police power of the states. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 133–34 (2d Cir. 2007) ("*MTBE*") (allowing government entity to seek monetary relief against refiners to remedy and prevent environmental damage); *accord, e.g.*, *United States v. Hooker Chems. & Plastics Corp.*, 722 F. Supp. 960 (W.D.N.Y. 1989) (entering summary judgment on public nuisance claim and finding that assumption of risk doctrine did not bar liability where governmental entity asserted claim in exercise of its police power to protect human health).

### 4.  Defendants' Laundry List of Federal Defenses Does Not Provide Federal Jurisdiction.

Defendants present seven federal issues they assert will crop up in the litigation, but none provides a basis for removal jurisdiction because they are all *defenses*. Defendants preview defenses based on the First Amendment; federal Due Process; the Clean Air Act's displacement of federal common law; the Commerce Clause; the foreign affairs doctrine; "whether a state court may review and assess the validity of acts of foreign states"; and some undisclosed federal laws "relating to the ownership and control of land" at locations such as coasts and interstate highways. *See* Not. of Rem. ¶ 33. Couching these "federal issues" as "notable" does not bring them within *Grable*'s limited scope, and Defendants' admission that they are not "strictly jurisdictional" surrenders the argument: none is "a necessary element of one of the well-pleaded state claims,"

---

it addresses are whistleblower protection for nuclear safety employees. *See generally* 42 U.S.C. §§ 5801 *et seq.*; *id.* §§ 5851–53. Finally, the Mining and Minerals Policy Act provides certain rights related to procuring and challenging land patents and mining claims that have nothing to do with tort claims arising from pollution. *See* 30 U.S.C. §§ 21a, 29–32, 54.

because they are all, instead, defenses. *See Franchise Tax Bd.*, 463 U.S. at 13. The hodgepodge of issues in Paragraph 33 of the Notice does not appear on the face of the Complaint and cannot impart "arising under" jurisdiction. *See, e.g.*, *Pinney*, 402 F.3d at 446 (a federal defense "does not make the claims into ones arising under federal law"); *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 478–79 (6th Cir. 2008) ("specter of [federal] equal protection problem" raised by challenge to Ohio's ballot-counting procedure did not create removal jurisdiction because it was "at best a federal defense that the Secretary may or may not wish to inject into the case in the Ohio courts" on remand).

### 5. Defendants' Invocation of Foreign Relations Is a Red Herring and Not a Basis for Federal Jurisdiction.

Defendants also argue that the City's claims are federal in character because they may "intrude upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine." Not. of Rem. ¶ 34. But as the *San Mateo* court correctly held, "[t]he mere potential for foreign policy implications (resulting from plaintiff[] succeeding on [its] claims at an unknown future date) does not raise the kind of actually disputed, substantial federal issue necessary for *Grable* jurisdiction." *San Mateo*, 294 F. Supp. 3d at 938. Accordingly, Defendants' argument fails for at least two reasons: First, the foreign affairs doctrine, like the myriad other federal issues Defendants raise, is merely an ordinary preemption defense outside *Grable*'s scope. *See supra* § III.B. "Under the foreign affairs doctrine, state laws that intrude on th[e] exclusively federal power [to administer foreign affairs] are preempted, under either the doctrine of conflict preemption or the doctrine of field preemption." *Gingery v. City of Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016). "Just as raising the specter of political issues cannot sustain dismissal under the political question doctrine, neither does a general invocation of international law or foreign relations mean that an act of state is an essential element of a claim."

*Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1091 (9th Cir. 2009) (reversing denial of motion to remand).

Second, assuming *arguendo* that foreign affairs preemption might be a basis for "arising under" jurisdiction, Defendants' foreign affairs argument is specious, not least because it wildly overstates the scope of relief the City seeks. To intrude on the federal government's foreign affairs power, a state's action must "produce something more than incidental effect in conflict with express foreign policy of the National Government." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003). The Complaint does not come close to meeting that standard.[14]

Defendants' statement that the Complaint "see[ks] to govern extraterritorial conduct and encroach on the foreign policy prerogative of the Federal Government's executive branch as to climate change treaties" (Not. of Rem. ¶ 34) is patently false. The City does not seek injunctive relief against any party, foreign or domestic; does not seek to modify any greenhouse gas regulation, law, or treaty, foreign or domestic; and surely does not "see[k] to regulate greenhouse gas emissions worldwide, far beyond the borders of the United States." *Id.* ¶ 35. To the contrary, the suit asks only for damages and abatement of the nuisance within Baltimore's territorial limits. *See, e.g.*, Compl. ¶¶ 12, 228. The City does not seek to regulate conduct across the globe.

---

[14] The other cases Defendants cite (Not. of Rem. ¶¶ 34, 35) are factually miles apart from this one and all involved states' attempts to directly regulate aliens or conduct of foreign sovereigns. *See Hines v. Davidowitz*, 312 U.S. 52, 65–68 (1941) (states may not place registration requirements on immigrants that conflict with federal immigration standards); *United States v. Pink*, 315 U.S. 203, 231–32 (1942) (New York could not "refus[e] to give effect to or recogni[ze]" nationalization of private property by Soviet Government "in the face of a disavowal by the United States of any official concern with that program"); *United States v. Belmont*, 301 U.S. 324 (1937) (reversing dismissal of complaint originally filed in federal court, on grounds that district court could not refuse to give effect to the Soviet Union's nationalization of funds and assignment thereof to the United States for violating New York state public policy).

Last, Defendants cannot manufacture federal jurisdiction merely by invoking a doctrine that cannot conceivably apply here. Foreign affairs field preemption only applies where a state "take[s] a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility." *Garamendi*, 539 U.S. at 420 n.11. That is, the state must purport to make its own foreign policy through legislation or otherwise. Here, the only arguably state action is the City pleading generally-applicable tort claims, an area of traditional state responsibility, for harms to the City. Likewise, conflict preemption requires a "clear conflict" between state and federal law, *id*. at 420, which Defendants have not even purported to identify. Even if the foreign affairs defense could create a basis for removal jurisdiction here—and it does not—no necessary element in any of the City's claims substantially impinges on the federal government's foreign policy prerogative.

Defendants misleadingly cite *Al Shimari v. CACI International, Inc.*, 679 F.3d 205, 231 (4th Cir. 2012), without discussing it, for the quotation "the federal government has exclusive power over foreign affairs, and that states have very little authority in this area." *See* Not. of Rem. ¶ 35. Defendants fail to mention that the quoted language came from Judge Wilkinson's *dissent* from the *en banc* majority that dismissed the appeal for lack of appellate jurisdiction. *Al Shimari*, 679 F.3d at 224–25. Nor do Defendants mention that the case was originally filed in federal district court, was never removed from state court, and did not adjudicate removal jurisdiction or any other issue of the district court's original jurisdiction. *Id.* at 209. *Al Shimari* is inapposite, and Defendants' citation to it is misleading at best.

### 6. Federal Laws Authorizing Regulation of Federal Navigable Waters Do Not Confer *Grable* Jurisdiction.

Defendants' final *Grable* argument, that the City's claims "depend on the resolution of substantial, disputed federal questions relating to rising levels of navigable waters of the United States" (Not. of Rem. ¶ 36), suffers from the same fatal flaws as Defendants' previous arguments

for *Grable* jurisdiction. Defendants do not identify any specific federal statute or regulation that is a necessary element of any of the City's claims, but merely allude in a generalized way to federal law and the Army Corps of Engineers' responsibilities in the Chesapeake Bay. *See id.* ¶¶ 36–37. Like the previous litany of possible federal issues, Defendants' invocation of navigable waters is, at most, a preemption defense incapable of generating federal jurisdiction. The mere possibility that some mitigation infrastructure may require a federal permit (again, "resulting from plaintiff[] succeeding on [its] claims at an unknown future date," *San Mateo*, 294 F. Supp. 3d at 939), is not an issue "necessarily raised" by the Complaint. And contrary to Defendants' assertion that the "Complaint challenges—and necessarily requires evaluation of—a federal regulatory scheme and the adequacy of past federal decision making under that scheme" (Not. of Rem. ¶ 37), no element of any of the City's claims requires such an analysis or such a showing. Unsurprisingly, Defendants cite no authority for that proposition. Defendants' reliance on *Tennessee Gas Pipeline*, 850 F.3d at 714, is again misplaced. In that case, the plaintiffs sought to require the defendants to backfill an extensive network of canals, explicitly relying on federal duties under the Rivers and Harbors Act. *Id.* at 721. The court found federal jurisdiction proper in that case not because a federal permit would eventually be required to authorize the relief requested, but instead because federal law supplied the duty at issue. *Id.* at 721, 723. Here, in contrast, state law supplies the duties at issue, and therefore there is no need to resort to federal law.

Nor are any of the purported federal issues involving oversight of navigable waters "actually disputed" or "substantial." Any such disputes would be heavily "fact-bound and situation specific," and thus are the opposite of the nearly "pure issue[s] of law" that on very rare occasions suffice to create *Grable* jurisdiction. *See Empire Healthchoice Assur.*, 547 U.S. at 700–01.

### C.      The Clean Air Act Does Not Completely Preempt the City's Claims.

Defendants fail to meet the high bar required to show the Clean Air Act ("the Act") completely preempts the City's claims to the extent they are related to emissions (Not. of Rem. ¶¶ 38–50), let alone complete preemption of the defective product, tortious marketing, and promotional conduct here at issue.[15] The Supreme Court recognizes a narrow "corollary" to the well-pleaded complaint rule where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co.*, 481 U.S. at 65).

The Fourth Circuit recognizes a presumption against complete preemption that may only be rebutted in the rare circumstance where "federal law 'displace[s] entirely any state cause of action.'" *Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005) (quoting *Franchise Tax Bd.*, 463 U.S. at 23). Thus, "[t]o remove an action on the basis of complete preemption, a defendant must establish that the plaintiff has a 'discernible federal [claim]' and that 'Congress intended [the federal claim] to be exclusive remedy for the alleged wrong.'" *Pinney*, 402 F.3d at 449 (quoting *King v. Marriott Int'l, Inc.*, 337 F.3d 421, 425 (4th Cir. 2003); *see also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1 (2003) at 8 (permitting removal only where a statute provides "the exclusive

---

[15] Nor is the foreign affairs doctrine grounds for complete preemption. Defendants cite no authority for the proposition that the judicially created foreign affairs doctrine is a basis for complete preemption, which requires clear congressional intent. Neither of Defendants' cases on the foreign affairs doctrine arose in the context of a motion to remand or even complete preemption. *See* Not. of Rem. ¶ 36 (citing *Garamendi*, 539 U.S. at 418, City of *Oakland v. BP P.L.C.*, No. C 17-06011 WHA, 2018 WL 3109726, and *California v. Gen. Motors Corp.*, No. C06-05755 MJJ, 2007 WL 2726871, at *14 (N.D. Cal. Sept. 17, 2007)). Both *Garamendi* and *Gen. Motors Corp.* were filed originally in federal court and both addressed generalized issues of the lawsuit's effect on foreign affairs—with no mention of the specific Congressional intent required for complete preemption. *Oakland* raised the foreign affairs doctrine on a motion to dismiss, not removal, and did not consider complete preemption at all. For the reasons discussed *supra*, § IV.B, the foreign affairs doctrine does not support removal under *Grable* and it is equally inapposite here.

cause of action for the claim asserted," and it "set[s] forth procedures and remedies governing that cause of action."). The defendant bears the burden to "establish congressional intent to extinguish similar state claims by making the federal cause of action exclusive," and the court must "construe removal strictly, resolving reasonable doubts against complete preemption." *Lontz*, 413 F.3d at 441. The Act provides neither an exclusive cause of action for the City's claims, nor procedures or remedies governing such a cause of action.

The Supreme Court has expressed great "reluctan[ce] to find th[e] extraordinary pre-emptive power" required for complete preemption, *Metro. Life Ins. Co.*, 481 U.S. at 65, encountering only three such statutes in the past half century.[16] It is unsurprising, then, that Defendants are unable to cite a single case holding that the Clean Air Act completely preempts any state law tort claims related to airborne emissions, not to mention the tortious marketing and promotion at issue in this case. To the contrary, there are many cases rejecting any notion that the Act completely preempts similar claims and remanding to state court.[17] In fact, courts often reject

---

[16] *See Beneficial Nat'l Bank*, 539 U.S. at 9–11 (National Bank Act); *Metro. Life Ins. Co.*, 481 U.S. at 65–66 (Section 502(a) of the Employee Retirement Income Security Act of 1974); *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 560 (1968) (Section 301 of the Labor Management Relations Act).

[17] *See, e.g.*, *Her Majesty The Queen In Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332, 342–43 (6th Cir. 1989) (denying removal based on complete preemption because "the plain language of the [Clean Air Act's] savings clause . . . clearly indicates that Congress did not wish to abolish state control"); *Morrison v. Drummond Co.*, No. 2:14-cv-0406-SLB, 2015 WL 1345721, at *3–*4 (N.D. Ala. Mar. 23, 2015) (remanding because "this [state law tort] case does not support a finding that the Clean Air Act has completely preempted plaintiff's state common law causes of action"); *Cerny v. Marathon Oil Corp.*, No. CIV.A. SA-13-CA-562, 2013 WL 5560483, at *8 (W.D. Tex. Oct. 7, 2013) ("Plaintiffs' claims are not completely preempted and . . . federal question jurisdiction is lacking."); *California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. Hardesty Sand & Gravel*, No. 2:11-CV-02278 JAM, 2012 WL 639344, at *5 (E.D. Cal. Feb. 24, 2012) (action for civil penalties against mining equipment operator improperly permitted under state law was not removable because "Congress limited [Clean Air Act] preemption to emission standards, and declined to completely preempt the regulation of nonroad

even ordinary preemption defenses asserted under the Act and allow state law claims arising from air pollutants to proceed.[18] Defendants' attempt to reach a different outcome here mischaracterizes both the nature of the Clean Air Act and the relief sought by the City.

> **1.    Far from Indicating Congressional Intent to Completely Preempt State Law, the Clean Air Act Repeatedly Emphasizes the Primary Role of the States.**

The Clean Air Act has nothing to do with the claims brought and relief sought by the City. Considering identical arguments, the district court in *San Mateo* held that nothing in the Act warranted complete preemption. 294 F. Supp. 3d at 938. "To the contrary, the Clean Air Act . . . contains savings clauses that preserve state causes of action and suggest that Congress did not intend the federal causes of action under those statutes 'to be exclusive.'" *Id.* As the Supreme Court has explained, "Down to its very core, the Clean Air Act sets forth a federalism-focused regulatory strategy." *E.P.A. v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1617 (2014) ("*Homer*").

The "touchstone of the federal district court's removal jurisdiction is . . . the intent of Congress." *Metro. Life Ins. Co.*, 481 U.S. at 66. The best way to discern congressional intent is the text of the statute itself. *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2185 (2014). Three provisions

---

engines"); *Gutierrez v. Mobil Oil Corp.*, 798 F. Supp. 1280, 1281–86 (W.D. Tex. 1992) (remanding claims against stationary source polluter, finding "[t]he Clean Air Act does not create federal court jurisdiction" and "does not preempt source-state common law claims against a stationary source").

[18] *See Bell v. Cheswick Generating Station*, 734 F.3d 188, 198 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) (allowing state tort claims to proceed against coal-fired power plant, holding that "[i]f Congress intended to eliminate such private causes of action, 'its failure even to hint at' this result would be 'spectacularly odd'"); *Merrick*, 805 F.3d at 690 (allowing claims for nuisance, trespass, and negligence for emissions from whiskey distillery because "the Clean Air Act expressly preserves the state common law standards on which plaintiffs sue"); *Keltner v. SunCoke Energy, Inc.*, No. 3:14-CV-01374-DRHPMF, 2015 WL 3400234, at *4 (S.D. Ill. May 26, 2015); *Bearse v. Port of Seattle*, No. C09-0957RSL, 2009 WL 3066675, at *4 (W.D. Wash. Sept. 22, 2009); *Tech. Rubber Co. v. Buckeye Egg Farm, L.P.*, No. 2:99-CV-1413, 2000 WL 782131, at *4–*5 (S.D. Ohio June 16, 2000); *Ford v. Murphy Oil U.S.A., Inc.*, 750 F. Supp. 766, 772–73 (E.D. La. 1990); *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58 (Iowa 2014).

in the Act definitively refute Defendants' contention that Congress intended the Act to completely preempt state law claims related to air-pollution emissions. Those provisions—none of which Defendants acknowledge—establish the opposite: Congress intended to preserve state law remedies for air pollution, to permit *more stringent* regulation than the Act's baseline.

First, the Act declares that "air pollution prevention . . . and air pollution control at its source is *the primary responsibility of States and local governments*," 42 U.S.C. § 7401(a)(3) (emphasis added), reflecting Congress's intent for state primacy in air pollution regulation. *See Homer*, 134 S. Ct. at 1617. The Supreme Court instructs caution in finding congressional intent to preempt (even with respect to ordinary preemption), and has emphasized "that the historic police powers of the States were not [meant] to be superseded by [a federal statute] unless that was the clear and manifest purpose of Congress." *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 365 (2002). That caution is particularly appropriate where, as here, the City seeks to enforce in state court state law that falls well within its historic police powers. *See MTBE*, 725 F.3d at 95–96 ("Imposing state tort law liability . . . falls well within the state's historic powers to protect the health, safety, and property rights of its citizens. . . . [T]he presumption that Congress did not intend [the Act] to preempt state law tort verdicts is particularly strong."). The Supreme Court has found that the "presumption against federal preemption is clear . . . from the terms of [§ 7401.]" *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 260 (2004).

Second, aside from limited exceptions not applicable here, nothing in the Act's chapter governing air quality and emissions limitations "shall preclude or deny the right of any State . . . to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution," except that no State or local government may "adopt or enforce any emission standard or limitation which is less stringent than

38

the standard or limitation" provided for by the Act and its implementing regulations. 42 U.S.C. § 7416. By this provision, Congress made clear that the Act sets a *floor* for emissions standards and limitations, but does not limit states' rights to create and enforce stricter air pollution emission, control, and abatement standards.

Third, Congress included another savings clause, which specifies that "nothing in" the chapter governing citizen suits "shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." *Id.* § 7604(e). This provision clarifies that Congress did not intend the Act to be the exclusive means of enforcing air quality standards, whether such standards are found in the Act itself or in some other source of law. *See, e.g.*, *Bell v. Cheswick Generating Station*, 734 F.3d 188, 197–98 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) (explaining that the Clean Air Act "serve[s] as a regulatory floor, not a ceiling," and thus "states are free to impose higher standards on their own sources of pollution, and . . . state tort law is a permissible way of doing so") (citing *Ouellette*, 479 U.S. at 498–99 (interpreting Clean Water Act and coming to the same conclusion)).

Ignoring precedent and relevant provisions of the Act, Defendants rely on EPA's regulatory emissions standards to suggest that the Act completely preempts the City's claims. Not. of Rem. ¶ 44. However, the "exclusive statutory remedy for the regulation of greenhouse gas emissions" to which Defendants refer (*id.*), defines only the process for enforcing violations of emissions permits, which has nothing to do with the City's claims. Defendants' argument rests on the false premise that the City's claims are an "end-run around a petition for rule-making regarding greenhouse gas emissions." *Id.* ¶ 49. Defendants falsely argue that the City seeks to set emissions standards for sources worldwide, but the City seeks only damages and abatement of a nuisance

within its boundaries through adaptation and mitigation measures. The City does not seek to enjoin emissions from any source regulated under the Act, enforce or invalidate any Clean Air Act permit, nor create any other restriction whatsoever on air pollution conceivably governed by the Act.

Furthermore, Defendants cite no authority supporting the assertion that the Clean Air Act creates the sole remedy for the City's tort injuries. Defendants' reliance on *N.C. ex rel. Cooper v. Tennessee Valley Authority*, 615 F.3d 291 (4th Cir. 2010) ("*TVA*"), *cert. denied*, 132 S. Ct. 46 (2011), is misplaced. *See* Not. of Rem. ¶ 43. That case was an *ordinary preemption* case that concerned subjecting a source in Alabama and Tennessee to North Carolina's nuisance law; it did not address complete preemption nor suggest the Clean Air Act necessarily governs all state law claims. *TVA*, 615 F.3d at 306–09. The Fourth Circuit has made clear;

> In assessing whether defendants have carried their burden, we may not conflate "complete preemption" with "conflict" or "ordinary" preemption. While these two concepts are linguistically related, they are not as close kin jurisprudentially as their names suggest. Complete preemption is a "jurisdictional doctrine," while ordinary preemption simply declares the primacy of federal law, regardless of the forum or the claim. *Sonoco Prods.*, 338 F.3d at 370–71. Ordinary preemption has been categorized as a federal "defense to the allegations." *Caterpillar*, 482 U.S. at 392 []. And as a mere defense, the "preemptive effect of a federal statute ... will not provide a basis for removal." *Beneficial,* 539 U.S. at 6[] (internal citations omitted). . . . Even if preemption forms the very core of the litigation, it is insufficient for removal. *Caterpillar*, 482 U.S. at 393[].

*Lontz*, 413 F.3d at 440–41. Moreover, in *TVA*, the Fourth Circuit found that the sources at issue could have been subject to nuisance law of their home states, if those states' nuisance laws were as expansive as North Carolina's; the limiting factor there was the scope of Tennessee's and Alabama's *state* laws, not the *federal* Act's preemptive force. *TVA*, 615 F.3d at 309–10.

Nor does *City of New York v. B.P.*, 2018 WL 3475470 (S.D.N.Y. July 19, 2018) (*"New York"*) support Defendants' complete preemption arguments. Addressing a motion to dismiss on an action originally filed in federal court, the *New York* court did not consider complete preemption

or removal jurisdiction at all. *Id*. at *3. Far from finding that federal jurisdiction was warranted because the Clean Air Act made the plaintiff's state claims necessarily federal, the court found that the Act displaced the plaintiff's *federal* common law claims. *Id*. at *6.

The Clean Air Act has nothing to do with the City's Complaint for damages and equitable relief from Defendants' conduct. Regardless, far from indicating congressional intent to completely preempt state law causes of action touching on air pollution (including those seeking abatement of air pollution), the Act expressly provides the opposite, *i.e.*, that Congress intended to preserve state law remedies related to air pollution, a subject Congress considered to be the primary responsibility of state governments. In that context, there is no basis for finding complete preemption. *See, e.g.*, *Her Majesty The Queen In Right of the Province of Ontario*, 874 F.2d at 343 (finding no complete preemption because the Act's savings clauses "compel[] the conclusion" that the Act did not preempt plaintiffs' state law claims).

### 2. The Clean Air Act Does Not Create a Right of Action that Encompasses the City's Tort Claims.

In addition to the Clean Air Act's affirmative statements demonstrating congressional intent to preserve state law claims, complete preemption cannot operate here because of what the Act does *not* contain: a private cause of action that could encompass the state law tort claims the City maintains. In the rare cases where the Supreme Court found complete preemption, it relied not only on congressional intent that federal law provided the exclusive remedy, but also on the presence on a specific federal cause of action that would have encompassed the plaintiff's state law claim. *See Beneficial Nat'l Bank*, 539 U.S. at 7–9; *Metro. Life Ins. Co.*, 481 U.S. at 62–63, 65–66; *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 560 (1968). The Fourth Circuit has emphasized that "a vital feature of complete

preemption is the existence of a federal cause of action that replaces the preempted state cause of action." *King*, 337 F.3d at 425. That is not the case here.

The Clean Air Act's citizen-suit provision creates a right of action only for violations of emissions standards or violation of an EPA order. *See* 42 U.S.C. § 7604. The Act does not regulate defective products nor the marketing or promotion of fossil fuels at all, let alone create a right of action for related claims. Nor does the Act provide a right to compensatory damages or authorize equitable abatement funds. *See Freeman*, 848 N.W.2d at 69 (Clean Air Act did not preempt state tort action against corn milling facility for emissions and emphasizing distinction between remedies under state law and the Clean Air Act). Without any federal cause of action to remedy the City's injuries, complete preemption cannot transform state tort claims into federal claims.

Because Defendants have failed to identify any federal law completely preempting the City's state law claims, their assertions of conflict with federal law provide no basis for removal.

## D.    The City's Complaint Does Not Fall Within the Jurisdictional Grant of the Outer Continental Shelf Lands Act.

The Complaint is not subject to federal jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1), even under the extremely broad interpretation of the statute Defendants advocate (Not. of Rem. ¶¶ 51–57). Defendants' argument is specious. Their overbroad formulation of the OCSLA jurisdictional grant would bring into federal court not only this case, but any case involving facts traceable to deep sea oil drilling, no matter how far-flung and remote—for example, a routine personal injury action against a tanker truck driver stemming from an car accident in Tennessee would be removable simply because the tanker carried gasoline refined from oil extracted from the Outer Continental Shelf ("OCS"). That is not the effect or intent of the OCSLA, and Congress did not intend such "absurd results." *Plains Gas Sols., LLC v. Tennessee Gas Pipeline Co.*, 46 F. Supp. 3d 701, 704–05 (S.D. Tex. 2014) (remanding case

alleging unlawful assignment of gas processing contract and unlawful closure of onshore pipeline valve, because activities that caused injury were not conducted on the OCS).

The OCSLA vests original jurisdiction in the district courts for claims concerning "damage resulting from injurious physical acts" conducted on the OCS, *Par. of Plaquemines v. Total Petrochem. & Ref. USA, Inc.*, 64 F. Supp. 3d 872, 895 (E.D. La. 2014), where the dispute "alters the progress of production activities on the OCS and thus threatens to impair the total recovery of the federally-owned minerals." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 570 (5th Cir. 1994). Neither of those elements is satisfied here.

The Fourth Circuit has not ruled on the outer limits of OCSLA jurisdiction, and Defendants instead rely on cases from the Fifth Circuit. The City does not concede that the Fifth Circuit's test is the correct one, nor that the Fourth Circuit would adopt it, and in any case Defendants' arguments fail even under a maximally broad reading of those cases. The Fifth Circuit has held:

> Courts typically assess jurisdiction under [§ 1349] in terms of whether (1) the activities that caused the injury constituted an 'operation' 'conducted on the outer Continental Shelf' that involved the exploration and production of minerals, and (2) the case 'arises out of, or in connection with' the operation.

*In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). "[T]he term 'operation' contemplate[s] the doing of some physical act on the [OCS]." *EP Operating Ltd. P'ship*, 26 F.3d at 567. And a case "arises out of, or in connection with" the operation when (1) the plaintiff "would not have been injured 'but for'" the operation, *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988), and (2) granting relief "thus threatens to impair the total recovery of the federally-owned minerals" from the OCS. *EP Operating Ltd. P'ship*, 26 F.3d at 570.

Fifth Circuit courts have treated the OCSLA jurisdictional grant as broad but have nonetheless held that "the 'but-for' test . . . is not limitless" and must be applied in light of the OCSLA's overall goals. *Plains Gas Sols.*, 46 F. Supp. 3d at 704–05. The

argument that the 'but-for' test extends jurisdiction to any claim that would not exist but for offshore production lends itself to absurd results; under [such a] view, an employment dispute brought by an employee of an onshore processing facility would fall within the OCSLA because, but for the activities on the OCS, the facility and the employment relationship would not exist.

*Plains Gas Sols.*, 46 F. Supp. 3d at 705. "The Fifth Circuit has rejected such a universal application, recognizing that 'one can hypothesize a "mere connection" between the cause of action and the OCS operation too remote to establish federal jurisdiction.'" *Id.* (quoting *In re Deepwater Horizon*, 745 F.3d at 163).

The City's injuries here were not caused by, do not arise from, and do not interfere with physical "operations" on the OCS, as that term is used in the OCSLA. The City's injuries arise from the defective nature of Defendants' fossil fuel products, Defendants' injection of those products into the marketplace without sufficient warnings of their known dangers, and from the campaign of misinformation that undermined public understanding of those dangers—no matter where or by what "operations" the products' constituent elements were originally extracted. Defendants' assertions that some Defendants "participate very substantially in the federal OCS leasing program," and that a "substantial" but undefined "portion of the national consumption of fossil fuel products stems from production on federal lands" (Not. of Rem. ¶ 55), do not mean that the City's injuries arose from "operations" on the OCS. Rather. the injuries stem from the nature of the products themselves and Defendants' knowledge of their dangerous effects. District courts in the Fifth Circuit routinely refuse to exercise jurisdiction over cases tangentially related to mineral exploration and production on the OCS, where granting relief would have no effect on those operations, such as here.[19]

---

[19]*See, e.g.*, *Parish of Plaquemines*, 64 F. Supp. 3d at 895 (no OCSLA jurisdiction where injurious conduct occurred in state waters, even though it "involved pipelines that ultimately stretch to the

Defendants' cases finding OCSLA jurisdiction do not deviate from that general rule. In all of them, the injuries complained of were actually caused by physical activity actually occurring on the OCS related to oil and natural gas extraction, or were contract disputes directly concerning those activities. In *Deepwater Horizon*, for example, the Fifth Circuit upheld OCSLA jurisdiction where the plaintiffs' claims for injury to wildlife and aquatic life were a direct result of a massive oil spill caused by the explosion of an offshore drilling rig. 745 F.3d at 162–64; *see also United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 406 (5th Cir. 1990) (contract dispute concerning natural gas pipeline running from OCS to Louisiana coast); *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202 (5th Cir. 1988) at 1203 (dispute concerning "take-or-pay obligations in contracts for the sale/purchase of natural gas" from natural gas platform); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1225 (5th Cir. 1985) (dispute over contract for transportation and installation of offshore oil and gas platform). The OCSLA does not provide this Court a basis for jurisdiction over this case.

---

OCS"); *Fairfield Indus., Inc. v. EP Energy E&P Co.*, No. CV H-12-2665, 2013 WL 12145968, at *5 (S.D. Tex. May 2, 2013), *report and recommendation adopted*, No. CV 4:12-2665, 2013 WL 12147780 (S.D. Tex. July 2, 2013) (no OCSLA jurisdiction over dispute regarding licensing agreement for pre-existing seismic data for Gulf of Mexico seabed, where "performance of the disputed contracts would not influence activity on the OCS, nor require either party to perform physical acts on the OCS"); *LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*, No. CIVA 06-11248, 2007 WL 854307, at *5 (E.D. La. Mar. 16, 2007) (no OCSLA jurisdiction over insurance dispute "regarding damages to production facilities that have already occurred" because suit "does not affect or alter the progress of production activities on the OCS, nor does it threaten to impair the total recovery of federally owned minerals from the OCS"); *Brooklyn Union Expl. Co. v. Tejas Power Corp.*, 930 F. Supp. 289, 292 (S.D. Tex. 1996) ("A controversy exclusively over the price of gas which has already been produced, as in the instant case, simply does not implicate the interest expressed by Congress in the efficient exploitation of natural resources on the OCS."); *see also St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 609 (D. Del. 2011) (granting motion to remand Florida law claims and observing that, "[w]hile the federal government has sovereignty on the Outer Continental Shelf, states still have the power to adjudicate claims arising from activities there; i.e., states have concurrent jurisdiction").

**E.   There Is No Enclave Jurisdiction Because the City's Claims Do Not "Arise" Within the Federal Enclave.**

Federal courts have federal question jurisdiction over tort claims that *arise on* federal enclave lands. *See, e.g.*, *Stokes v. Adair*, 265 F.2d 662, 665–66 (4th Cir. 1959) (finding federal enclave jurisdiction where personal injuries at issue happened at a U.S. Army post). Defendants' assertion that the City's claims arose within federal enclaves fails for at least three reasons. First, contrary to Defendants' arguments, the Complaint expressly disclaims injuries to any federal property in Baltimore. Compl. ¶ 1 n.2. Second, Defendants' assertions "on information and belief" that some of their alleged bad acts occurred on federal land are not supported by the Complaint. Finally, and most importantly, even if some portion of Defendants' tortious conduct did occur on federal land, the City's claims "arose" only once all the elements of the claim were complete, which occurred here only when and where the City suffered injuries, i.e. on non-federal land. The *San Mateo* court rejected this argument as well, finding "federal law was not the locus in which the claim arose." 294 F. Supp. 3d at 939 (citation omitted).

**1.   The City's Injuries Occurred and Will Occur Exclusively on Non-Federal Lands.**

The Complaint seeks to abate the nuisances caused by "sea level rise, extreme precipitation events, heatwaves, other results of the changing hydrologic regime caused by increasing temperatures, and associated consequences of those physical and environmental changes . . . on the City." Compl. ¶ 12. The Complaint defines the scope of injury to exclude any federal territory, and as such, its claims are necessarily limited to those occurring on non-federal lands within Baltimore. *Id.* ¶¶ 1 n.2, 195–217. The Court's inquiry ends there. *See, e.g.*, *Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1132 (W.D. Wash. 2017) (because plaintiff "assert[ed] that it does not seek damages for contamination to . . . land within the federal territory," "none of its claims arise on federal enclaves"); *Bd. of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E. v.*

46

*Tennessee Gas Pipeline Co.*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (no enclave jurisdiction where plaintiff stipulated not to seek damages for wetland loss in federal wildlife reserve). There is therefore no basis to assert federal enclave jurisdiction based on the location of City's injuries.[20]

Second, Defendants argue that "[o]n information and belief, Defendants maintain or maintained oil and gas operations on military bases or other federal enclaves," and that "the Complaint relies upon conduct occurring in the District of Columbia." Not. of Rem. ¶¶ 70, 71. However, neither assertion is supported by the Complaint. Defendants state that some portion of some Defendants' fossil fuel extraction has occurred on federal land, but cite no allegation in the Complaint referring to those lands or to conduct occurring there. Defendants also refer to their trade association memberships and financing of think tanks and lobbyists (described at Compl. ¶¶ 165–67). Defendants have not met their burden to identify how such facts provide any basis for enclave removal here.[21]

---

[20] Defendants' reliance on *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 370 (1964), and *Mississippi River Fuel Corp. v. Cocrehan*, 390 F.2d 34, 35 (5th Cir. 1968), (Not. of Rem. ¶ 70), is misplaced. Both cases held that a state may not exercise its taxing power over oil and gas drilling and pipeline operations located entirely within the federal enclave. Neither analyzed where a state law tort cause of action arises for enclave jurisdiction purposes—let alone whether injuries sustained on exclusively non-federal land could be subject to enclave jurisdiction, as Defendants urge. Neither case can be read for that proposition.

[21] The cases Defendants cite to support their District of Columbia argument (Not. of Rem. ¶ 71) have nothing to do with removal, and do not even discuss the Enclave Clause as a basis for jurisdiction. The court in *Jacobsen v. U.S. Postal Service*, 993 F.2d 649, 652 (9th Cir. 1992), considered whether "ingress-egress walkways" at federal post offices are public fora under the First Amendment. The opinion does not address any jurisdictional issue and does not mention the Enclave Clause. *Id. Collier v. District of Columbia*, 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014), was an excessive force action against a District of Columbia police officer, in which the court observed in dicta that "[b]ecause the District of Columbia is a federal enclave, it is subject to the Fifth Amendment, and not the Fourteenth, which applies to the States." The court did not discuss or cite the Enclave Clause, and jurisdiction existed because the plaintiff expressly brought claims under the Constitution and 42 U.S.C. § 1983. *Id.* at 14. Finally, *Hobson v. Hansen*, 265 F. Supp. 902, 906 (D.D.C. 1967), held in relevant part that a statute vesting power to appoint members of the

**2.      Each of the City's Claims Arose Only Once a Complete Tort Existed, Which Occurred When and Where the City Suffered Injury—on Non-Federal Lands.**

Even if Defendants' Notice of Removal accurately described the contents of the Complaint, federal enclave jurisdiction would still not be proper because the City's claims "arose" only at the time and place where all the elements of the claims were complete, forming an actionable tort. The elements of the City's claims are defined by substantive Maryland law, and each claim includes an injury element. Because the injuries complained of occurred and will occur within Baltimore, those claims "arose" within the City's boundaries, and none "arose" within a federal enclave.

A tort cause of action "arises," for enclave purposes, when and where the underlying tort is complete. *Totah v. Bies*, No. C 10-05956 CW, 2011 WL 1324471, at *1 (N.D. Cal. Apr. 6, 2011) (finding enclave jurisdiction in defamation action because "publication—the last event necessary to render the tortfeasor liable"—occurred in a federal enclave); *see also Bordetsky v. Akima Logistics Servs., LLC*, No. CV 14-1786 (NLH/JS), 2016 WL 614408, at *2 (D.N.J. Feb. 16, 2016) ("When dealing with a federal enclave, the focus is on where the tort occurred.").[22]

---

District of Columbia Board of Education in D.C. district court judges was constitutional under the Enclave Clause. That case had nothing to do with removal jurisdiction over state law tort claims.

[22] The cases Defendants cite that consider the issue in detail perform the same analysis as in *Totah*, looking to where all elements forming the cause of action were complete to determine where the claim arose. *See Sparling v. Doyle*, No. EP-13-CV-00323-DCG, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014) (observing that the "key factor" for finding enclave jurisdiction is "the location of the plaintiff's injury or where *the specific cause of action* arose," and finding jurisdiction where all parties agreed all relevant conduct and injuries occurred at Fort Bliss (emphasis added)); *Bd. of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co.*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (rejecting jurisdiction where plaintiff disclaimed any injuries to land in federal enclaves, such that defendant could not show that "Defendants' [dredging activities] took place on a federal enclave or the damage complained of—coastal erosion—occurred on a federal enclave"); *Fung v. Abex Corp.* is inapplicable here because it held only that where a personal injury action arises from a discrete occurrence at a military facility, enclave jurisdiction is proper. 816 F. Supp. 569, 571 (N.D. Cal. 1992) (finding jurisdiction over asbestos personal injury action where all alleged injurious exposures occurred on naval bases during employment by naval contractor).

Notwithstanding Defendants' mischaracterization, the Fourth Circuit's holding in *Stokes* supports this reading: there, the court there found enclave jurisdiction over claims arising from a car accident where all of the elements, including injury to the plaintiff, occurred on a federal enclave. 265 F.2d at 663.

Under black letter Maryland law, "the place of the tort is considered to be the place of injury." *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 231 (Md. 2000). Here, each of the City's claims has an injury element, and therefore each claim arose only when and where the City suffered injury.[23] Because the City's alleged injuries occurred on non-federal land only, and federal enclave jurisdiction is therefore improper.[24]

---

[23] The City's First and Second Causes of Action are for public and private nuisances, Compl. ¶¶ 218—36, both of which require an injury. *See Adams v. Comm'rs of Town of Trappe*, 102 A.2d 830, 834 (Md. 1954) (comparing public and private nuisance claims). The City's Third, Fourth, Fifth, and Sixth Causes of Action are product liability claims for failure to warn and design defect, alleging strict liability and negligence theories. Compl. ¶¶ 237–81. Each requires the City to prove it was *injured* by Defendants' tortious conduct. *See Hollingsworth & Vose Co. v. Connor*, 764 A.2d 318, 337 (Md. Ct. Spec. App. 2000) (describing "injury" as the last-occurring element in strict products liability and negligence claims). Baltimore's Seventh Cause of Action for trespass, Compl. ¶¶ 282–90, also requires an injury in the form of an interference with a plaintiff's interest in exclusive possession of property. *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 94, *on reconsideration in part*, 71 A.3d 150 (Md. 2013) (no cause of action for trespass where water contaminant not detected in certain plaintiffs' wells). Nor is Baltimore's Eighth Cause of Action under the state Consumer Protection Act grounds for federal enclave jurisdiction. Defendants do not and cannot argue that that claim presents a "federalized" question of state law arising on any federal enclave specifically identified in the Notice of Removal. *See* Not. of Rem. ¶¶ 70–71; *Colon v. United States*, No. GJH-17-775, 2018 WL 1352962, at *9 (D. Md. Mar. 14, 2018) (stating rule for whether state law claim can create federal question jurisdiction). Because the Complaint disavows claims that arise on any federal enclave, that cause of action cannot present a federalized state law question under the federal enclave doctrine.

[24] Defendants' citation to *Norair Eng'g Corp. v. URS Fed. Servs., Inc.*, RDB-16-1440, 2016 WL 7228861 (D. Md. Dec. 14, 2016), does not alter this conclusion. That case arose when defendant breached a contract rather than committed a tort, and the Court therefore emphasized the location of contract performance rather than location of the contractual injury. *Id.* at *3. Baltimore's claims sound in tort, and its claims did not arise until Baltimore sustained injuries—none of which occurred in a federal enclave.

### F. The City's Claims Are Not Removable Under 28 U.S.C. § 1442(a)(1) Because Defendants Are Not "Acting Under Federal Officers."

To establish that this Court may properly exercise its limited jurisdiction in this case, Defendants bear the burden to establish that they "act[ed] under" a federal officer—or pursuant to a federal officer's subjection, guidance or control—when they engaged in the conduct giving rise to the City's claims. 28 U.S.C. § 1442(a)(1). "Because federal officer removal is rooted in 'an anachronistic mistrust of state courts' ability to protect and enforce federal interests and immunities,'" Section 1442 must be "read narrowly" when applied to private parties. *Mobley v. Cerro Flow Prod., Inc.*, No. CIV 09-697-GPM, 2010 WL 55906, at *3 (S.D. Ill. Jan. 5, 2010) (quoting *Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*, 245 F. Supp. 2d 1144, 1150, 1152 n.6 (D. Colo. 2002)). "[P]rivate actors seeking to benefit from [§ 1442] bear a special burden of establishing the official nature of their activities." *Freiberg*, 245 F. Supp. 2d at 1150.

Defendants contend that, because some of them have participated in economic agreements with federal entities related to fossil fuel extraction and sale over the last century, those Defendants were acting under federal officers within the meaning of Section 1442(a)(1) for the purpose of this case. Rejecting a nearly identical gambit, the court in *San Mateo* characterized the same federal officer removal argument as "dubious," and the same result applies here. 294 F. Supp. 3d at 939.

#### 1. Defendants Have Not Shown They "Acted Under" Federal Officers.

Although Defendants do not purport to *be* federal officers, they contend that a subset of them were "acting under" federal officers when they extracted and sold fossil fuels pursuant to occasional contracts with the federal government. Not. of Rem. ¶¶ 58–66. To prove that it was acting under a federal officer within the meaning of Section 1442(a)(1), however, a defendant must establish both that it was "involve[d in] an effort to *assist*, or to help *carry out*, the duties or tasks of [a] federal superior" and that its relationship with the federal superior "involve[d] 'subjection,

50

guidance, or control.'" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151–52 (2007). In *Watson*, plaintiffs sued Philip Morris in state court for unfair business practices and deceptive conduct related to manipulating cigarette tests to obtain a lower tar and nicotine result that could be used to market the cigarettes as "light." *Id.* at 146. The Supreme Court rejected the tobacco company's federal officer removal, holding that even in a heavily regulated industry, a private company does not "act[] under" an officer of the United States unless it is "lawfully assist[ing]" the federal officer "in the performance of his official duty." *Id.* at 151. None of the tortious conduct the City challenges was taken under the guidance or control of any federal officer. Defendants therefore cannot remove their claims pursuant to Section 1442(a)(1).[25]

Defendants rely on a sparse showing of two OCS mineral leases, which are presumably representative. *Id.* ¶ 61 & Exhs. B & C. Nothing in those leases supports that the extraction and exploration activities Defendants undertook pursuant to them was anything more than an arms-length commercial transaction. First, when a corporation makes an uncoerced decision to enter into a lease agreement with the federal government for the purpose of finding and extracting fossil fuels, it makes a choice that is free from the "subjection, guidance, or control," of the federal government. *Watson*, 551 U.S. at 152. Defendants cite no case—and the City has found none—where a voluntary choice by a private party to lease property or mineral rights from the federal government automatically transformed any later activity involving the lease into activity under the control of a federal officer.

---

[25] Defendants also fail to establish that they were helping a government official perform a government function—*i.e.*, that they were "involve[d in] an effort to *assist*, or to help *carry out*, the duties or tasks of [a] federal superior"—as required to establish that they were acting under a federal officer. *Watson*, 551 U.S. at 152. Defendants rely exclusively on their commercial relationship with federal entities arising out of leasing land or selling an off-the-shelf commodity to the government. But Defendants identify no case in which such a garden-variety commercial relationship gave rise to acting-under removal jurisdiction.

Second, the Supreme Court has held unambiguously that "the help or assistance necessary to bring a private party within the scope of the statute does *not* include simply *complying* with the law." *Watson*, 551 U.S. at 152. The Court held that

> a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. . . . And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

*Id.* at 153.[26] Something more than simply following federal rules or guidelines is required to establish the requisite acting-under relationship; Defendants have not satisfied that requirement.

Third, the contractual obligations in the leases do not include the type of detailed direction that could demonstrate the necessary federal "subjugation, guidance, or control." *See Watson*, 551 U.S. at 152. Defendants allege that the leases imposed extensive government control over the process of extracting fossil fuels, but an inspection of the leases shows that is not so. The leases did not require Defendants to extract fossil fuels in a particular manner, did not dictate the composition of oil or gas that would later be refined and sold to third parties, and did not remotely purport to affect the content or methods of Defendants' communications with consumers about Defendants' products. In sum, nothing in the leases controlled any of the actions that form a basis for liability under the City's claims.

Defendants err in seeking refuge in the Fourth Circuit's decision in *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249 (4th Cir. 2017). In *Sawyer*, a shipbuilder brought suit against his

---

[26] *See also, e.g.*, *MTBE*, 488 F.3d at 132 (Section 1442 was not intended to be construed "so broadly that it would federalize a broad spectrum of state-law tort claims against entities regulated by—though not acting under—officers or agencies of the United States"); *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 663 n. 14 (E.D. Tex. 1999) (rejecting federal officer removal and stating that "Defendants can bury this Court in federal government regulations controlling their actions. But if there is no causal nexus between Defendants' actions in response to this control and the Plaintiffs' claims, then the government did not "make them do it" since the "it" was never under government control.").

employer, a government contractor, for asbestos exposure. 860 F.3d at 251–52. The court held that removal was proper because the Navy exerted "intense direction and control . . . over all written documentation" and specifically dictated the precise contents of the warnings the plaintiff claimed were absent from the asbestos products at issue. *Id.* at 253, 258. Here, the federal government provided no such specifications, and the challenged conduct instead relies on deceptive product promotion that not only lacked federal control, but also was *concealed from* the federal government. *See, e.g.*, Compl. ¶¶ 6, 229.

Defendants have not shown that the leases directed the manner of extraction; directed the subsequent composition of the resulting product; or directed the manner in which Defendants communicated with consumers, regulators, and the public.[27] As already discussed, Defendants' claim that the leases required them to extract or sell a certain amount of oil or gas is a consequence of their voluntary commercial decision to seek out leases with the government, not any government compulsion or direction sufficient to invoke federal officer removal. Defendants have failed to establish that the leases attached as Exhibits B and C to their Notice of Removal created an "acting under" relationship that gives rise to federal officer removal jurisdiction.

Defendants next rely on a 1944 Unit Plan Contract ("UPC") between Standard Oil (a Chevron predecessor) and the U.S. Navy governing the "joint operation and development" of the Elk Hills Reserve, a strategic petroleum reserve that comprised a common underground pool

---

[27] *Compare Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399–400 (5th Cir. 1998) (manufacturers of Agent Orange were acting under a federal officer for purposes of tort claims related to product composition and lack of warning where the federal government imposed "detailed specifications concerning the make-up, packaging, and delivery of Agent Orange" and refused to allow a warning on the product), *with MTBE*, 488 F.3d at 131 (refusing federal officer removal because "while federal regulations . . . have much to say about gasoline content, they allow refiners to use any of several additives to meet federal . . . requirements and say nothing regarding the marketing of gasoline containing MTBE, a highly dangerous compound that, like tar and nicotine, poses a threat to human health").

spanning properties owned by the Navy and Standard Oil. Not. of Rem. ¶ 63 & Ex. D. The Elk

Hills Reserve was "expressly made subject to pre-existing private ownership," and the government

and Standard Oil's respective ownership in the oil field were settled under the contract, with the

Navy taking approximately a 75% ownership stake, and Standard taking approximately 25%. *See*

*United States v. Standard Oil Co. of California*, 545 F.2d 624, 626 (9th Cir. 1976); Not. of Rem.

Ex. D § 2(d). This type of agreement "was at that time and still is a common arrangement in the

petroleum industry where two or more owners have interests in a common pool." *Id.* In

"consideration for Standard curtailing its production" to retain the oil reserve for a time of

emergency, Standard was permitted under the contract to extract the lesser of 25 million barrels or

one-third of its owned interest in the reserve's "Shallow Oil Zone." *Standard Oil Co. of California*,

545 F.2d at 627–28. The UPC *reduced* Standard Oil's production at the reserve, and indeed

Standard could have complied fully with the UPC's by producing no oil at all from it. Nothing in

the UPC comes close to the "subjection, guidance, or control" needed to establish that Defendants

were acting under a federal officer. *See Watson*, 551 U.S. at 152.[28]

---

[28] Other terms also make clear that Standard was not coerced or compelled to manage and develop
the reserve in place of the government. For example, the "Operating Committee" supervising
"exploration, prospecting, development, and producing operations on the Reserve" consisted of
"two petroleum engineers, one of whom shall be appointed by and shall represent Navy, and the
other shall be appointed by and represent Standard." Ex. D § 3(b). If either party desired to drill
an exploratory well, the proposal went first before an Engineering Committee composed of three
representatives from Standard and three from the Navy, any non-unanimous decision of which was
reviewable by the Secretary of the Navy. *Id.* § 4(e)(1), (e)(2). If the Secretary or Committee denied
the proposal, however, "the party proposing the drilling of such well shall, notwithstanding such
determination, be entitled to have such well drilled but the cost of drilling and equipping such well
shall be borne solely be such party." *Id.* Finally, Standard had "the right to take delivery, and make
such disposition, of the production allocated to it [t]hereunder as it may desire," and "[n]either
Navy nor Standard [had] any preferential right to purchase any portion of the other's share of such
production." *Id.* § 7.

Finally, Defendants reference certain commercial contracts under which at least one Defendant agreed to supply fuel to the Navy Exchange Service Command (NEXCOM), which in turn served as a retailer reselling the fuel at a discount to active duty military, retirees, reservists, and their families. Not. of Rem. ¶ 64. Again: a company's voluntary decision to sell a commodity to the government does not alone render it a federal officer in cases alleging the product was defective or that defendants' behavior was otherwise tortious.[29] Under Defendants' logic, any manufacturer of any product would be entitled to remove any state law product liability claim against it if the manufacturer sold one of its products to a government entity at some point in time. *See Watson*, 551 U.S. at 153 (rejecting federal officer removal where it "would expand the scope . . . potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries"). Such an expansive view of Section 1442(a)(1) would ignore its historical purpose of preventing state court interference with or prejudice against federal operations. *Id.* at 150, 152.

**2.      No Nexus Exists Between Defendants' Actions Challenged in This Case and the Directions of Any Federal Officer.**

Federal officer jurisdiction also requires that the defendant establish a "sufficient connection or association" between the acts it performed under the government's direction and the plaintiff's claims. *Sawyer*, 860 F.3d at 258 (quotation omitted). Because there was no delegation of authority from federal agencies to Defendants, nor direct control by those agencies over

---

[29] To the extent Defendants suggest that the NEXCOM contract was anything more than a mere commodity-purchase arrangement, they fail to substantiate that claim. Defendants have not proffered an example of such a contract, instead relying on a bare allegation that their agreements with NEXCOM "contained detailed fuel specifications." Not. of Rem. ¶ 64. That is insufficient to carry Defendants' burden of establishing removal jurisdiction. Defendants fail to establish or even allege that the "detailed fuel specifications" caused Defendants to produce, sell, or communicate in a particular way about the fuel they sold to the government in a manner that could have given rise to the City's injuries.

Defendants' challenged conduct, a sufficient nexus is necessarily absent. Regardless the degree of federal control, the connection is still insufficient because the City's claims have nothing to do with anything Defendants allege they have done under federal direction and Defendants' fail under Fourth Circuit case law. For example, although the Fourth Circuit found federal officer removal proper in *Sawyer*, where the government closely controlled the presence and content of warnings on the products involved, this Court has rejected federal officer removal in a cases where—like here—defendants failed to show that government "restricted or prohibited them from providing additional safeguards or information to consumers." *Compare Sawyer*, 860 F.3d at 258, *with In re Wireless Telephone Radio Frequency Emissions Prods. Liab. Litig.*, 327 F. Supp. 2d 554, 563 (D. Md. 2004) (granting motion to remand); *see also Meyers v. Chesterton*, No. CIV.A. 15-292, 2015 WL 2452346, at *6 (E.D. La. May 20, 2015) (rejecting federal officer removal because "nothing about the Navy's oversight prevented the Defendants from complying with any state law duty to warn"). Defendants have not demonstrated that the government had any role in Defendants' promotion and marketing of fossil fuel products, nor with their simultaneous concealment and failure to warn of the known hazards of these defective products. Their contractual associations with the federal government do not establish that the government interfered with or prevented Defendants from complying with their state law duties, and the relationship is too attenuated to support jurisdiction for "acting under" federal officers. *See San Mateo*, 294 F. Supp. 3d at 939.

### G.     The Case Is Not Removable Under the Bankruptcy Removal Provisions, 28 U.S.C §§ 1452(a) and 1334.

#### 1.     The City Brings This Action Pursuant to Its Police and Regulatory Powers.

The Complaint presents an exercise of the City's police and regulatory powers—a type of action Congress expressly exempted from bankruptcy removal:

> A party may remove any claim or cause of action in a civil action *other than* a proceeding before the United State Tax Court or *a civil action by a governmental unit to enforce such unit's police or regulatory power*, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

28 U.S.C. § 1452(a) (emphases added). Just as the district court in *San Mateo* concluded, this state law action addressing climate change impacts on municipal infrastructure and resources is an exercise of police power "aimed at protecting the public safety and welfare . . . on behalf of the public," and therefore is not subject to bankruptcy removal. *See* 294 F. Supp. 3d at 939.

The Fourth Circuit applies two interrelated inquiries—the public purpose and pecuniary purpose tests—to decide whether an action is an exercise of a governmental entity's police and regulatory power. *See Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 865 (4th Cir. 2001) (in context of automatic stay provision, state agency's enforcement of regulations to deter environmental misconduct at a landfill fell within police power exception).[30] To determine whether a governmental entity is seeking to promote the public safety and welfare, a court must "determine the primary purpose" of the entity's action. *Id.*

> If the purpose of the law is to promote 'public safety and welfare,' or to 'effectuate public policy, then the exception applies. On the other hand, if the purpose of the law relates 'to the protection of the government's pecuniary interest in the debtor's property, or to 'adjudicate private rights,' then the exception is inapplicable.

*Id.* (citations and quotation marks omitted).

---

[30] The statutory language of the removal exception for police and regulatory functions is practically identical to language exempting government enforcement actions from the automatic stay in bankruptcy proceedings under 28 U.S.C. § 362(b)(4), and therefore courts look to cases interpreting Section 362(b)(4) for guidance in interpreting Section 1452(a). *City & Cty. of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1123 (9th Cir. 2006), *cert. denied*, 549 U.S. 882 (2006) (holding that the two statutes were designed to work in tandem and should be interpreted consistently); *see also* 1 *Collier on Bankruptcy* (15th ed.) § 3.07[3] ("It would seem, therefore, that the congressional intent was to make those types of civil actions that are not subject to removal correspond to civil actions that are excepted from the automatic stay.").

Here, the City seeks to protect public safety and welfare by abating, and paying to correct, the "cascading social and economic impacts" that follow from the physical impacts of Defendants' conduct. *See, e.g.*, Compl. ¶ 18. Far from being brought to "reap[] a financial windfall" (Not. of Rem. ¶ 75), the relief sought seeks not to protect any interest held by the City in any bankruptcy debtor's property, but to remediate public harm and protect the public well-being. *See, e.g.*, *id.* ¶¶ 1, 8, 212. There is no requirement that the government have no pecuniary motive whatsoever when exercising its police powers, so long as the action's "primary purpose" is protecting the public welfare. *Safety-Kleen, Inc.*, 274 F.3d at 865; *see also U.S. EEOC v. CTI Glob. Sols., Inc.*, 422 B.R. 49, 52–53 (D. Md. 2010) ("[T]he fact that a secondary, pecuniary interest may be involved does not bring the case outside of the [police and regulatory power] exception."); *In re Universal Life Church, Inc.*, 128 F.3d 1294, 1298–99 (9th Cir. 1997), *cert. denied*, 524 U.S. 952 (1998) (acknowledging that "most government actions which fall under this exemption have some pecuniary component," and holding that "[t]his does not abrogate their police power function"). Punitive damages, moreover, serve not to enrich the City, but instead to deter harmful conduct, and therefore do not abrogate the exercise of police power. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 & n.9 (2008); *see also California ex rel. Brown v. Villalobos*, 453 B.R. 404, 412–13 (D. Nev. 2011) (request for civil penalties, disgorgement, and restitution did not convert a governmental unit's police-power action into a solely pecuniary action sufficient for removal).

Bankruptcy removal jurisdiction is absent because the City's case falls squarely within the exception for exercises of police and regulatory power. *See San Mateo*, 294 F. Supp. 3d at 939; *see also MTBE*, 488 F.3d at 133 (police power exception encompassed States' claims because "the clear goal of these proceedings is to remedy and prevent environmental damage with potentially serious consequences for public health, a significant area of state policy").

### 2.    The City's Suit Is Not "Relate[d] to" Any Bankruptcy Case.

Even if the City were not exercising its police and regulatory powers, removal still would not be appropriate under 28 U.S.C. §§ 1452(a) and 1334 because the City's claims are not "relate[d] to" any bankruptcy case. Specifically, Section 1452(a) only allows for removal of claims arising "under section 1334 of this title." In turn, Section 1334(b) vests district courts with original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." Although each Section 1334(b) subclause has been interpreted to create its own basis for jurisdiction, here Defendants assert only the "related to" subclause applies. *See* Not. of Rem. ¶ 72.

In a last-ditch effort, defendants allege jurisdiction based on the 30 year-old bankruptcy of a single Chevron subsidiary, Texaco Inc. ("Texaco"). Prior to confirmation of a Chapter 11 plan, "related to" jurisdiction broadly encompasses matters that "could conceivably have any effect on the estate being administered in bankruptcy." *Owens-III, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 625 (4th Cir. 1997). But after a plan is confirmed, "related to" jurisdiction is substantially narrower and requires the claims to have a "close nexus" to a reorganized debtor's confirmed plan that "must affect an integral aspect of the bankruptcy process. *Valley Hist. Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 836 (4th Cir. 2007) (finding suit served "no conceivable bankruptcy administration purpose" and rejecting bankruptcy removal). There is no "close nexus" where, as here, the matter at issue "could have existed entirely apart from the bankruptcy proceeding and did not necessarily depend upon resolution of a substantial question of bankruptcy law." *In re Ray*, 624 F.3d 1124, 1135 (9th Cir. 2010) (no "related to" jurisdiction over claims brought by a would-be real estate purchaser against debtor and actual purchaser following plan confirmation, even though action involved interpretation of the bankruptcy court's sale order).

There is no connection—let alone a "close nexus"—between the City's causes of action and the Texaco's Chapter 11 plan that was confirmed in 1988. *See* Not. of Rem. ¶ 74. Resolving this case in no way requires the Court to answer a bankruptcy law question or interpret, implement, consummate, execute, or administer the Texaco plan. *See Valley Hist. Ltd. P'ship*, 486 F.3d at 836–37. The district court in *San Mateo* found that "to the extent two defendants' bankruptcy plans [were] relevant, there [was] no sufficiently close nexus between the plaintiffs' lawsuits and the[] defendants' plans." 294 F. Supp. 3d at 939. That reasoning applies with added force here, where no named Defendants have undergone bankruptcy, and the only identified bankruptcy even conceivably related to this case is a 30-year old confirmed plan of a defendant's subsidiary.

Defendants nebulously argue that the Complaint involves "historical activities of . . . predecessor companies, subsidiaries, and companies that Defendants may have acquired or with which they may have merged," and therefore "there are many other Title 11 cases that *may* be related." Not. of Rem. ¶ 73 (emphasis added). Defendants do not assert, let alone establish, that any such historical activities have a "close nexus" with bankruptcy law, preventing the Court from even assessing whether there is a "relation to" a confirmed plan. Simply put, the City's causes of action "could have existed entirely apart from the bankruptcy proceeding and d[o] not necessarily depend upon resolution of a substantial question of bankruptcy law." *In re Ray*, 624 F.3d at 1135.

### 3.    Equity Demands That This Case Be Remanded to State Court.

Even if this action could be "related to" a bankruptcy proceeding—which it cannot—equity demands remand to state court. A bankruptcy-related claim removed under Section 1452 may be remanded "on any equitable ground." 28 U.S.C. § 1452(b). This standard represents "an unusually broad grant of authority" that "subsumes and reaches beyond all of the reasons for remand under nonbankruptcy removal statutes." *In re McCarthy*, 230 B.R. 414, 417 (B.A.P. 9th Cir. 1999).

Courts in the Fourth Circuit generally weigh several factors when deciding questions of remand under Section 1452:

> (1) the effect of the action on the administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the bankruptcy case; [and] (6) the existence of a right to a jury trial.

*In re Masterbuilt Cos., Inc.*, 458 B.R. 725, 729 (D. Md. 2011).

Every factor weighs in favor of remand here. As noted, the single bankruptcy plan Defendants identified was confirmed more than 30 years ago, and this action will not affect its the administration or implementation. The Complaint is based entirely on state law claims, and comity favors state court resolution of state law claims. *See, e.g.*, *Fed. Home Loan Bank of Boston v. Ally Fin., Inc.*, No. CIV.A. 11-10952-GAO, 2012 WL 769731, at *4 (D. Mass. Mar. 9, 2012). There is no open bankruptcy case with respect to any defendant, let alone a related action. The City seeks a jury trial, which is unavailable in bankruptcy court. *See, e.g.*, *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*, No. 04 CIV. 708 (GEL), 2004 WL 1048239, at *6 (S.D.N.Y. May 7, 2004) ("[T]he presence of a Seventh Amendment jury trial right in a removed action weighs heavily in favor of remand."). The interests of equity compel remand pursuant to 28 U.S.C. § 1452(b).

### H.    There Is No Admiralty Jurisdiction, and Admiralty Jurisdiction Cannot Serve as a Ground for Removal.

The Constitution bestows federal courts original—but not exclusive—jurisdiction over admiralty and maritime claims, U.S. Const. art. III, § 2, cl. 1. However, 28 U.S.C. § 1333 protects a plaintiff's right to have state law admiralty claims heard in state court, and thus 28 U.S.C. § 1441 prohibits removal on that basis. In any event, the City's claims do not arise in admiralty at all.

A tort claim comes within admiralty jurisdiction only when it satisfies both the "location" and "connection to maritime activity" tests. *Jerome B. Grubart, Inc. v. Great Lakes Dredge &*

*Dock Co.*, 513 U.S. 527, 534 (1995). Defendants have not established that the City's claims satisfy either test, and indeed, the only court to decide the issue of admiralty jurisdiction in the context of a climate change case rejected it as a basis for removal. *See Cty. of Santa Cruz v. Chevron Corp.*, et al., Case No. 3:18-cv-00450, Doc. No. 142, at 1 (N.D. Cal. July 10, 2018) (granting remand of climate change tort cases brought by California municipalities and rejecting removal on admiralty grounds for the reasons stated in *Coronel v. AK Victory*, 1 F. Supp. 3d 1175 (W.D. Wash. 2014)).

### 1. Admiralty Jurisdiction Is Not a Basis for Removal.

Even if the City's claims arose in admiralty, which they do not, state law admiralty claims brought in state court are not removable under 28 U.S.C. § 1441 absent some other jurisdictional basis, such as diversity or federal question jurisdiction. *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 371 (1959); *Cassidy v. Murray*, 34 F. Supp. 3d 579, 584 (D. Md. 2014).

Federal courts' admiralty jurisdiction "is 'exclusive' only as to those maritime proceedings in rem, that is, where a vessel or thing is itself treated as the offender and made the defendant by name or description." *Madruga v. Superior Court of State of Cal.*, 346 U.S. 556, 561 (1954). There is no plausible basis to characterize the City's case as an in rem proceeding, and federal jurisdiction therefore could not be exclusive here. For in personam cases like this one, the "saving to suitors" clause in 28 U.S.C. § 1333 "leave[s] state courts competent to adjudicate maritime causes of action." *Madruga*, 346 U.S. at 560 (quotations omitted). Here, the City exercised its congressionally protected right to file state law claims in state court, and therefore Section 1333 prohibits removal on the basis of admiralty.

The 2011 amendments to Section 1441 do not disrupt this well-established rule, which has persisted "throughout the history of federal admiralty jurisdiction—from the Judiciary Act of 1789 through *Romero* and up to the present." *Coronel*, 1 F. Supp. 3d at 1187; *see also Cassidy*, 34 F. Supp. 3d at 583 ("Permitting defendants to remove these cases without an independent

jurisdictional basis not only disrupts decades of maritime precedent but also renders the saving clause null and void."). District courts in the Fourth Circuit unanimously agree with this point. *See, e.g.*, *A.E.A. ex rel. Angelopoulos v. Volvo Penta of the Americas, LLC*, 77 F. Supp. 3d 481, 492 (E.D. Va. 2015) ("[T]he 2011 amendment to § 1441 did not impact the removability of maritime claims."); *Atl. Coast Marine Grp., Inc. v. Willis*, 210 F. Supp. 3d 807, 811 (E.D.N.C. 2016) (rejecting defendant's argument that maritime cases are removable to federal court as a matter of federal question jurisdiction). As amended, Section 1441 allows removal of civil actions in the original jurisdiction of the federal courts "[e]xcept as otherwise expressly provided by Act of Congress." *See* Pub. L. No. 112-63, 125 Stat. 758 (Dec. 7, 2011) ("Federal Courts Jurisdiction and Venue Clarification Act"). Under *Romero*, the savings clause of Section 1333 is just such an exception, because "it was unquestioned aim of the saving clause of 1789 to preserve" concurrent state court jurisdiction over admiralty matters and the "historic option of a maritime suitor pursuing a common-law remedy to select his forum." 358 U.S. 371–72.

### 2.   No Tort Has Caused Injury on Navigable Water, and No Vessel on Navigable Water Has Caused an Injury on Land.

At bottom, the City's claims are not claims do not sound in admiralty. Defendants cannot satisfy the *Grubart* "location" test, which requires either that the tort occurred on navigable water, or injury suffered on land was caused by a vessel on navigable water. 513 U.S. at 534.

The *Oakland* court's characterization of coastal land flooding as "the very instrumentality of plaintiffs' alleged injuries," *Oakland*, 2018 WL 1064293, at *5, has no relevance under the law of admiralty, which makes clear that a tort occurring on land only falls within admiralty if the "instrumentality" of that injury was a *vessel*. *See* 46 U.S.C. § 30101(a) (extension of admiralty jurisdiction for injury "caused by a vessel on navigable waters . . . consummated on land"). Despite Defendants' arguments, the production of some unspecified amount of fossil fuels by "mobile

offshore drilling units," Not. of Rem. ¶ 77, does not transform the City's state law tort claims into claims under admiralty law. Whether or not such drilling platforms are "vessels" within the meaning of Section 30101(a), there is no allegation in the Complaint, nor have Defendants contended, that those "vessels" *caused* injuries on land. As alleged, the proximate cause of the City's injuries is the defects in the products themselves and Defendants' promotion of those products with knowledge of their dangers, not from any Defendant's off-shore drilling operations.

### 3. The Claims Have No Substantial Relationship to Traditional Maritime Activity.

Defendants also fail to satisfy *Grubart*'s "connection to maritime activity" test. 513 U.S. at 534. As the Supreme Court has recognized, the "law of admiralty has evolved over many centuries, designed and molded to handle problems of *vessels*," e.g., navigational rules, seaworthiness of ships, maritime liens, and cargo damage. *Exec. Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 269–70 (1972) (emphasis added). The key inquiry is whether the allegedly tortious activity is "so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply." *Grubart*, 513 U.S. at 539–40. In other words, the traditional maritime activity must be the "proximate cause of the incident." *Id.* at 541. The potential for fossil fuel extraction to damage ports does not satisfy this test because oil and gas production is not itself a traditional maritime activity. In *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425 (1985), the Supreme Court concluded that the "exploration and development of the Continental Shelf are not themselves maritime commerce." Although *Herb's Welding* involved a fixed drilling platform, courts have extended this proposition to torts arising on "vessels"

engaged in offshore oil and gas production, focusing on whether the specific injurious activity was related to a traditional subject of admiralty law, e.g. navigation.[31]

Defendants' limited off-shore drilling activities on mobile offshore drilling units are not alleged to be the proximate cause of the City's injuries. Rather, the critical conduct at issue in the case is Defendants' marketing and promotion of fossil fuels, which has nothing to do with traditional maritime activity. Those land-based activities do "not require the special expertise of a court in admiralty as to navigation or water-based commerce." *Oman v. Johns-Manville Corp.*, 764 F.2d 224, 232 (4th Cir. 1985), *cert. denied*, 474 U.S. 970 (1985) (shipyard workers' tort claims against asbestos manufacturers not within admiralty jurisdiction) (internal citation omitted).

## V.       CONCLUSION

The City's Complaint seeks relief exclusively under state law, and none of Defendants' laundry list of federal defenses supports removal jurisdiction. For the reasons explained above, and for those to be advanced at oral argument, the City's Complaint does not present subject matter jurisdiction over these state law claims. The Court should remand this action to the Circuit Court of Maryland for Baltimore City.


Dated: September 11, 2018                                    Andre M. Davis
                                                            City Solicitor

---

[31] *See, e.g.*, *Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prod. Co.*, 448 F.3d 760, 771 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 670 (2006) (even claims involving an accident on a vessel constructing a drilling platform did not arise from "traditionally maritime activities"); *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 218 (5th Cir. 2013) (in personal injury case on mobile offshore drilling unit, "the act which gave rise to the incident in question—in this case, replacing a casing over a well—was in furtherance of the non-maritime activity of offshore oil exploration and drilling" (Clement, J., concurring)).

/s/ Victor M. Sher

Victor M. Sher (*pro hac vice*)
vic@sheredling.com
Matthew K. Edling (*pro hac vice*)
matt@sheredling.com
**Sher Edling LLP**
100 Montgomery Street, Suite 1410
San Francisco, CA 94014
Tel.: (628) 231-2500
Fax: (628) 231-2929

Suzanne Sangree
suzanne.sangree2@baltimorecity.gov
Elizabeth Ryan Martinez
liz.martinez@baltimorecity.gov
**Baltimore City Law Department**
100 N. Holliday Street, Suite 109
Baltimore, MD 21202
Tel.: (443) 388-2190
Fax: (410) 576-7203

*Attorneys for Plaintiff the Mayor and
City Council of Baltimore*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September 2018, the foregoing document was filed

through the ECF system and will be sent electronically to the registered participants identified on

the Notice of Electronic Filing.

*/s/ Victor M. Sher*